# EXHIBIT A

# LOAN AGREEMENT

by and among

## Capital Funding, LLC,
a Maryland limited liability company

(as Agent)

The lenders that are party thereto

and

22 Maple Street, LLC, a Delaware limited liability company
and
25 Oriol Drive, LLC, a Delaware limited liability company
and
59 Coolidge Road, LLC, a Delaware limited liability company
and
20 Kinmonth Road, LLC, a Delaware limited liability company

(collectively, as Borrower)

dated as of March 4, 2014

16815951v.8

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS, ACCOUNTING PRINCIPLES, UCC TERMS. ............................... 1
    1.1    Definitions. ........................................................................................................ 1
    1.2    Singular and Plural Forms. ............................................................................... 15
    1.3    UCC Definitions. ............................................................................................. 15
    1.4    Accounting Terms. ........................................................................................... 15
    1.5    Amendments, Etc. ........................................................................................... 15
    1.6    Successor Programs. ........................................................................................ 15
    1.7    Laws, Etc. ........................................................................................................ 15

ARTICLE II TERMS OF THE LOAN .................................................................................... 15
    2.1    The Loan. .......................................................................................................... 15
    2.2    Security for the Loan. ...................................................................................... 19
    2.3    Origination Fee; Transaction Costs. ............................................................... 19
    2.4    Conditions Precedent to Closing. .................................................................... 19

ARTICLE III BORROWER'S REPRESENTATIONS AND WARRANTIES ............................ 22
    3.1    Existence, Power and Qualification. ............................................................... 22
    3.2    Power and Authority. ....................................................................................... 23
    3.3    Due Execution and Enforcement. .................................................................... 23
    3.4    Single Purpose Entity. ..................................................................................... 23
    3.5    Pending Matters. .............................................................................................. 23
    3.6    Financial Statements Accurate. ....................................................................... 23
    3.7    Compliance with Facility Laws. ...................................................................... 24
    3.8    Maintain Bed Capacity. ................................................................................... 25
    3.9    Medicare and Medicaid Compliance. ............................................................. 25
    3.10   Third-Party Payors. ......................................................................................... 25
    3.11   Governmental Proceedings and Notices. ........................................................ 25
    3.12   Physical Plant Standards. ................................................................................. 26
    3.13   Pledges of Accounts. ....................................................................................... 26
    3.14   Payment of Taxes and Property Impositions. ................................................. 26
    3.15   Title to Collateral. ........................................................................................... 26
    3.16   Priority of Mortgage. ...................................................................................... 26
    3.17   Location of Chief Executive Offices. .............................................................. 26
    3.18   Disclosure. ....................................................................................................... 26
    3.19   Trade Names. ................................................................................................... 27
    3.20   ERISA. ............................................................................................................. 27
    3.21   Ownership. ....................................................................................................... 27
    3.22   Compliance With Applicable Laws. ................................................................ 27
    3.23   Solvency. ......................................................................................................... 27
    3.24   Lease Agreement. ............................................................................................ 27
    3.25   Other Indebtedness. ......................................................................................... 27
    3.26   Other Obligations. ........................................................................................... 27
    3.27   Fraudulent Conveyances. ................................................................................ 28

16815951v.8

3.28    Fixtures, Furniture and Equipment. ...................................................28
3.29    Sole Purpose. ...................................................................................28
3.30    Use of Loan Proceeds. .....................................................................28

ARTICLE IV AFFIRMATIVE COVENANTS OF BORROWER.........................28
4.1     Payment of Loan/Performance of Loan Obligations. .......................28
4.2     Maintenance of Existence...................................................................28
4.3     Maintenance of Single Purpose. ........................................................28
4.4     Accrual and Payment of Taxes. .........................................................28
4.5     Insurance. ..........................................................................................29
4.6     Financial and Other Information.........................................................35
4.7     Compliance Certificate. .....................................................................37
4.8     Books and Records. ...........................................................................37
4.9     Payment of Indebtedness....................................................................37
4.10    Conduct of Business. .........................................................................37
4.11    Periodic Surveys. ..............................................................................38
4.12    Debt Service Coverage Ratio Requirements. .....................................38
4.13    [Intentionally Deleted]........................................................................41
4.14    HUD Financing...................................................................................41
4.15    Updated Appraisals.............................................................................41
4.16    Comply with Covenants and Laws. ...................................................41
4.17    Taxes and Other Charges....................................................................42
4.18    Commitment Letter.............................................................................42
4.19    Certificate. .........................................................................................42
4.20    Notice of Fees or Penalties. ...............................................................42
4.21    Lease Agreement.................................................................................42
4.22    Control Agreements............................................................................42
4.23    Loan Closing Certification. ................................................................43
4.24    Required Repairs. ...............................................................................43
4.25    Management. ......................................................................................43

ARTICLE V NEGATIVE COVENANTS OF BORROWER.................................44
5.1     Assignment of Licenses and Permits. ................................................44
5.2     No Liens; Exceptions..........................................................................44
5.3     Merger, Consolidation, Etc.................................................................44
5.4     Maintain Single-Purpose Entity Status. .............................................45
5.5     Change of Business.............................................................................45
5.6     Changes in Accounting........................................................................46
5.7     ERISA Funding and Termination. ......................................................46
5.8     Transactions with Affiliates................................................................46
5.9     Transfer of Property or any Ownership Interests. ..............................46
5.10    Change of Use.....................................................................................46
5.11    Place of Business. ...............................................................................46
5.12    Acquisitions. .......................................................................................47
5.13    Dividends, Distributions and Redemptions. .......................................47

ARTICLE VI ENVIRONMENTAL HAZARDS .................................................47

16815951v.8

6.1      Prohibited Activities and Conditions............................................................47
6.2      Exclusions....................................................................................................47
6.3      Preventive Action.........................................................................................48
6.4      O&M Program Compliance...........................................................................48
6.5      Borrower's Environmental Representations and Warranties.........................48
6.6      Notice of Certain Events...............................................................................48
6.7      Costs of Inspection.......................................................................................49
6.8      Remedial Work.............................................................................................49
6.9      Cooperation with Governmental Authorities. ................................................49
6.10     Indemnity......................................................................................................49

ARTICLE VII PAYMENT RESERVES........................................................................52
7.1      Establishment of Payment Reserves.............................................................52
7.2      Required Repair Reserve .............................................................................52
7.3      Replacement Reserve...................................................................................52
7.4      Disbursements from the Required Repair Reserve and the Replacement
         Reserve.........................................................................................................52
7.5      HUD Fee Reserve.........................................................................................53
7.6      HUD Financing Cost Reserve.......................................................................53
7.7      Disposition of the HUD Fee and the HUD Financing Cost Reserves. ...........53
7.8      Cash Collateral Reserve...............................................................................54
7.9      Security Interest in Payment Reserves..........................................................54

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES.............................................55
8.1      Events of Default..........................................................................................55
8.2      Remedies......................................................................................................57
8.3      Costs of Collection and Enforcement............................................................58
8.4      Offsets..........................................................................................................58

ARTICLE IX EXIT FEE.............................................................................................59
9.1      Exit Fee.........................................................................................................59

ARTICLE X MISCELLANEOUS.................................................................................60
10.1     Waiver...........................................................................................................60
10.2     Costs and Expenses. ....................................................................................60
10.3     Performance of Agent and Lenders...............................................................61
10.4     Indemnification.............................................................................................61
10.5     Headings.......................................................................................................62
10.6     Survival of Covenants. ..................................................................................62
10.7     Notices, etc. .................................................................................................62
10.8     Benefits.........................................................................................................63
10.9     Supersedes Prior Agreements; Counterparts. ...............................................63
10.10    Loan Agreement Governs. ............................................................................64
10.11    CONTROLLING LAW.....................................................................................64
10.12    WAIVER OF JURY TRIAL..............................................................................64
10.13    Management Agreement................................................................................65
10.14    Patriot Act Compliance. ................................................................................65

10.15   Syndication. ........................................................................... 66
10.16   Construction. .......................................................................... 67
10.17   No Partnership. ....................................................................... 67
10.18   Post-Closing Obligations. ......................................................... 67

ARTICLE XI   AGENT ............................................................................ 67
11.1   Appointment and Authorization. ................................................. 67
11.2   Agent and Affiliates. ................................................................ 68
11.3   Action by Agent. ..................................................................... 68
11.4   Consultation with Experts. ....................................................... 68
11.5   Liability of Agent. .................................................................... 68
11.6   Indemnification. ....................................................................... 69
11.7   Right to Request and Act on Instructions. .................................. 69
11.8   Credit Decision. ....................................................................... 69
11.9   Collateral Matters. ................................................................... 69
11.10   Agency for Perfection. ............................................................ 70
11.11   Notice of Default. ................................................................... 70
11.12   Assignment by Agent; Resignation of Agent; Successor Agent. ......... 70
11.13   Payment and Sharing of Payment. ............................................. 71
11.14   Right to Perform, Preserve and Protect. .................................... 72
11.15   Additional Titled Agents. ......................................................... 72
11.16   Amendments and Waivers. ....................................................... 73
11.17   Assignments and Participations. ................................................ 74
11.18   Right to Purchase and Buy-Out Upon Refinancing. ...................... 77
Closing on the sale of a Lender's interest in the Loan to any other Lender under
    this Section will be held at purchasing Lender's principal office (or the
    majority in interest if multiple lenders) or at the office of its attorney and
    will take place on a mutually agreeable date within 20 Business Days from
    the date of receipt by the selling Lender of the applicable purchase notice
    (the "Deadlock/Discretionary Purchase Date"). ................................. 77
11.19   Lender's Rights to Offset, Set-Off. ........................................... 78
11.20   Definitions. ............................................................................ 78

# LIST OF EXHIBITS

Exhibit A                 Legal Description
Exhibit B                 Compliance Certificate
Exhibit C                 Loan Commitment
Exhibit D                [Intentionally Deleted]
Exhibit E                 Repairs and Replacements
Exhibit F                 Liens
Exhibit G                Payment Reserves
Exhibit H                Exit Fee
Exhibit I                  Post-Closing Obligations

# LIST OF SCHEDULES

Schedule 3.21         Pre-Transfer and Post-Transfer Organizational Chart of Borrower

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement") is made as of March 4, 2014, by and among 22 MAPLE STREET, LLC, a Delaware limited liability company having its principal office at 260 Chambers Bridge Road, Suite 2A, Brick, New Jersey 08723 (together with its successors and assigns, the "Amesbury Borrower"), 25 ORIOL DRIVE, LLC, a Delaware limited liability company having its principal office at 260 Chambers Bridge Road, Suite 2A, Brick, New Jersey 08723 (together with its successors and assigns, the "Autumn Borrower"), 59 COOLIDGE ROAD, LLC, a Delaware limited liability company (together with its successors and assigns, the "Emerson Village Borrower"), 20 KINMONTH ROAD, LLC, a Delaware limited liability company having its principal office at 260 Chambers Bridge Road, Suite 2A, Brick, New Jersey 08723 (together with its successors and assigns, the "Waban Health Center Borrower"; and the Amesbury Borrower, Autumn Borrower, Emerson Village Borrower and Waban Health Center Borrower each individually and collectively, the "Borrower"), and CAPITAL FUNDING, LLC, a Maryland limited liability company, individually as a Lender, and as Agent, CONGRESSIONAL BANK, a Maryland chartered bank, MVB BANK, INC., a West Virginia banking corporation and AP MA FUNDING LLC, a Delaware limited liability company, each as additional Lenders, and the financial institutions or other entities from time to time parties hereto, each as a Lender.

Borrower has requested that the Lenders make a loan to Borrower in the aggregate principal sum of Thirty-Six Million Eight Hundred Fifty-Six Thousand Six Hundred Twenty-Seven and No/100 Dollars ($36,856,627.00) (the "Loan") for the purpose of acquiring the Property (hereinafter defined).

Lenders are willing to make the Loan on the terms and conditions set forth in this Agreement and the other Loan Documents.

NOW, THEREFORE, Borrower and Lenders hereby agree as follows:

## ARTICLE I
## DEFINITIONS, ACCOUNTING PRINCIPLES, UCC TERMS.

1.1     Definitions.  As used in this Agreement, the following terms shall have the following meanings unless the context hereof shall otherwise indicate:

"Accounts" with respect to a Facility, means any rights of Borrower arising from the operation of the Facility to payment for goods sold or leased or for services rendered, not evidenced by an Instrument, including, without limitation: (a) all accounts arising from the Lease and/or operation of the Facility; (b) all moneys and accounts held by Agent on behalf of the Lenders pursuant to this Agreement; and (c) all rights to payment from Medicare or Medicaid programs, or similar state or federal programs, boards bureaus or agencies and rights to payment from patients, residents, private insurers, and others arising from the operation of the Facility, including rights to payment pursuant to Reimbursement Contracts.  Accounts shall include the proceeds thereof (whether cash or non-cash, moveable or immoveable, tangible or intangible) received from the sale, exchange, transfer, collection or other disposition or substitution thereof.

"Affiliate" means, with respect to any Person: (a) each Person that controls, is controlled by or is under common control with such Person; (b) each Person that, directly or indirectly, owns or controls, whether beneficially or as a trustee, guardian or other fiduciary, any of the Stock of such Person; and (c) each of such Person's officers, directors, members, joint venturers and partners.

"Agent" mean Capital Funding, LLC, a Maryland limited liability company, in its capacity as administrative agent for itself and for the Lenders hereunder, as such capacity is established in, and subject to the provisions of ARTICLE XI, and the successors and assigns of Capital Lending and Mortgage Group, LLC in such capacity.

"Agreement" is defined in this preface to this Agreement.

"Amesbury Borrower" is defined in the preface to this Agreement.

"Amesbury Facility" means the 130 bed skilled nursing facility known as Amesbury Village located on the Amesbury Property, as it may now or hereafter exist, together with any other general or specialized care facilities, if any, including any Alzheimer's care unit, subacute, and any assisted care living facility, now or hereafter operated on the Amesbury Property.

"Amesbury Facility License" means the license(s) issues to the Amesbury Operator to operate the Amesbury Facility.

"Amesbury Lease Agreement" means that certain Lease made as of the date hereof by and between the Amesbury Borrower, as Landlord and the Amesbury Operator, as Tenant, with respect to the Amesbury Facility, as the same may be amended, restated, replaced, subleased or modified from time to time.

"Amesbury Operator" means Merrimack Valley Health Center, LLC, a Delaware limited liability company, its successors and assigns.

"Amesbury Property" means the real estate located at 22 Maple Street, Amesbury, Massachusetts 01913, which is more particularly described in Exhibit A-1 hereto, upon which the Amesbury Facility is located, and which, concurrent with the Closing Date, will be owned by Amesbury Borrower and leased to the Amesbury Operator pursuant to the Amesbury Lease Agreement.

"AR Intercreditor Agreement" means that certain Intercreditor Agreement to be entered into by and between Capital Finance, LLC, as working capital lender and Lender as mortgage lender, which agreement permits an Operator loan from working capital lender to Operator in an amount not to exceed $7,500,000 until six (6) months following the closing date of such loan, at which time such loan shall be reduced to $6,000,000 and nine (9) months following such closing date, such loan shall be reduced to $4,000,000, and which agreement shall be similar to the standard HUD form intercreditor agreement.

"Assignment of Rents and Leases" means (a) with respect to the Amesbury Property, that certain Assignment of Rents and Leases executed by the Amesbury Borrower and

2

Lender of even date herewith, as the same may be amended, restated, replaced, subleased or modified from time to time, (b) with respect to the Autumn Property, that certain Assignment of Rents and Leases executed by the Autumn Borrower and Lender of even date herewith, as the same may be amended, restated, replaced, subleased or modified from time to time, (c) with respect to the Emerson Village Property, that certain Assignment of Rents and Leases executed by the Emerson Village Borrower and Lender of even date herewith, as the same may be amended, restated, replaced, subleased or modified from time to time, and (d) with respect to the Waban Health Center Property, that certain Assignment of Rents and Leases executed by the Waban Health Center Borrower and Lender of even date herewith, as the same may be amended, restated, replaced, subleased or modified from time to time.

"Autumn Borrower" is defined in the preface to this Agreement.

"Autumn Facility" means the 160 bed skilled nursing facility known as Autumn Village located on the Autumn Property, as it may now or hereafter exist, together with any other general or specialized care facilities, if any, including any Alzheimer's care unit, subacute, and any assisted care living facility, now or hereafter operated on the Autumn Property.

"Autumn Facility License" means the license(s) issues to the Autumn Operator to operate the Autumn Facility.

"Autumn Lease Agreement" means that certain Lease made as of the date hereof by and between the Autumn Borrower, as Landlord and the Autumn Operator, as Tenant, with respect to the Autumn Facility, as the same may be amended, restated, replaced, subleased or modified from time to time.

"Autumn Operator" means Worcester Health Center, LLC, a Delaware limited liability company, its successors and assigns.

"Autumn Property" means the real estate located at 25 Oriol Drive, Worcester, Massachusetts 01605, which is more particularly described in Exhibit A-2 hereto, upon which the Autumn Facility is located, and which, concurrent with the Closing Date, will be owned by Autumn Borrower leased to the Autumn Operator pursuant to the Autumn Lease Agreement.

"Borrower" is defined in the preface to this Agreement.  Each reference to Borrower shall refer collectively and individually to each such entity constituting Borrower.

"Borrower's knowledge" means (i) the actual knowledge of Borrower, or (ii) the knowledge a Borrower would have had if a Borrower had made due inquiry regarding the fact or other matter in question as a prudent business person would be expected to make in the management of the Borrower's business affairs.

"Business Day" means any day on which banks, savings and loan associations, savings banks, or other financial institutions are generally open for regular banking business in the State of Maryland.

"Cash Collateral Deposit" is defined in Section 7.8(a).

3

"Cash Collateral Reserve" is defined in Section 7.8(a).

"Certificate of Need" means with respect to each Facility, the Certificate of Need, if any, now or hereafter required and issued by any Governmental Authority for the Facility.

"Closing Date" means the date on which all or any part of the Loan is disbursed by the Lenders to or for the benefit of Borrower, including to any loan escrow funding agent.

"Collateral" means, collectively, all of Borrower's and Guarantor's right, title and interest in and to the Property, Improvements, Equipment, Rents, Accounts, General Intangibles, Instruments, Inventory, Money, Deposit Accounts, Permits (to the full extent assignable), Reimbursement Contracts, Imposition Deposits, Payment Reserves, and all Proceeds, all whether now owned or hereafter acquired, and including replacements, additions, accessions, substitutions, and products thereof and thereto, all other assets of the Borrower, wherever located, whether now owned or existing or hereafter acquired or arising, together with all proceeds thereof, and all other property of Borrower, Operator or Person which is or hereafter may become subject to a Lien in favor of Agent on behalf of the Lenders as security for any of the Loan Obligations.

"Control Agreement" is defined in Section 4.22.

"Debt" means the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums owing to Lenders in respect of the Loan under the Note, this Agreement, the Security Instrument or any other Loan Document.

"Debt Service" is defined in Section 4.12.

"Debt Service Coverage Ratio" is defined in Section 4.12.

"Default" means the occurrence or existence of any event which, but for the giving of notice or expiration of time or both, would constitute an Event of Default.

"Default Rate" means a per annum rate of interest equal to the lesser of (a) seven hundred and fifty (750) basis points (i.e., 7.50 percentage points) in excess of Effective LIBOR Rate, or (ii) the maximum rate of interest which may be collected from Borrower under applicable law.

"Deposit Account" means, individually and collectively, as applicable, each of the Borrower Deposit Accounts and the Operator Deposit Accounts as such terms are defined in Section 4.22.

"Deposit Account Control Agreement" means, individually and collectively, as applicable, each of the Borrower Operating Account Control Agreement, and Operator Account Control Agreements as such terms are defined in Section 4.22.

"Disbursement Date" is the first date on which a Lender disburses any proceeds of the Loan to or for the account of Borrower or to any loan escrow or funding agent.

4

"EBITDAR" is defined in Section 4.12.

"Effective LIBOR Rate" means the per annum rate equal to the LIBOR Rate plus the Margin. Notwithstanding the foregoing, the Effective LIBOR Rate shall in no event be less than six and 40/100 percent (6.40%) per annum. Agent's determination of the Effective LIBOR Rate as of each Determination Date shall be conclusive and binding, absent manifest error.

"Emerson Village Borrower" is defined in the preface to this Agreement.

"Emerson Village Facility" means the 163 bed skilled nursing facility known as Emerson Village, located on the Emerson Village Property, as it may now or hereafter exist, together with any other general or specialized care facilities, if any, including any Alzheimer's care unit, subacute, and any assisted care living facility, now or hereafter operated on the Emerson Village Property.

"Emerson Village Facility License" means the license(s) issues to the Emerson Village Operator to operate the Emerson Village Facility.

"Emerson Village Lease Agreement" means that certain Lease made as of the date hereof by and between the Emerson Village Borrower, as Landlord and the Emerson Village Operator, as Tenant, with respect to the Emerson Village Facility, as the same may be amended, restated, replaced, subleased or modified from time to time.

"Emerson Village Operator" means Watertown Health Center, LLC, a Delaware limited liability company, its successors and assigns.

"Emerson Village Property" means the real estate located at 59 Coolidge Hill Road, Watertown, Massachusetts 02472, which is more particularly described in Exhibit A-3 hereto, upon which the Emerson Village Facility is located, and which, concurrent with the Closing Date, will be owned by Emerson Village Borrower leased to the Emerson Village Operator pursuant to the Emerson Village Lease Agreement.

"Environmental Indemnity Agreement" means that certain Environmental Indemnity Agreement dated as of the date hereof by and among Borrower, Operator and Agent.

"Environmental Permit" means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Property and/or the Improvements.

"Equipment" means, with respect to each Property and Facility, all beds, linen, televisions, carpeting, telephones, cash registers, computers, lamps, glassware, rehabilitation equipment, restaurant and kitchen equipment, and other fixtures and equipment of Borrower located on, attached to or used or useful in connection with any of the Property or the Facility and all renewals and replacements thereof and substitutions therefore; provided, however, that with respect to any items which are leased for the benefit of the Facility and not owned by Borrower, the Equipment shall include the leasehold interest only of Borrower together with any options to purchase any of said items and any additional or greater rights with respect to such items which

5

Borrower may hereafter acquire, but the foregoing shall not be construed to mean that such leasing shall be permitted hereunder and under the other Loan Documents.

"Event of Default" means any "Event of Default" as defined in Article VII hereof.

"Exhibit" means an Exhibit to this Agreement, unless the context refers to another document, and each such Exhibit shall be deemed a part of this Agreement to the same extent as if it were set forth in its entirety wherever reference is made thereto.

"Exit Fee" is defined in Section 9.1(a).

"Extension Notice" is defined in Section 2.1(b).

"Extension Option" is defined in Section 2.1(b)(i).

"Facility" or "Facilities" means the Amesbury Facility, the Autumn Facility, the Emerson Village Facility, and the Waban Health Center Facility, individually and collectively.

"Facility License" or "Facility Licenses" means the Amesbury Facility License, the Autumn Facility License, the Emerson Village Facility License, and the Waban Health Center Facility License, individually and collectively.

"Facility Operating Expenses" is defined in Section 4.12.

"Financial Covenants" is defined in Section 4.12.

"GAAP" means, as in effect from time to time, generally accepted accounting principles consistently applied as promulgated by the American Institute of Certified Public Accountants.

"General Intangibles" means, with respect to each Property and Facility all intangible personal property of Borrower arising out of or connected with the Property or the Facility and all renewals and replacements thereof and substitutions therefore (other than Accounts, Rents, Instruments, Inventory, Money, Permits, and Reimbursement Contracts), including, without limitation, choses in action, contract rights and other rights to payment of money.

"Governmental Authority" means any board, commission, carrier, intermediary, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Borrower, Operator, Manager, Facility, the Property and/or the Improvements or the use, operation or improvement of the Property.

"Gross Income from Operations" is defined in Section 4.12.

"Guarantor" means individually and collectively, Avi "Zisha" Lipschutz, Dov Newmark and Larry Lipschutz.

6

"Guaranty Agreement" means that certain Guaranty of Payment and Performance of even date herewith from Guarantor to Lender.

"Hazardous Materials" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground storage tanks, whether empty or containing any substance; any substance the presence of which on the Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law or regulated under any Hazardous Materials Law.

"Hazardous Materials Laws" means all federal, state, and local laws (including common law), ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments, that relate to the protection or pollution of the environment or human health and safety or to Hazardous Materials. Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., the Toxic Substance Control Act, 15 U.S.C. Section 2601, et seq., the Clean Water Act, 33 U.S.C. Section 1251, et seq., and the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, and their state analogs.

"HUD" means the United States Department of Housing and Urban Development or any agency thereof.

"HUD CONTRACT" means that certain contract regarding HUD Financing between Agent and Borrower dated March 3, 2014.

"HUD Expenses" is defined in Section 7.7.

"HUD Fee Reserve" is defined in Section 5.

"HUD Financing" means, with respect to the Property, financing granted through a program insured by HUD which financing is secured by a first mortgage lien on the Property in favor of the HUD Lender and consistent with any commitment letter or as otherwise provided in this Agreement.

"HUD Financing Cost Reserve" is defined in Section 7.6.

"HUD Lender" means Capital Funding, LLC, a Maryland limited liability company, or any Affiliate of Agent.

"Impositions" and "Imposition Deposits" mean the Impositions and Imposition Deposits defined in the Security Instrument.

7

"Improvements" means, with respect to a Property, all buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Property, including, but not limited to, all gas and electric fixtures, radiators, heaters, engines and machinery, boilers, ranges, elevators and motors, plumbing and heating fixtures, carpeting and other floor coverings, water heaters, awnings and storm sashes, and cleaning apparatus which are or shall be attached to the Property or said buildings, structures or improvements.

"Indebtedness" means any (a) obligations for borrowed money, (b) obligations, payment for which is being deferred by more than thirty (30) days, representing the deferred purchase price of property other than accounts payable arising in connection with the purchase of inventory customary in the trade and in the ordinary course of the business of Borrower or Operator, (c) obligations, whether or not assumed, secured by Liens or payable out of the proceeds or production from the Accounts and/or real or personal property now or hereafter owned or acquired by Borrower or Operator, and (d) the amount of any other obligation of Borrower or Operator (including obligations under financing leases) which would be shown as a liability on a balance sheet prepared in accordance with GAAP.

"Instruments" means, with respect to the Property and Facility, all instruments, chattel paper, documents or other writings obtained from or in connection with the operation of the Property or the construction and operation of the Facility (including, without limitation, all ledger sheets, computer records and printouts, data bases, programs, books of account, trademarks or trade names, utility contracts, maintenance and service contracts, and files relating thereto).

"Inventory" means, with respect to the Property and Facility, all inventories of food, beverages and other comestibles held by Borrower, if any, for sale or use at or from the Property or the Facility, and soap, paper supplies, medical supplies, drugs and all other such goods, wares and merchandise held by Borrower for sale to or for consumption by guests, patients or residents of the Property or the Facility and all such other goods returned to or repossessed by Borrower.

"Late Charge" is defined in Section 2.1(e)(vii).

"Lease Agreement" means, individually and collectively, the Amesbury Lease Agreement, the Autumn Lease Agreement, the Emerson Village Lease Agreement and the Waban Health Center Lease Agreement, as the same may be amended, restated, replaced, subleased or modified from time to time.

"Leases" means the Amesbury Lease Agreement, the Autumn Lease Agreement, the Emerson Village Lease Agreement and the Waban Health Center Lease Agreement, together with any other oral or written leases, subleases, licenses, concessions, residency agreements, occupancy agreement and other agreements for the use or occupancy made or agreed to by, any person or entity and any and all amendments, extensions, renewals, modifications and replacements thereof pertaining to all or any part of the Property, or any possessory interest therein, whether such leases or other agreements have been heretofore or are hereafter made or agreed to.

16815951v.8

"Lenders" means each of (a) Capital Funding, LLC, in its capacity as a lender hereunder, (b) Congressional Bank, a Maryland chartered bank, (c) AP MA Funding LLC, a Delaware limited liability company, (d) MVB Bank, Inc., a West Virginia banking corporation, (e) each other Person that becomes a party hereto as Lender as provided for herein, and (f) the respective successors of all of the foregoing, and "Lenders" means all of the foregoing is defined in the preface to this Agreement.

"Lien" means any voluntary or involuntary mortgage, security deed, deed of trust, lien, pledge, assignment, security interest, title retention agreement, financing lease, levy, execution, seizure, judgment, attachment, garnishment, charge, lien or other encumbrance of any kind, including those contemplated by or permitted in this Agreement and the other Loan Documents.

"LIBOR Business Day" means any day other than a Saturday, Sunday or any other day on which commercial banks in London, England are open for business.

"LIBOR Rate" means for each month (or any portion thereof), a rate of interest determined by Agent, (expressed as a percentage per annum and rounded upward, if necessary, to the next nearest 1/8 of 1%) equal to the rate of interest that under current practice is listed as the one month rate announced by Bloomberg L.P. as the London Interbank Offered Rate or equivalent as of the last LIBOR Business Day of the immediately preceding month (or in the event that Bloomberg L.P. or its successor shall cease to quote such rate, such rate will be equal to the London Interbank Offered Rate as of the last LIBOR Business Day of the immediately preceding month under the heading "Money Rates" in the Eastern Edition of The Wall Street Journal and should such practice change, such other indication of the prevailing LIBOR rate or its equivalent as may reasonably be determined by Agent) (the "Determination Date").

"Loan" is defined in the preface of this Agreement and is evidenced by this Agreement, the Note and other Loan Documents.

"Loan Commitment" means the sum of each Lender's Loan Commitment Amount as set forth in Exhibit C to this Agreement.

"Loan Commitment Percentage" means, as to any Lender, (a) on the Closing Date, the percentage set forth opposite such Lender's name on Exhibit C to this Agreement under the column "Loan Commitment Percentage", and (b) on any date following the Closing Date, the percentage equal to the principal amount of the Loan held by such Lender on such date *divided by* the aggregate principal amount of the Loan on such date.

"Loan Documents" means, collectively, this Agreement, the Assignment of Rents and Leases, the Note, the Security Instrument, the SDA, the Guaranty Agreement, the Environmental Indemnity Agreement and the Management Subordination Agreement, together with any and all other documents executed by Borrower or others evidencing, securing or otherwise relating to the Loan.

"Loan Obligations" means the aggregate of all principal and interest owing from time to time under the Note and the other Loan Documents and all expenses, charges and other amounts from time to time owing under the Note, this Agreement, or the other Loan Documents

16815951v.8

and all covenants, agreements and other obligations from time to time owing to, or for the benefit of, Agent and Lenders pursuant to the Loan Documents.

"Loan Party" means the Borrower, Guarantor and Operator.

"Management Agreement" means, with respect to any Facility, the management agreement or administrative services agreement entered into by and between Operator and the Manager, pursuant to which the Manager is to provide management, administrative and other services with respect to such Facility.

"Management Subordination Agreement" means that certain Subordination and Collateral Assignment of Management Agreement dated as of the date hereof among Agent, Operator and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Manager" means any other entity engaged by Borrower or Operator to manage the Property as permitted hereunder.

"Margin" means four hundred fifty (440) basis points (i.e. 4.40 percentage points).

"Maturity Date" means February 29, 2016, or such other date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise, subject to the Extension Options.

"Medicaid" means that certain program of medical assistance, funded jointly by the federal government and the states of the United States of America, for impoverished individuals who are aged, blind and/or disabled, and/or members of families with dependent children, which program is more fully described in Title XIX of the Social Security Act (42 U.S.C. §§ 1396 *et seq.*) and the regulations promulgated thereunder.

"Medicare" means that certain federal program providing health insurance for eligible elderly and other individuals, under which physicians, hospitals, skilled nursing homes, home health care and other providers are reimbursed for certain covered services they provide to the beneficiaries of such program, which program is more fully described in Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 *et seq.*) and the regulations promulgated thereunder.

"Minimum Debt Service Coverage Ratio" is defined in Section 4.12.

"Minimum EBITDAR" is defined in Section 4.12.

"Money" means all monies, cash, rights to deposit or savings accounts or other items of legal tender obtained from or for use in connection with the operation of the Property.

"Mortgaged Property" means the Amesbury Property, the Autumn Property, the Emerson Village Property, the Waban Health Center Property, and the Improvements thereon and all real or personal property owned by the Borrower and encumbered by a Security Instrument, together with all tangible or intangible rights pertaining to the Property and

10

Improvements, as more particularly defined in the Security Instrument as the "Mortgaged Property".

"Net Operating Income" is defined in Section 4.12.

"Note" means one or more promissory notes (including all schedules, riders, alonges, endorsements, addenda or amendments together with any renewals, replacements, substitutions or extensions thereof) executed by Borrowers of even date herewith in an original principal amount (or, if more than one Note is issued to a Lender, in an aggregate original principal amount) equal to such Lender's Pro Rata Share of the Loan Commitment.

"O&M Program" means a written program of operations and maintenance approved by Agent relating to any Hazardous Materials in, on or under the Property.

"Operator" means the Amesbury Operator, the Autumn Operator, the Emerson Village Operator and the Waban Health Center Operator, individually and collectively.

"Payoff Fee" is defined in Section 2.1(c).

"Principals" means any Person owning twenty-five percent (25%) or more of direct or indirect ownership interests in the Borrower.

"Patriot Act" is defined in Section 10.14.

"Payment Reserves" means the Required Repair Reserve, the Replacement Reserve, the HUD Fee Reserve, the HUD Financing Cost Reserve, the Cash Collateral Reserve, the Imposition Deposits, and any other escrow or reserve fund established pursuant to the Loan Documents.

"Permits" means all licenses, permits and certificates used or necessary in connection with the ownership, operation, use or occupancy of the Property and/or the Facility thereon, including, without limitation, Facility Licenses, business licenses, state health department licenses, food service licenses, licenses to conduct business, Certificates of Need (if required) and all such other permits, licenses and rights, obtained from any governmental, quasi-governmental or private person or entity whatsoever concerning ownership, operation, use or occupancy.

"Permitted Encumbrances" is defined in Section 5.2 hereof.

"Person" means any natural person, firm, trust, corporation, partnership, limited liability company, trust and any other form of legal entity.

"Physical Plant Standards" means a "Physical Plant Standard" as defined in Section 3.12.

"Proceeds" means all awards, payments, earnings, royalties, issues, profits, liquidated claims, and proceeds (including proceeds of insurance and condemnation or any conveyance in lieu thereof) from the sale, conversion (whether voluntary or involuntary),

16815951v.8

exchange, transfer, collection, loss, damage, condemnation, disposition, substitution or replacement of any of the Collateral.

"Property" "Property" or "Properties" means the Amesbury Property, the Autumn Property, the Emerson Village Property and the Waban Health Center Property, individually and collectively.

"Pro Rata Share" means (a) with respect to a Lender's right to receive payments of principal and interest with respect to the Loan, the Loan Commitment Percentage of such Lender, and (b) for all other purposes (including, without limitation, the indemnification obligations set forth in this Agreement) with respect to any Lender, the percentage obtained by *dividing* (i) such Lender's then outstanding principal amount of the Loan, *by* (ii) the then outstanding principal amount of the Loan of all Lenders.

"Reimbursement Contracts" means, with respect to the Facility, all contracts and rights pursuant to reimbursement or Third-Party Payor Programs and contracts for the Facility which are now or hereafter in effect with respect to residents qualifying for coverage under the same, including, but not limited to, Medicare, Medicaid, any successor program or other similar reimbursement program (whether operated by a Governmental Authority or quasi-governmental agency or by a private Person) and private insurance agreements.

"Rents" means all rent and other payments of whatever nature from time to time payable pursuant to the Leases (including, without limitation, rights to payment earned under leases for space in the Improvements for the operation of ongoing retail businesses such as newsstands, concession stands, barbershops, beauty shops, gift shops, cafeterias, dining rooms, restaurants, lounges, vending machines, physicians' offices, pharmacies, laboratories, gymnasiums, swimming pools, tennis courts, golf courses, recreational centers and specialty shops), deposits (whether for security or otherwise but excluding any resident trust accounts), issues, profits, revenues, royalties, rights, benefits, and income of every nature of and from the Property and the operations conducted or to be conducted thereon.

"Replacement Reserve" is defined in Section 7.3.

"Replacement Reserve Monthly Deposit" is defined in Section 7.3.

"Required Lenders" means, subject to the provisions of Article ARTICLE XI, at any time Lenders holding sixty-six and two thirds percent (66 2/3%) or more of the outstanding principal balance of the Loan.

"Required Repairs" is defined in Section 7.2.

"Required Repair Reserve" is defined in Section 7.2.

"Restricted Person" means a Person that is a Borrower.

"Security Instrument" means with respect to each Property that certain Deed of Trust and Security Agreement of even date herewith from Borrower in favor of and for the

benefit of Agent and Lenders and covering the Mortgaged Property described herein as the same may be amended, restated, replaced, subleased or modified from time to time.

"Single Purpose Entity" means a Person which owns no interest or property other than the Property and the Improvements.

"SDA" means that certain Subordination and Attornment Agreement of even date herewith by and among Borrower, Operator and Agent.

"Stock" means all shares, options, warrants, general or limited partnership interests, membership interests, participations or other equivalents (regardless of how designated) in a corporation, limited liability company, partnership or any equivalent entity, whether voting or nonvoting, including, without limitation, common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended).

"Permitted Subordinated Debt" means the loan by the members of Borrower to Borrower to finance Borrower's equity obligations under the Loan at closing pursuant to the terms of the Subordinated Debt Documents.

"Subordinated Debt Documents" means the promissory note securing the Permitted Subordinated Debt, governed by a Subordination Agreement, which note must be in form and substance acceptable to the Agent in its sole discretion.

"Subordination Agreement" means the agreement between Agent and another creditor of Borrowers, as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, pursuant to which the Permitted Subordinated Debt owing from Borrower to such creditor are subordinated in any way to the Obligations and the Liens created under the Security Documents, the terms and provisions of such Subordination Agreement to have been agreed to by and be acceptable to Agent in its sole discretion.

"Taxes" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Land or the Improvements.

"Term" means the date hereof through the Maturity Date, as the same may be extended, or earlier termination of the Loan.

"Third-Party Payor Programs" is defined in Section 3.10.

"Transfer" means the conveyance, assignment, sale, transfer, mortgaging, collateral assignment, encumbrance, pledging, alienation, hypothecation, granting of a security interest in, granting of options with respect to, or other disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for

13

consideration or of record) all or any portion of any legal or beneficial interest (i) in all or any portion of the Mortgaged Property or any other real or personal property of the Borrower; (ii) in the Stock of any corporation which is a Restricted Person, a member of a Restricted Person (if the Restricted Person is a limited liability company), a partner of a Restricted Person or, if applicable, a partner of a general partner of a Restricted Person; or (iii) in a Restricted Person (or any trust of which the Restricted Person is a trustee), or, (iv) if a Restricted Person is a limited or general partnership, limited liability company, joint venture, trust, nominee trust, tenancy in common or other unincorporated form of business association or form of ownership interest, in any Person having a direct or indirect legal or beneficial ownership in the Restricted Person, including any legal or beneficial interest in any constituent limited partner or member of the Restricted Person whether directly or through multiple tiers of ownership. The term "Transfer" shall also include, without limitation, the following: an installment sales agreement wherein a Restricted Person agrees to sell the Mortgaged Property or any other real or personal property of Borrower, or any part thereof or any interest therein, for a price to be paid in installments; an agreement by a Restricted Person leasing all or a substantial part of the Mortgaged Property or any other real or personal property of Borrower to one or more Persons pursuant to a single transaction or related transactions, or a sale, assignment or other transfer of, or the grant of a security interest in, a Restricted Person's right, title and interest in and to any Leases or any Rent; any instrument subjecting the Mortgaged Property to a condominium regime or transferring ownership to a cooperative corporation or other form of multiple ownership or governance; the dissolution or termination of a Restricted Person, any general partner of a Restricted Person, any general partner of any general partner of a Restricted Person, if applicable, or, if the Restricted Person is a limited liability company, any corporate member of a Restricted Person; the issuance of new Stock in any corporation which is a Restricted Person, a member of a Restricted Person (if the Restricted Person is a limited liability company), a partner of a Restricted Person or, if applicable, a partner of a general partner of a Restricted Person; or the merger or consolidation with any other Person of a Restricted Person, any general partner of a Restricted Person, any general partner of any general partner of a Restricted Person, if applicable, or, if a Restricted Person is a limited liability company, any corporate or member of a limited liability company that is a Restricted Person.

"Waban Health Center Borrower" is defined in the preface to this Agreement.

"Waban Health Center Facility" means the 88 bed skilled nursing facility known as Waban Health Center located on the Waban Health Center Property, as it may now or hereafter exist, together with any other general or specialized care facilities, if any, including any Alzheimer's care unit, subacute, and any assisted care living facility, now or hereafter operated on the Waban Health Center Property.

"Waban Health Center Facility License" means the license(s) issues to the Waban Health Center Operator to operate the Waban Health Center Facility.

"Waban Health Center Lease Agreement" means that certain Lease made as of the date hereof by and between the Waban Health Center Borrower, as Landlord and the Waban Health Center Operator, as Tenant, with respect to the Waban Health Center Facility, as the same may be amended, restated, replaced, subleased or modified from time to time.

14

16815951v.8

"Waban Health Center Operator" means Waban Health Center, LLC, a Delaware limited liability company, its successors and assigns.

"Waban Health Center Property" means the real estate located at 20 Kinmonth Road, Newton, Massachusetts 02468, which is more particularly described in Exhibit A-4 hereto, upon which the Waban Health Center Facility is located, and which, concurrent with the Closing Date, will be owned by Waban Health Center Borrower leased to the Waban Health Center Operator pursuant to the Waban Health Center Lease Agreement.

1.2    Singular and Plural Forms.  Singular terms shall include the plural forms and vice versa, as applicable, of the terms defined.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.  For example, all references to a defined term that includes more than one Person (for example Borrower or Operator) shall mean, refer to and include each of the Persons included within the defined term.  All references to a defined term that includes more than one written instrument, document, agreement or thing means and includes each document, agreement or thing encompassed within the defined term.

1.3    UCC Definitions.  Terms contained in this Agreement shall, unless otherwise defined herein or unless the context otherwise indicates, have the meanings, if any, assigned to them by the Uniform Commercial Code in effect in the State of Massachusetts.

1.4    Accounting Terms.  All accounting terms used in this Agreement shall be construed in accordance with GAAP, except as otherwise specified.

1.5    Amendments, Etc.  All references to other documents or instruments shall be deemed to refer to such documents or instruments as they may hereafter be extended, renewed, modified, or amended and all replacements and substitutions therefore.

1.6    Successor Programs.  All references herein to "Medicaid" and "Medicare" shall be deemed to include any successor program thereto.

1.7    Laws, Etc.  Any reference to a code, act, statute or regulation means that law, code, act, statute or regulation as amended or supplemented from time to time and any corresponding provisions of successor laws, codes, acts, statutes or regulations and any reference to any law, code, act or statute shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

ARTICLE II
TERMS OF THE LOAN

2.1    The Loan.  Borrower has agreed to borrow the Loan from Lenders, and Lenders have agreed to make the Loan to Borrower, subject to Borrower's compliance with and observance of the terms, conditions, covenants, and provisions of this Agreement and the other Loan Documents, and Borrower has made the covenants, representations, and warranties herein and therein as a material inducement to Lenders to make the Loan.

(a)    Loan.  On the Closing Date, Lenders shall make a Loan to Borrower in the

15

amount of Thirty-Six Million Eight Hundred Fifty-Six Thousand Six Hundred Twenty-Seven and No/100 Dollars ($36,856,627.00). The proceeds of the Loan shall be used to acquire the Property, to fund the Payment Reserves and to pay closing costs and fees.

(b)     Extension Options. Borrower may extend the Maturity Date two (2) consecutive times for a period of six (6) months each (each, an "Extension Option") upon Borrower's satisfaction of the following conditions:

(i)     Borrower shall have delivered to Agent written notice of such election (an "Extension Notice") no earlier than ninety (90) days and no later than forty-five (45) days prior to the Maturity Date or the expiration of the first Extension Option, as the case may be;

(ii)     no Default or Event of Default shall have occurred and is continuing; and

(iii)     Agent shall have received Borrower's current financial statements, certified as correct by Borrower.

(c)     Payoff Fee. Simultaneously with the repayment of the Loan by Borrower, Borrower shall in addition pay Agent, for the benefit of Agent, a fee equal to 1.0% of the original principal balance of the Loan (the "Payoff Fee").

(d)     Interest.

(i)     Except as otherwise provided in this Agreement, the unpaid principal amount of the Loan and any interest not paid when due, shall bear interest with respect to so much of the principal amount of the Loan outstanding for a calendar month, at the Effective LIBOR Rate. Notwithstanding the foregoing, Agent agrees that the Payment Reserves shall bear interest at the Effective LIBOR Rate.

(ii)     Interest on the unpaid principal amount of the Loan shall be (i) payable in advance on the Disbursement Date for the partial month in which the Disbursement Date occurs; (ii) payable monthly in arrears commencing on the first day of the second full calendar month following the calendar month in which the Disbursement Date occurs, and on the first day of each month thereafter until the principal, together with all interest and other charges payable with respect to the Loan, shall be fully paid; and (iii) calculated on the basis of a 360 day year and the actual number of days elapsed. Interest not paid when due (without giving effect to any grace or notice period or cure right contained herein or in any other Loan Document) shall accrue like interest as principal and shall be immediately payable.

(iii)     All agreements among Borrower, Agent and Lender are expressly limited, so that in no event or contingency, whether because of the advancement of the Loan, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to Agent or any Lender for the use, forbearance, or retention of the money to be advanced under this Agreement or any Loan Document exceed the highest lawful rate permissible under applicable usury laws. If, under any circumstances, fulfillment of any provision of the Loan, the Loan Agreement, the other Loan Documents or any other agreement

16

pertaining to the Loan, after timely performance of such provision is due, shall involve exceeding the limit of interest validity prescribed by law that a court of competent jurisdiction deems applicable, then, *ipso facto*, the obligations to be fulfilled shall be reduced to the limit of such validity.   If, under any circumstances, Agent or any Lender shall ever receive as interest an amount that exceeds the highest lawful rate, the amount that would be excessive interest shall be applied to reduce the unpaid principal balance of the Loan and not to pay interest, or, if such excessive interest exceeds the unpaid principal balance of the Loan, such excess shall be refunded to Borrower.   This provision shall control every other provision of all agreements among Borrower, Agent and Lender.

(e)    Principal.

(i)    The entire unpaid principal balance of the Loan and all accrued but unpaid interest and all other charges payable with respect to the Loan shall be due and payable on the Maturity Date.

(ii)    Borrower may repay all or any portion of the Loan without premium or penalty at any time, subject to payment of the Payoff Fee and any Exit Fee, provided that (a) not less than thirty (30) days prior to any prepayment of principal, Borrower shall notify Agent in writing that Borrower is making a prepayment in the amount specified in such written notice, and (b) if such prepayment of principal occurs on any day other than the first day of a calendar month, Borrower shall indemnify Agent and each Lender and hold Agent and each Lender harmless from any losses, costs and/or expenses which Agent and each Lender sustains or incurs arising from the reemployment of funds obtained by Agent and each Lender hereunder or from fees payable to or on account of any warehouse lending or repurchase arrangement from which funds loaned hereby were obtained, in each case for the remainder of the applicable calendar month ("Breakage Costs").   Agent shall deliver to Borrower a statement setting forth the amount and basis of determination of any Breakage Costs in such detail as determined in good faith by the Agent to be adequate, it being agreed that such statement and the method of its calculation shall be adequate and shall be conclusive and binding upon the Borrower, absent manifest error.

(iii)    All payments of interest, principal and fees shall be made in lawful money of the United States in immediately available funds, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any taxes or other payments by wire transfer to Agent on behalf of the Lenders to such account as Agent shall from time to time designate.   Payments shall be credited on the Business Day on which immediately available funds are received prior to 3:00 P.M. Eastern Standard Time; payments received after 3:00 P.M. Eastern Standard Time shall be credited to the Loan on the next Business Day.   Payments which are by check, which Agent may at its option accept or reject, or which are not in the form of immediately available funds shall not be credited to the Loan until such funds become immediately available to Agent, and, with respect to payments by check, such credit shall be provisional until the item is finally paid by the payor bank.

(iv)    Except to the extent otherwise required by law or by the express terms of any other Loan Document, Agent shall apply and credit funds received by Agent pursuant to this Agreement or any other Loan Document in such manner and order of priority as

17

Agent shall determine in Agent's sole discretion; provided, however, that in the absence of any contrary determination by Agent, such funds shall be applied and credited (a) first, to pay, or reimburse Agent and each Lender for amounts advanced by Agent and each Lender (other than principal of the Loan) pursuant to any provision of the Loan Documents (including without limitation those fees, charges, costs and expenses described in subsections (vi) and (vii) below, (b) second, to fund any deposits that Borrower may be required by the terms of any Loan Document to make with Lender, including any such deposits to be used to pay the cost of repairing or constructing any improvements, insurance premiums, Taxes, Payment Reserves, and utility charges, (c) third, to pay any Late Charges due under this Agreement or any other Loan Document, (d) fourth, to pay any other sums due under the Loan Documents, excluding interest earned or accrued and principal, (e) fifth, to pay any interest earned or accrued, and (f) sixth, to pay principal outstanding.

(v)       Agent may submit monthly billings reflecting payments due; provided, however, that any changes in the interest rate which occur between the date of billing and the due date may be reflected in adjustments in the billing for a subsequent month.  Neither the failure of Agent to submit a bill, nor any error in any such bill shall excuse Borrower from the obligation to make full payment of all Borrower's payment obligations when due.

(vi)       From and after and during the continuance of any Event of Default, any unpaid principal, accrued interest, Late Charges and other amounts payable under this Agreement or any other Loan Document shall bear interest, compounded monthly, at the Default Rate; provided, however, that if collection from Borrower of interest at such rate would be contrary to applicable law, then such amounts shall bear interest at the highest rate which may be collected from Borrower under applicable law.

(vii)      If any payment (whether of fees, interest or principal and including the payment due on the Maturity Date or upon any acceleration of the Loan) is not paid within ten (10) days of the date on which the payment is due, Borrower shall pay to Agent in addition to the delinquent payment and without any requirement of notice or demand by Lender except as may be imposed by law, a "Late Charge" equal to five percent (5%) of the amount of the delinquent payment.  Late Charges are (a) payable in addition to, and not in limitation of, the Default Rate; (b) intended to compensate Agent and Lenders for administrative and processing costs incident to late payments; (c) not interest; and (d) not subject to refund or rebate or credit against any other amount due.  Borrower expressly acknowledges and agrees that this Late Charges provision is reasonable under the circumstances existing on the date of this Agreement, that it would be extremely difficult and impractical to fix Agent's and each Lender's actual damages arising out of any late payment and that the Late Charge shall be presumed to be the actual amount of such damages incurred by Lender.  In addition, in the event that any loan payment check tendered by Borrower to Agent is not honored upon presentment for demand, Borrower shall pay to Agent upon demand an amount equal to Two Hundred Fifty Dollars ($250.00).  No provision in this Agreement (including the provisions for Late Charges and for additional interest on any amounts remaining unpaid after the Maturity Date) shall be construed as in any way excusing Borrower from its obligation to make each payment promptly when due.

(f)       Acceleration upon Certain Transfers.  The unpaid principal balance of the Loan and interest thereon and all other Loan Obligations shall become immediately due and

18

16815951v.8

payable, and Borrower shall immediately pre-pay the Loan and all unpaid Loan Obligations in the event of any Transfer not expressly permitted by the Loan Agreement, the Security Instrument or any of the other Loan Documents.

    2.2    <u>Security for the Loan</u>.  The Loan will be evidenced, secured and guaranteed by the Loan Documents.

    2.3    <u>Origination Fee; Transaction Costs</u>.  On or before the Closing Date, Borrower shall have paid to Agent, for the benefit of the Lenders, in accordance with their respective Pro Rata Shares, an origination fee in an amount equal to one percent (1.00%) of the Loan; and Borrower shall have paid or reimbursed Agent for all title insurance premiums, recording and filing fees, costs of environmental reports, physical condition reports, appraisals and other reports, the reasonable fees and costs of Agent's and each Lender's counsel and all other third party out of pocket expenses incurred in connection with the origination of the Loan.  The origination fee shall be deemed to be fully earned upon the earlier to occur of (a) issuance of any commitment letter, or (b) the Closing Date, and shall be non-refundable upon payment.  The origination fee shall be due and payable on the Closing Date or on the earlier termination or expiration of any commitment letter.

    2.4    <u>Conditions Precedent to Closing</u>.  The obligation of Lenders to make the Loan hereunder is subject to the fulfillment by Borrower or waiver by Lenders of the following conditions precedent no later than the Closing Date:

    (a)    <u>Representations and Warranties; Compliance with Conditions</u>.  The representations and warranties of Borrower contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and no Default or an Event of Default shall have occurred and be continuing; and Borrower shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

    (b)    <u>Loan Agreement and Note</u>.  Agent shall have received a copy of this Agreement and the Note, in each case, duly executed and delivered on behalf of Borrower.

    (c)    <u>Delivery of Loan Documents; Title Insurance; Reports; Leases</u>.

    (i)    <u>Security Instrument, Assignment of Leases</u>.  Agent shall have received from Borrower fully executed and acknowledged counterparts of the Security Instrument, the SDA and the Assignment of Leases and evidence that counterparts of the Security Instrument, the SDA and Assignment of Leases have been delivered to the title company for recording, in the reasonable judgment of Agent, so as to effectively create upon such recording valid and enforceable Liens upon the Property, of the requisite priority, in favor of Lenders (or such other trustee as may be required or desired under local law), subject only to the Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents.  Agent shall have also received from Borrower fully executed counterparts of the other Loan Documents.

    (ii)    <u>Title Insurance</u>.  Agent shall have received title insurance policies

issued by a title company acceptable to Agent and dated as of the Closing Date, or a commitment to issue a policy with title insurance (either in the form of a commitment or pro forma policy). Such title insurance policies shall (i) provide coverage in amounts satisfactory to Agent, (ii) insure Lenders that the Security Instrument creates a valid lien on the Property encumbered thereby of the requisite priority, free and clear of all exceptions from coverage other than Permitted Encumbrances and standard exceptions and exclusions from coverage (as modified by the terms of any endorsements), (iii) contain such endorsements and affirmative coverages as Agent may reasonably request, and (iv) name Lenders as the insureds.   The title insurance policies shall be assignable.  Agent also shall have received evidence that all premiums in respect of such title insurance policies have been paid.

(iii)    Survey.  Agent shall have received a current land survey for the Property, certified to the title company, Agent, and Lenders and their successors and assigns, in form and content satisfactory to Agent and prepared by a professional and properly licensed land surveyor satisfactory to Agent in accordance with the Accuracy Standards for ALTA/ACSM Land Title Surveys as adopted by ALTA, American Congress on Surveying & Mapping and National Society of Professional Surveyors in 2011 or such other standard as Agent may approve in its sole discretion.  Each such survey shall reflect the same legal description contained in the title insurance policies relating to the Property and shall include, among other things, a metes and bounds description of the real property comprising part of the Property reasonably satisfactory to Agent.  The surveyor's seal shall be affixed to each survey and the surveyor shall provide a certification for each survey in form and substance acceptable to Agent.

(iv)    Insurance.  Agent shall have received valid certificates of insurance and the endorsements related thereto for the policies required pursuant to Section 4.5 hereunder, satisfactory to Agent in its sole discretion, and evidence of the payment of all insurance premiums payable for the existing policy period.

(v)    Environmental Reports.   Agent shall have received a Phase I environmental report (and, if recommended by the Phase I environmental report, a Phase II environmental report) in respect of the Property, in each case satisfactory in form and substance to Agent.

(vi)    Zoning.  With respect to the Property, Agent shall have received, at Agent's option, letters or other evidence with respect to the Property from the appropriate municipal authorities (or other Persons) concerning applicable zoning and building laws, in substance reasonably satisfactory to Agent.

(vii)    Encumbrances.  Borrower shall have taken or caused to be taken such actions in such a manner so that Agent and Lenders have a valid and perfected first priority Lien as of the Closing Date with respect to the Security Instrument on the Property, subject only to applicable Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents, and Agent shall have received satisfactory evidence thereof.

(d)    Related Documents.  Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall be in form and substance reasonably satisfactory to Agent, and shall have been duly authorized, executed and delivered by

20

all parties thereto and Agent shall have received and approved certified copies thereof.

(e)     <u>Delivery of Organizational Documents</u>.  Borrower shall deliver or cause to be delivered to Agent copies certified by Borrower of all organizational documentation related to Borrower and/or the formation, structure, existence, good standing and/or qualification to do business, as Agent may request in its sole discretion, including good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan and incumbency certificates as may be requested by Agent.

(f)     <u>Opinions of Borrower's Counsel</u>.  Agent shall have received opinions from Borrower's counsel with respect to the due execution, authority, enforceability of the Loan Documents and such other matters as Agent may require, all such opinions in form, scope and substance satisfactory to Agent and Agent's counsel in their reasonable discretion.

(g)     <u>Basic Carrying Costs</u>.  Borrower (or other Persons) shall have paid all basic carrying costs relating to the Property which are in arrears, if any, including without limitation, (i) accrued but unpaid insurance premiums, (ii) currently due Taxes (including any in arrears) and (iii) currently due other charges, which amounts shall be funded with proceeds of the Loan.

(h)     <u>Completion of Proceedings</u>.  All corporate and other proceedings taken or to be taken in connection with the transactions contemplated by this Agreement and other Loan Documents and all documents incidental thereto shall be satisfactory in form and substance to Agent, and Agent shall have received all such counterpart originals or certified copies of such documents as Agent may reasonably request.

(i)     <u>Payments</u>.  All Payment Reserves, payments, deposits or escrows required to be made or established by Borrower under this Agreement, the Note and the other Loan Documents on or before the Closing Date shall have been paid.

(j)     <u>Origination Fee; Transaction Costs</u>.  Borrower shall have paid to Agent the origination fee pursuant to <u>Section 2.3</u> and shall have paid or reimbursed Agent and Lenders for all title insurance premiums, recording and filing fees, costs of environmental reports, physical condition reports, appraisals and other reports, the reasonable fees and costs of Agent's and Lenders' counsel and all other third party out of pocket expenses incurred in connection with the origination of the Loan.

(k)     <u>Material Adverse Change</u>.  There shall have been no material adverse change in the financial condition or business condition of Borrower or the Property since the date of the most recent financial statements delivered to Agent.  The income and expenses of the Property, the occupancy thereof, and all other features of the transaction shall be as represented to Agent without material adverse change.  Neither Borrower nor any of its constituent Persons shall be the subject of any bankruptcy, reorganization, or insolvency proceeding.

(l)     <u>Leases</u>.  Agent shall have received a fully executed copy of the Leases, all of which shall be satisfactory in form and substance to Agent, together with copies of all necessary approvals in accordance with all applicable health care requirements.

16815951v.8

(m)    Tenant Estoppels.  Agent shall have received an executed estoppel letter, which shall be in form and substance satisfactory to Agent, from Operator under the Lease Agreement.

(n)    Subordination and Attornment.  Agent shall have received appropriate instruments acceptable to Agent subordinating all of the Leases designated by Agent to the Security Instrument.  Agent shall have received an agreement to attorn to Agent and Lenders satisfactory to Agent from any tenant under a Lease that does not provide for such attornment by its terms.

(o)    Tax Lot.  Agent shall have received evidence that the Property constitutes one (1) or more separate tax lots, which evidence shall be reasonably satisfactory in form and substance to Agent.

(p)    Physical Condition Reports.  Agent shall have received physical condition reports with respect to the Property, which reports shall be reasonably satisfactory in form and substance to Agent.

(q)    Management Agreement.  Agent shall have received copies of the Management Agreement, which shall be satisfactory in form and substance to Agent, and copies of all necessary approvals in accordance with all legal requirements.

(r)    Appraisal.  Agent shall have received an appraisal of the Property, which shall be satisfactory in form and substance to Agent.

(s)    Medicare/Medicaid Agreements, Facility Licenses.  Agent shall have received, in form and substance reasonably acceptable to Agent, copies of Operator's current and valid Medicare and Medicaid provider numbers and agreements if issued as of the Closing Date, copies of the most recent state surveys, copies of all participation agreements relating to health plans, and information pertaining to the patient census for the Property, copies of the Facility License of the Operator or other evidence satisfactory to Agent that the Facility Licenses will be issued upon the Closing.

(t)    Further Documents.  Agent or its counsel shall have received such other and further approvals, opinions, documents and information as Agent or its counsel may have reasonably requested including the Loan Documents in form and substance satisfactory to Agent and its counsel.

## ARTICLE III
## BORROWER'S REPRESENTATIONS AND WARRANTIES

To induce Agent and Lenders to enter into this Agreement, and to make the Loan to Borrower, Borrower represents and warrants to Agent and Lenders as follows:

3.1    Existence, Power and Qualification.  Each Loan Party is a duly organized and validly existing limited liability company, has the power to own or lease its properties and to carry on its business as is now being conducted, and is duly qualified to do business and is in

good standing in every jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes its qualification necessary.

3.2     Power and Authority.  Borrower has full power and authority to borrow the Indebtedness evidenced by the Note and to incur the Loan Obligations provided for herein, all of which have been authorized by all proper and necessary action.  All consents, approvals authorizations, orders or filings of or with any court or Governmental Authority, if any, required for the execution, delivery and performance of the Loan Documents by the Borrower have been obtained or made. Operator has the full power and authority to incur liabilities and obligations provided for in the respective Loan Documents to which it is a party, all of which have been authorized by all proper and necessary action.  All consents, approvals authorizations, orders or filings of or with any court or Governmental Authority, if any, required for the execution, delivery and performance of the Loan Documents by the Operator have been obtained or made.

3.3     Due Execution and Enforcement.  Each of the Loan Documents to which a Loan Party is a party constitutes a valid and legally binding obligation of the Loan Party, enforceable in accordance with its respective terms (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium, or other laws relating to the rights of creditors generally and by general principles of equity) and does not violate, conflict with, or constitute any default under any law, government regulation, decree, judgment, the Loan Party's articles of organization or incorporation, partnership agreement/operating agreement or by-laws, as applicable, or any other agreement or instrument binding upon the Loan Party.

3.4     Single Purpose Entity.  Each of Borrower and Operator is a Single Purpose Entity.

3.5     Pending Matters.

(A)     Operations; Financial Condition.  No action or investigation is pending or, to the best of Borrower's knowledge, threatened before or by any court or administrative agency which might result in any material adverse change in the financial condition, operations or prospects of a Loan Party or any reduction of the reimbursement rate under the Reimbursement Contracts.  Neither Loan Party is in violation of any agreement, the violation of which might reasonably be expected to have a material adverse effect on its business or assets.  Neither Loan Party is in violation of any order, judgment, or decree of any court, or any statute or governmental regulation to which it is subject.

(B)     Property Improvements.  There are no proceedings pending or, to the best of Borrower's knowledge, threatened, to acquire through the exercise of any power of condemnation, eminent domain or similar proceedings any part of the Property, the Improvements or any interest therein, or to enjoin or similarly prevent or restrict the use of the Property or the operation of any of the Facility in any manner.  None of the Improvements is subject to any unrepaired casualty or other damage.

3.6     Financial Statements Accurate.  All financial statements heretofore or hereafter provided by or on behalf of Borrower or Operator are and will be true and complete in all material respects as of their respective dates and fairly present the respective financial condition of Borrower or Operator, and there are no material liabilities, direct or indirect, fixed or

23

contingent, as of the respective dates of such statements which are not reflected therein or in the notes thereto or in a written certificate delivered with such statements. The financial statements of the Borrower or Operator have been and will be prepared in accordance with GAAP. There has been no material adverse change in the financial condition, operations, or prospects of Borrower or Operator since the dates of such statements except as fully disclosed in writing with the delivery of such statements. All financial statements of the operations of the Facility hereafter provided to Agent will be true and complete in all material respects as of their respective dates, and to the best of Borrower's knowledge, all such financial statements provided to Agent are true and correct in all material respects.

3.7     Compliance with Facility Laws.

(a)     Borrower, Operator and Manager, as applicable, are the lawful holders of all Permits for the Facility, including, without limitation, the Certificate of Need (if required) and Facility License, all of which (i) are in full force and effect; (ii) constitute all of the Permits required for the use, operation and occupancy thereof; (iii) have not been pledged as collateral for any other loan or Indebtedness (other than pursuant to the Permitted Working Capital Financing (as hereinafter defined, with respect to the Operator); (iv) are held free from restrictions or any encumbrance which would materially adversely affect the use or operation of the Facility; and (v) are not provisional, probationary or restricted in any way.

(b)     Borrower, Operator, Manager and the operation of the Facility are in compliance in all material respects with the applicable provisions of Medicare, Medicaid, long term care, nursing facility and/or assisted living facility laws, rules, regulations, requirements of Governmental Authorities, and published interpretations to which the Facility is subject. No waivers of any laws, rules, regulations, or requirements (including, but not limited to, minimum foot requirements per bed) are required for the Facility to operate at the current licensed bed capacity or participate in the Medicare and Medicaid programs.

(c)     All Reimbursement Contracts and requisite certifications (including without limitation certification to participate in the Medicare and Medicaid programs) (i) are in full force and effect; (ii) have not been pledged as collateral for any other loan or Indebtedness (other than pursuant to the Permitted Working Capital Financing and pursuant to the Lease Agreement); (iii) are held free from restrictions or any encumbrance which would materially adversely affect the use or operation of the Facility; and (iv) are not provisional, probationary or restricted in any way.

(d)     Each of Borrower, Operator and Manager, as applicable, is in good standing with all the respective Governmental Authorities governing applicable Permits and Reimbursement Contracts. The Facility is current in the payment of all so-called provider taxes or other assessments owed by the Facility with respect to the Permits and/or Reimbursement Contracts. Borrower will, or will cause Operator to, maintain (without allowing to lapse) the Certificate of Need (if required), Facility License, other required Permits, certification to participate in the Medicare and Medicaid programs and other material Reimbursement Contracts.

(e)     No Certificate of Need is required by any Governmental Authority to operate the Facility as a skilled nursing care facility. To the best of Borrower's knowledge, in the

24

event Agent or any Lender acquires the Facility through foreclosure or otherwise, none of Agent, any Lender, or a subsequent manager, operator, transferee or any subsequent purchaser (through foreclosure or otherwise) must obtain a Certificate of Need prior to applying for and receiving a license or operating certificate to operate the Facility and certification to receive Medicare and Medicaid payments for patients having coverage thereunder, provided that no service or bed complement is changed.   Upon foreclosure, work-out, restructuring or other transfer of the Facility or Property, Borrower shall cooperate, and cause the Operator, Manager or any other licensee, manager or Person in possession of the Facility to cooperate with Agent, Lenders or any subsequent operator, manager, transferee or purchaser of the Property, in obtaining a Certificate of Need (if required), Facility License, Medicare and Medicaid certification, other Permits or Reimbursement Contracts for the Facility.

3.8    Maintain Bed Capacity.   Neither Borrower nor Operator, nor to their knowledge any other Person, has reduced, or granted to any Person the right to reduce, the number of licensed beds in the Facility or applied, or granted to any Person the right to apply, for approval to transfer the right to any and all of the licensed Facility beds to any other location.

3.9    Medicare and Medicaid Compliance.   The Facility is in compliance with all requirements for participation in the Medicare and Medicaid programs, including without limitation, the Medicare and Medicaid Patient Protection Act of 1987 (as amended).  The Facility is in conformance in all material respects with all insurance, reimbursement and cost reporting requirements and has current provider agreements which are in full force and effect under Medicare and Medicaid.

3.10    Third-Party Payors.   There is no threatened or pending revocation, suspension, termination, probation, restriction, limitation, or nonrenewal affecting Borrower, Operator, Manager, or the Facility or any Reimbursement Contract or participation or provider agreement with any third-party payor, including Medicare, Medicaid, Blue Cross and/or Blue Shield, and any other private commercial insurance managed care and employee assistance program (such programs, the "Third-Party Payor Programs") to which Borrower, Operator, Manager or the Facility presently is subject.  All Medicare, Medicaid and private insurance cost reports and financial reports submitted by Borrower, Operator, Manager or the Facility are and will be materially accurate and complete and have not been and will not be misleading in any material respects.  No cost reports required to be filed by the Facility remain "open" or unsettled, except as otherwise disclosed.

3.11    Governmental Proceedings and Notices.   Loan Parties have received no notice of, and to the best of Borrower's knowledge, neither Borrower, the Operator nor the Facility is currently the subject of any proceeding by any Governmental Authority and no notice of any violation has been received from a Governmental Authority that would, directly or indirectly, or with the passage of time:

(A)    Have a material adverse impact on Operator's ability to accept and/or retain patients or result in the imposition of a fine, a sanction, a lower rate certification or a lower reimbursement rate for services rendered to eligible patients;

16815951v.8

(B)    Modify, limit or annul or result in the transfer, suspension, revocation or imposition of probationary use of any of the Permits; or

(C)    Affect Operator's continued participation in the Medicare or Medicaid programs or any other Third-Party Payor Programs, or any successor programs thereto, at current rate certifications.

3.12    Physical Plant Standards.  To the best of Borrower's knowledge, the Facility and the use thereof complies in all material respects with all applicable local, state and federal building codes, fire codes, health care, nursing facility and other similar regulatory requirements (the "Physical Plant Standards"), and no waivers of Physical Plant Standards exist at the Facility.

3.13    Pledges of Accounts.  Neither Borrower, Guarantor nor Operator has pledged its Accounts as collateral security for any loan or Indebtedness other than the Loan, except as set forth in the AR Intercreditor Agreement.

3.14    Payment of Taxes and Property Impositions.  Borrower has filed all federal, state, and local tax returns which it is required to file and has paid, or made adequate provision for the payment of, all taxes which are shown pursuant to such returns or are required to be shown thereon or to assessments received by Borrower, including, without limitation, provider taxes. All such returns are complete and accurate in all respects.  Borrower has paid or made adequate provision for the payment of all applicable water and sewer charges, ground rents (if applicable) and Taxes with respect to the Property.

3.15    Title to Collateral.  Borrower has good and marketable title to the Mortgaged Property described in the Security Instrument executed by Borrower and all of the other Collateral, subject to no lien, mortgage, pledge, encroachment, zoning violation, or encumbrance, except Permitted Encumbrances which do not and will not materially interfere with the security intended to be provided by the Security Instrument and the Assignment of Rents and Leases or the current use or operation of the Property and the Improvements thereon or the current ability of the Facility to generate net operating income sufficient to service the Loan.  All Improvements situated on the Property are situated wholly within the boundaries of the Property.

3.16    Priority of Mortgage.  The Security Instrument constitutes a valid first lien against the real and personal property described therein, prior to all other liens or encumbrances, including those which may hereafter accrue, excepting only Permitted Encumbrances, none of which materially and adversely affect: (a) the ability of the Borrower to pay in full the principal of and interest on the Note when due; (b) the security (and its value) intended to be provided by the Security Instrument; or (c) the current use of the Property and the Improvements.

3.17    Location of Chief Executive Offices.  The location of each Loan Party's principal place of business and chief executive office is c/o Synergy Health Centers LLC, 260 Chambers Bridge Road, Suite 2A, Brick, New Jersey 08723.

3.18    Disclosure.  All information furnished or to be furnished by a Loan Party to Agent and Lenders in connection with the Loan or any of the Loan Documents, is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as

26

completeness may be necessary to provide Agent and Lenders with true and accurate knowledge of the subject matter.

3.19   Trade Names.  No Loan Party has changed its legal name, been known by any other name or been a party to a merger, reorganization or similar transaction within the last five (5) years.

3.20   ERISA.  Borrower is in compliance with all applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

3.21   Ownership.  The Ownership Interest of each Loan Party is correctly and accurately set forth in the Pre-Transfer Organizational Chart of the Borrower on Schedule 3.21.  Agent acknowledges and agrees that upon approval of the transfer by the Massachusetts Department of Public Health and the Centers for Medicare and Medicaid Services and subject to Patriot Act compliance, Borrower shall be permitted to transfer the Ownership Interest of Borrower to the entities set forth on Schedule 3.12 (the "Investor Transfer") and pursuant to the structure set forth in the Post-Transfer Organizational Chart of Borrower on Schedule 3.21.  Borrower agrees to provide Agent with written notice within two (2) business days of the Investor Transfer and to provide Agent with copies of such updated organizational documents of Borrower as Agent shall request.

3.22   Compliance With Applicable Laws.  The Facility and its operations and the Property comply in all material respects with all covenants and restrictions of record and applicable laws, ordinances, rules and regulations, including, without limitation, the Americans with Disabilities Act and the regulations thereunder, and all laws, ordinances, rules and regulations relating to zoning, setback requirements and building codes and there are no waivers of any building codes currently in existence for the Facility.

3.23   Solvency.  Borrower is solvent for purposes of 11 U.S.C. §548, and the borrowing of the Loan will not render the Borrower insolvent for purposes of 11 U.S.C. §548.

3.24   Lease Agreement.  The Lease Agreement (a) is in full force and effect and there are no defaults (either monetary or non-monetary) by the Borrower or Operator thereunder; (b) has a term extending for not less than five (5) years following the Closing Date; and (c) provides for a triple net aggregate annual rent payment of at least 1.10 times Debt Service.

3.25   Other Indebtedness.  Borrower has no outstanding Indebtedness, secured or unsecured, direct or contingent (including any guaranties), other than: (a) the Loan, and (b) Indebtedness which represents trade payables or accrued expenses incurred in the ordinary course of business of owning and operating the Property.  No other Indebtedness will be secured (senior, subordinate or pari passu) by the Property.

3.26   Other Obligations.  Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Borrower is a party or by which Borrower or the Property or other Collateral is otherwise bound, other than obligations incurred in the ordinary course of the operation of the Property, other than obligations under the Security Instrument and the other Loan Documents.

16815951v.8

3.27    Fraudulent Conveyances.  Borrower: (a) has not entered into this Agreement or any of the other Loan Documents with the actual intent to hinder, delay, or defraud any creditor; and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and mature.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

3.28    Fixtures, Furniture and Equipment.  Borrower or Operator owns the fixtures, furniture and Equipment required by all state and federal laws and regulations for (a) the operation of the Property (b) the maintenance of the Facility License in good standing, and (c) certification to participate in the Medicare and Medicaid programs.

3.29    Sole Purpose.  Borrower warrants, represents and agrees that each of Borrower and Operator is a Delaware limited liability company that has not engaged in any business other than the acquisition and leasing and the operation of the Facility.

3.30    Use of Loan Proceeds.  The proceeds of the Loan are to be used solely to acquire the Property and conduct the business of long term nursing care services.

## ARTICLE IV
## AFFIRMATIVE COVENANTS OF BORROWER

Borrower agrees with and covenants unto Agent and the Lenders that until the Loan Obligations have been paid in full:

4.1    Payment of Loan/Performance of Loan Obligations.  Borrower shall duly and punctually pay or cause to be paid the principal and interest of the Note in accordance with its terms and duly and punctually pay and perform or cause to be paid or performed all Loan Obligations hereunder and under the other Loan Documents.

4.2    Maintenance of Existence.  Borrower  and Operator shall each maintain its existence as a limited liability company, and, in each jurisdiction in which the character of the property owned by it or in which the transaction of its business makes qualification necessary, maintain good standing.

4.3    Maintenance of Single Purpose.  Borrower and Operator shall each maintain its existence as a Single Purpose Entity.

4.4    Accrual and Payment of Taxes.  During each fiscal year, Borrower and Operator shall each make accurate provision for the payment of all current tax liabilities of all kinds, including, without limitation, federal and state income taxes, franchise taxes, payroll taxes and

16815951v.8

Taxes, all required withholding of income taxes of employees, all required old age and unemployment contributions, and all required payments to employee benefit plans, and pay the same when they become due.

4.5    Insurance.  Borrower shall maintain, or cause Operator to maintain, the following insurance coverages with respect to the Property, the Improvements and the Facility thereon:

(a)    Insurance against loss or damage by fire, casualty and other hazards as now are or subsequently may be covered by a comprehensive "all risk" policy or a policy covering "special" causes of loss, with such endorsements as Agent may from time to time reasonably require and which are customarily required by institutional lenders of similar properties similarly situated, including, without limitation, building ordinance or law, demolition, incurred cost of construction, lightning, windstorm, civil commotion, hail, riot, strike, water damage, sprinkler leakage, collapse, malicious mischief, explosion, smoke, aircraft, vehicles, vandalism, falling objects and weight of snow, ice or sleet, and covering the Facility in an amount equal to one hundred percent (100%) of the full insurable replacement value of the Facility (exclusive of footings and foundations below the lowest basement floor) without deduction for depreciation.   The determination of the replacement cost amount shall be determined by the "Insurable Value" or "Cost Approach to Value" as reflected in an appraisal, with a waiver of depreciation, and shall be adjusted annually to comply with the requirements of the insurer issuing the coverage, or as may be determined to be reasonably required by Agent, and, unless the insurance required by this paragraph shall be effected by blanket and/or umbrella policies in accordance with the requirements of this Agreement, the policy shall include inflation guard coverage that ensures that the policy limits will be increased over time to reflect the effect of inflation.   Each policy shall, subject to Agent's approval, contain: (i) a replacement cost endorsement, without deduction for depreciation; (ii) either an agreed amount endorsement or a waiver of any co-insurance provisions; and (iii) an ordinance or law coverage or enforcement endorsement if the Improvements or the use of the Property constitutes any legal nonconforming structures or uses, and shall provide for deductibles in such amounts as Agent may permit in its sole discretion.

(b)    Commercial general liability insurance under a policy containing "Comprehensive General Liability Form" of coverage (or a comparably worded form of coverage) and the "Broad Form CGL" endorsement (or a policy which otherwise incorporates the language of such endorsement), providing coverage on an occurrence (or "claims made") basis, which policy shall include, without limitation, coverage against claims for personal injury, bodily injury, death and property damage liability with respect to the Facility and the operations related thereto, whether on or off the Property, and the following coverages: Product Liability/Completed Operations; Broad Form Contractual Liability, Independent Contractor, Personal Injury and Advertising Injury Protection, Medical Payment (with a minimum limit of $5,000 per person), Broad Form Cross Suits Liability Endorsement, where applicable, hired and non-owned automobile coverage (including rented and leased vehicles), and, if any alcoholic beverages shall be sold, manufactured or distributed in the Facility, liquor liability coverage, all of which shall be in such amounts as Agent may from time to time reasonably require, but not less than One Million Dollars ($1,000,000) per occurrence, Three Million Dollars ($3,000,000) in the aggregate.   The deductible amount shall not exceed $50,000 per occurrence.   Such liability policy shall delete the contractual exclusion under the personal injury coverage, if possible, and if

29

available, shall include the following endorsements: Notice of Accident, Knowledge of Occurrence, and Unintentional Error and Omission.

(c) Professional liability insurance coverage for the Facility combined in an amount equal to One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate, with each deductible not to exceed $100,000 in the aggregate.

(d) Loss of rents insurance for the Property: (i) covering the same perils of loss as are required to be covered by the property insurance required under Section 4.5(a) above; (ii) in an amount of 100% of the gross rental income of the Facility for a period of twelve (12) months as reasonably projected by Agent, containing a 180-day extended period of indemnity endorsement; (iii) including either an agreed amount endorsement or a waiver of any co-insurance provisions, so as to prevent Borrower, Agent, any Lender and any other insured thereunder from being a co-insurer; and (iv) providing that any covered loss thereunder shall be payable to Agent and Lenders.

(e) During the period of any new construction on the Property, a so-called "Builder's All-Risk Completed Value" or "Course of Construction" insurance policy in non-reporting form for any improvements under construction, including, without limitation, for demolition and increased cost of construction or renovation, in an amount equal the amount of the general contract plus the value of any existing trust note for improvements and materials stored on or off the real property, including "soft cost" coverage, and Workers' Compensation Insurance covering all persons engaged in such construction, in an amount at least equal to the minimum required by law. In addition, each contractor and subcontractor shall be required to provide Agent with a certificate of insurance for (i) workers' compensation insurance covering all persons engaged by such contractor or subcontractor in such construction in an amount at least equal to the minimum required by law, and (ii) general liability insurance showing minimum limits of at least Five Million Dollars ($5,000,000), including coverage for products and completed operations. Each contractor and subcontractor also shall cover Borrower, Agent and each Lender as an additional insured under such liability policy and shall indemnify and hold Borrower, Agent and each Lender harmless from and against any and all claims, damages, liabilities, costs and expenses arising out of, relating to or otherwise in connection with its performance of such construction.

(f) If the Facility contains steam boilers, steam pipes, steam engines, steam turbines or other high pressure vessels, insurance covering the major components of the central heating, air conditioning and ventilating systems, boilers, other pressure vessels, high pressure piping and machinery, elevators and escalators, if any, and other similar equipment installed in the Improvements, in an amount equal to one hundred percent (100%) of the full replacement cost thereof, which policies shall insure against physical damage to and loss of occupancy and use of the Improvements arising out of an accident or breakdown covered thereunder.

(g) Flood Hazard insurance, in the maximum amount allowable by law, if any portion of the Improvements is located in a federally designated "special flood hazard area" and in which flood insurance is available. In lieu thereof, Agent will accept proof, satisfactory to it in its sole discretion, that the improvements are not within the boundaries of a designated "special flood hazard area."

30

(h)     Workers' compensation insurance or other similar insurance which may be required by governmental authorities or applicable legal requirements in an amount at least equal to the minimum required by law.

(i)     Such other insurance coverages, in such amounts, and such other forms and endorsements, as may from time to time be required by Agent in its sole discretion and which are customarily required by institutional lenders to similar properties, similarly situated, including, without limitation, coverages against other insurable hazards (including, by way of example only, earthquake, sinkhole and mine subsidence), which at the time are commonly insured against and generally available.

(j)     <u>Additional Requirements/Provisions</u>:

(i)     Borrower is required to provide Agent with original renewals or replacements of such insurance policies or certificates during the Term of the Loan.

(ii)     If the Facility is located in a seismically active area or an area prone to geologic instability and mine subsidence, Agent may require an inspection by a qualified structural or geological engineer satisfactory to Agent, and at Borrower's expense.  The Facility must be structurally and geologically sound and capable of withstanding normal seismic activity or geological movement.  Agent reserves the right to require earthquake insurance or Maximum Probable Loss insurance on a case-by-case basis.

(iii)     All insurance policies shall have a term of not less than one (1) year and shall be in the form and amount and with deductibles as, from time to time, shall be acceptable to Agent in its sole discretion.  Except for the insurance coverage pursuant to <u>Section 4.5(c)</u> above, all insurance coverages apply to the Property and Facility separately.  All such policies shall be primary, provide for loss payable solely to Agent and Lenders and shall contain a standard "non-contributory mortgagee" endorsement or its equivalent relating, inter alia, to recovery by Agent and Lenders notwithstanding the negligent or willful acts or omissions of Borrower and notwithstanding: (i) occupancy or use of the Facility for purposes more hazardous than those permitted by the terms of such policy; (ii) any foreclosure or other action taken by Agent or any Lender pursuant to the Security Instrument upon the occurrence of an Event of Default thereunder; or (iii) any change in title or ownership of the Facility.

(iv)     All insurance policies must be written by a licensed insurance carrier in the State in which the Facility is located and that has a long-term senior debt rating of at least "AA" by Standard & Poor's Rating Service.

(v)     All liability insurance policies must name "Capital Funding, LLC, a Maryland limited liability company, and its successors and/or assigns as their interests may appear" as additional insureds, and all property insurance policies (including those provided for in <u>Sections 4.5(a)</u>, <u>(d)</u>, <u>(e)</u>, <u>(f)</u>, <u>(g)</u> and <u>(i)</u> as applicable) must name "Capital Lending and Mortgage Group, LLC, a Maryland limited liability company, and its successors and/or assigns as their interests may appear" as the named mortgage holder entitled to all insurance proceeds as loss payee.  Agent shall have the right, without Borrower's consent, by notice to the insurance

31

company and to Borrower, to change the additional insured and named mortgagee endorsements in connection with any sale, assignment or other transfer of the Loan.

(vi)     All insurance policies for the above required insurance must provide for thirty (30) days prior written notice of cancellation to Agent.

(vii)     Policies or binders, together with the evidence of the above required insurance on ACORD Form 27 or its equivalent, must be submitted to Agent prior to setting the interest rate on the Loan.  Borrower shall not carry separate insurance, concurrent in kind or form or contributing in the event of loss, with any insurance required under this Section 4.5.  If the limits of any policy required hereunder are reduced or eliminated due to a covered loss, Borrower shall pay the additional premium, if any, in order to have the original limits of insurance reinstated, or Borrower shall purchase new insurance in the same type and amount that existed immediately prior to the loss.

(viii)     If Borrower fails to maintain and deliver to Agent the original policies or certificates of insurance required by this Agreement, Agent may, at its option, procure such insurance and Borrower shall pay or, as the case may be, reimburse Agent and Lenders for, all premiums thereon promptly, upon demand by Agent, with interest thereon at the Default Rate from the date paid by Agent or any Lender to the date of repayment and such sum shall constitute a part of the Loan Obligations.

(ix)     The insurance required by this Agreement may, at the option of Borrower, be effected by blanket and/or umbrella policies issued to Borrower or to an Affiliate of Borrower covering the Facility and the properties of such Affiliate; provided that, in each case, the policies otherwise comply with the provisions of this Agreement and allocate to the Facility, from time to time, the coverage specified by this Agreement, without possibility of reduction or coinsurance by reason of, or damage to, any other property (real or personal) named therein.  If the insurance required by this Agreement shall be effected by any such blanket or umbrella policies, Borrower shall furnish to Agent original policies or certified copies thereof, with schedules attached thereto showing the amount of the insurance provided under such policies which is applicable to the Facility.

(x)     None of Agent, Lender or its respective agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Agreement; it being understood that: (i) Borrower shall look solely to its insurance company for the recovery of such loss or damage; (ii) such insurance company shall have no rights of subrogation against Agent, Lender, or any of its respective agents or employees; and (iii) Borrower shall use its best efforts to procure from such insurance company a waiver of subrogation rights against Agent and each Lender.  If, however, such insurance policies do not provide for a waiver of subrogation rights against Agent and each Lender (whether because such a waiver is unavailable or otherwise), then Borrower hereby agrees, to the extent permitted by law and to the extent not prohibited by such insurance policies, to waive its rights of recovery, if any, against Agent, Lender, and each of its respective agents and employees, whether resulting from any damage to the Facility, any liability claim in connection with the Facility or otherwise. If any such insurance policy shall prohibit Borrower from waiving such claims, then Borrower

32

must obtain from such insurance company a waiver of subrogation rights against Agent and each Lender.

(k)     At its option, Agent agrees that Agent shall make the net proceeds of insurance or condemnation (after payment of Agent's and Lender's reasonable costs and expenses) available to Borrower for Borrower's repair, restoration and replacement of the Improvements, Equipment and Inventory damaged or taken on the following terms and subject to Borrower's satisfaction of the following conditions:

(i)     The aggregate amount of all such proceeds shall not exceed the aggregate amount of all such Loan Obligations;

(ii)     At the time of such loss or damage and at all times thereafter while Agent or any Lender is holding any portion of such proceeds, there shall exist no Default or Event of Default;

(iii)     The Improvements, Equipment, and Inventory for which loss or damage has resulted shall be capable of being restored to its preexisting condition and utility in all material respects with a value equal to or greater than that which existed prior to such loss or damage and such restoration shall be capable of being completed prior to the earlier to occur of (A) the expiration of loss of rents insurance as determined by an independent inspector or (B) the original Maturity Date of the Loan;

(iv)     Within thirty (30) days from the date of such loss or damage Borrower shall have given Agent a written notice electing to have the proceeds applied for such purpose;

(v)     Within sixty (60) days following the date of notice under the preceding subparagraph (iv) and prior to any proceeds being disbursed to Borrower, Borrower shall have provided to Agent all of the following:

(A)     complete plans and specifications for restoration, repair and replacement of the Improvements, Equipment and Inventory damaged to the condition, utility and value required by Section 4.5(k)(iii) above;

(B)     if loss or damage exceeds $50,000, fixed-price or guaranteed maximum cost bonded construction contracts for completion of the repair and restoration work in accordance with such plans and specifications;

(C)     builder's risk insurance for the full cost of construction with Agent named under a standard mortgagee loss-payable clause;

(D)     such additional funds as in Agent's reasonable opinion are necessary to complete such repair, restoration and replacement; and

(E)     copies of all permits and licenses, if any, necessary to complete the work in accordance with the plans and specifications;

33

(vi)     Agent may, at Borrower's expense, retain an independent inspector to review and approve plans and specifications and completed construction and to approve all requests for disbursement, which approvals shall be conditions precedent to release of proceeds as work progresses;

(vii)    No portion of such proceeds shall be made available by Agent for architectural reviews or for any other purposes which are not directly attributable to the cost of repairing, restoring or replacing the Improvements, Equipment and Inventory for which a loss or damage has occurred unless the same are covered by such insurance;

(viii)   Borrower shall diligently pursue such work and shall complete such work prior to the earlier to occur of the expiration of business interruption insurance or the Maturity Date;

(ix)     Borrower, Operator and Facility each continues to achieve the requirements of the Financial Covenants set forth in Section 4.12(b) below;

(x)      Each disbursement by Agent of such proceeds and deposits shall be funded subject to conditions and in accordance with disbursement procedures which a commercial construction lender would typically establish in the exercise of sound banking practices and shall be made only upon receipt of disbursement requests on an AIA G702/703 form (or similar form approved by Agent) signed and certified by Borrower and, if required by the Agent, its architect and general contractor with appropriate invoices and lien waivers as required by Agent; and

(xi)     Agent, for the benefit of the Lenders, shall have a first lien and security interest in all building materials and completed repair and restoration work and in all fixtures and equipment acquired with such proceeds, and Borrower shall execute and deliver such mortgages, deeds of trust, security agreements, financing statements and other instruments as Agent shall request to create, evidence, or perfect such lien and security interest.

(xii)    In the event and to the extent such insurance proceeds are not required or used for the repair, restoration and replacement of the Improvements, Equipment and Inventory for which a loss or damage has occurred, or in the event Agent does not permit Borrower to have the insurance proceeds applied to the restoration of the Improvements, Equipment, or Inventory, or, if the conditions set forth herein for such application are otherwise not satisfied, then Agent shall be entitled without notice to or consent from Borrower to apply such proceeds, or the balance thereof, at Agent's option either (A) to the full or partial payment or prepayment of the Loan Obligations (without premium) in the manner aforesaid, or (B) to the repair, restoration and/or replacement of all or any part of such Improvements, Equipment and Inventory for which a loss or damage has occurred.

(l)      Borrower appoints Agent as Borrower's attorney-in-fact to cause the issuance of or an endorsement of any insurance policy to bring Borrower into compliance herewith and, as limited above, at Agent's sole option, to make any claim for, receive payment for, and execute and endorse any documents, checks or other instruments in payment for loss,

theft, or damage covered under any such insurance policy; however, in no event will Agent or any Lender be liable for failure to collect any amounts payable under any insurance policy.

    4.6    <u>Financial and Other Information</u>.  Borrower shall provide to Agent, and cause the Operator to provide to Agent, at its address set forth in <u>Section 10.7</u>, the following financial statements and information on a continuing basis during the Term of the Loan:

    (a)    <u>Periodic from Borrower</u>.  Within (i) thirty (30) days after the end of each calendar month and (ii) sixty (60) days after the end of each calendar year, and (iii) fourteen (14) days after written request submitted to Borrower by Agent, Borrower shall deliver to Agent, true, complete and correct financial statements for Borrower for such calendar month, year or other period requested by Agent.  Such financial statements shall include for each such period a (A) balance sheet, (B) an statement of income and expenses, (C) a statement of changes in financial position, (D) a detailed statement showing the computation of Debt Service Coverage Ratio of Borrower and each ratio and requirement that is the subject of a Financial Covenant, and such further detailed information with respect to the Property and the financial affairs of Borrower as may be reasonably requested by Agent.  Within twenty (20) days after the end of each calendar month, Borrower shall deliver to Agent financial statements prepared internally for Borrower for such calendar month accurately reflecting income, expenses, and such other information required to determine Debt Service Coverage Ratio as provided in <u>Section 4.12</u> and such other information as Agent may reasonably request.  All such financial statements shall be manually signed and certified as true and correct by each manager of Borrower as to quarterly and annual statements and by the chief financial officer of Borrower as to monthly statements. The financial statements required to be submitted under this subsection need not be audited financial statements provided the submitted financial statements shall otherwise be in a form satisfactory to Agent.

    (b)    <u>Periodic from Operator</u>.  Within: (i) thirty (30) days after the end of each calendar month and (ii) ninety (90) days after the end of each calendar year, and (iii) fourteen (14) days after written request submitted to Borrower by Lender, Borrower shall deliver to Agent, true, complete and correct financial statements, prepared in accordance with GAAP, for Operator and Facility (or any other party operating the Facility) for such calendar month, year or other period requested by Agent, including but not limited to: (i) operating statements for the Facility, including without limitation, (A) a written profit and loss statement for the Facility setting forth, among other things, each item of Gross Income from Operations, Facility Operating Expenses, depreciation, Debt Service, and capital expense for the Facility during the immediately preceding month, (B) a cash flow statement, (C) census, (D) a statement of the number of bed days available and the actual patient days incurred for the year, together with yearly census information of the Facility as of the end of such year in sufficient detail to show patient-mix (i.e., private, Medicare, Medicaid, and V.A.) on a daily average basis for such, (E) a detailed statement showing the computation of each ratio and requirement that is the subject of a Financial Covenant, (f) each item defined in <u>Section 4.12</u> with respect to the operation of the Property; (ii) financial statements of the Operator including (X) a balance sheet and a statement of income and expenses for the period, (Y) (Z) a statement of changes in financial position; and (iv) such further detailed information with respect to the operation of the Facility and the financial affairs of the Operator of other operator of the Facility as may be reasonably requested by Agent.  Within thirty (30) days after the end of each calendar month, Borrower shall deliver to Agent operating

statements prepared internally for Operator and Facility (or any other party operating the Facility) for such calendar month accurately reflecting income, expenses, and such other information required to determine EDITDAR, as provided in Section 4.12 and such other information as Agent may reasonably request. All such financial statements shall be manually signed and certified as true and correct by Borrower and the chief financial officer of Operator as to the quarterly and annual statements and by the chief financial officer of Operator as to the monthly statements. The financial statements required to be submitted under this subsection need not be audited financial statements provided the submitted financial statements shall otherwise be in a form satisfactory to the Agent. In addition, within thirty (30) days of Agent's request, Borrower shall deliver to Agent Medicare and Medicaid cost reports and/or a rent roll for the Property.

   (c) <u>Tax Returns</u>.  Within ten (10) days after the filing deadline, as may be extended from time to time, copies of all federal tax returns of Borrower and Operator, together with all supporting documentation and required schedules.

   (d) <u>Cost Reports</u>.  Within ten (10) days of filing or receipt, all Medicaid and/or Medicare cost reports and any amendments thereto filed with respect to the Facility and all responses, audit reports, or inquiries with respect to such cost reports.

   (e) <u>Surveys</u>.  Within the timeframes required by Section 4.11, copies of all Facility License and/or Medicare and/or Medicaid certification survey reports and statements of deficiencies with respect to the Facility (with plans of correction attached thereto).

   (f) <u>Medicaid Rate Calculation Worksheet</u>.  Within twenty (20) days of receipt, a copy of the "Medicaid Rate Calculation Worksheet" (or the equivalent thereof) from the applicable agency.

   (g) <u>Licensing Notices</u>.  Within the timeframes required by Section 4.11, any and all notices (regardless of form) from any and all Governmental Authorities that the Facility License and/or the Medicare and/or Medicaid certification is being downgraded to a substandard category, revoked, or suspended, or that action is pending or being considered to downgrade to a substandard category, revoke, or suspend the Facility License or certification, and within ten (10) days after receipt of any renewal of the Facility License.

   (h) <u>Medicare Default Rate</u>.  Within ten (10) days of receipt, a statement of the number of patient days for which the Facility has received the Medicare default rate for any applicable period.  For purposes herein, "default rate" shall have the meaning ascribed to it in that certain applicable Medicare rate notification letter prepared in connection with any review or survey of the Facility.

   (i) <u>Other Requirements</u>.

     (i) Agent reserves the right to require that the annual financial statements of Borrower and Operator be audited and prepared by a nationally recognized accounting firm or independent certified public accountant acceptable to Agent, at their respective cost and expense, if: (A) an Event of Default exists; (B) required by HUD, internal policy, or by any investor in any securities backed in whole or in part by the Loan or any rating agency rating such securities; or (C) Agent has reasonable grounds to believe that the unaudited

16815951v.8

financial statements do not accurately represent the financial condition of a Borrower or the Operator, as the case may be.

(ii)    Agent further reserves the right to require such other financial information of a Borrower or Operator, in such form and at such other times (including monthly or more frequently) as Agent shall deem necessary, and Borrower agrees promptly to provide or to cause to be provided, such information to Agent. All financial statements must be in the form and detail as Agent may from time to time reasonably request.

4.7    Compliance Certificate.    At the time of furnishing the monthly or quarterly operating statements required under the foregoing section, Borrower shall furnish to Agent a compliance certificate in the form attached hereto as Exhibit B executed by the chief financial officer of the Borrower and the Operator, respectively.

4.8    Books and Records.  Borrower shall keep and maintain, or cause to be kept and maintained, at all times at the Facility and upon Agent's request shall make available at the Facility, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the results of the operation of the Facility, and copies of all written contracts, leases, subleases (if any), and other instruments which affect the Property, which books, records, contracts, leases, subleases (if any) and other instruments shall be subject to examination and inspection at any reasonable time by Agent (upon reasonable advance notice, which for such purposes only may be given orally, except in the case of an emergency or following an Event of Default, in which case no advance notice shall be required); provided, however, that if an Event of Default has occurred and is continuing, Borrower shall deliver or cause to be delivered to Agent upon written demand all books, records, contracts, leases and subleases (if any) and other instruments relating to the Facility or its operation, other than such documents required by law to be maintained at the Facility and Borrower authorizes Agent to obtain a credit report on Borrower at any time.

4.9    Payment of Indebtedness.  Borrower shall duly and punctually pay or cause to be paid all other Indebtedness now owing or hereafter incurred by Borrower in accordance with the terms of such Indebtedness, except such Indebtedness owing to those Persons other than Agent and Lenders which is being contested in good faith and with respect to which any execution against properties of Borrower has been effectively stayed and for which reserves and collateral for the payment and security thereof have been established as determined by Agent in its sole discretion.

4.10    Conduct of Business.  Borrower shall conduct, or cause Operator to conduct, the operation of the Facility at all times in a manner consistent with the level of operation of the Facility as of the date hereof, including without limitation, the following:

(A)    to maintain the standard of care for the patients of the Facility at all times at a level necessary to ensure quality care for the patients of the Facility in accordance with customary and prudent industry standards;

(B)    to operate the Facility in a prudent manner and in compliance with applicable laws and regulations relating thereto and cause all Permits, Reimbursement Contracts,

37

and any other agreements necessary for the use and operation of the Facility or as may be necessary for participation in the Medicaid, Medicare, or other applicable reimbursement programs to remain in effect without reduction in the number of licensed beds authorized for use in the Medicaid, Medicare, or other applicable reimbursement programs;

(C)     to maintain sufficient Inventory and Equipment of types and quantities at the Facility to enable Operator to adequately perform operations of the Facility;

(D)     to keep all Improvements and Equipment located on or used or useful in connection with the Facility in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all needed and proper repairs, renewals, replacements, additions, and improvements thereto to keep the same in good operating condition;

(E)     to maintain sufficient cash in the operating accounts of the Facility in order to satisfy the working capital needs of the Facility;

(F)     to keep all required Permits and insurance coverage current and in full force and effect; and

(G)     to correct any deficiency by the date required by the applicable licensure and certification agency, if such deficiency could adversely affect either: (i) the right to continue participation in Medicare and Medicaid for existing patients; or (ii) the right to admit new Medicare and Medicaid patients; or (iii) the right to continue operating the Facility as a skilled nursing facility.

4.11     Periodic Surveys.  Borrower shall furnish or cause Operator to furnish to Agent within three (3) days of receipt a copy of any Medicare, Medicaid, Facility License or other Governmental Authority survey or report and any statement of deficiencies, and within three (3) business days copies of any report or correspondence indicating that any action is pending or being considered to impose remedies against the Facility or downgrade the Facility to a substandard category, and within the time period required by the particular Governmental Authority for furnishing a plan of correction also furnish or cause to be furnished to Agent a copy of the plan of correction generated from such survey or report for the Facility, and correct or cause to be corrected any deficiency, the curing of which is a condition of continued licensure or for full participation in Medicaid, Medicare or other reimbursement program pursuant to any Reimbursement Contract for existing patients or for new patients to be admitted with Medicaid or Medicare coverage, by the date required for cure by such agency (plus extensions granted by such agency).

4.12     Debt Service Coverage Ratio Requirements.

(a)     As used in this Agreement, the following terms shall have the following meanings unless the context hereof shall otherwise indicate:

(i)     "Debt Service" means, with respect to any particular period of time and provided there is no Event of Default, scheduled principal and interest payments due under the Note; and if there is an Event of Default, then Debt Service shall include scheduled principal and interest payments due under the Note and all other outstanding Indebtedness of Borrower.

16815951v.8

(ii)      "Debt Service Coverage Ratio" means the ratio for the applicable period in which: the numerator is the Net Operating Income from the Rents under the Leases for such period; and the denominator is the Debt Service due and payable for such period.

(iii)     "EBITDAR" means for any period Gross Income from Operations for such period less all Facility Operating Expenses for such period.

(iv)     "Facility Operating Expenses" shall mean the total of all expenditures of whatever kind relating to the operation, maintenance and management of the Property and the Facility that are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, taxes and assessments, advertising expenses, management fees equal to 5% of Gross Income from Operations, administrative service fees, professional fees, payroll and related taxes, computer processing charges, operational, equipment or other lease payments as approved by Agent, and other similar costs, but excluding depreciation, amortization, and rent paid pursuant to the Lease Agreement (less any amounts for capital expenditures), all calculated on a monthly basis in accordance with GAAP consistently applied.

(v)      "Financial Covenants" means the obligation of Borrower to satisfy the Minimum Debt Service Coverage Ratio and the Minimum EBITDAR requirements pursuant to Section 4.12(b).

(vi)     "GAAP" means, as in effect from time to time, generally accepted accounting principles consistently applied as promulgated by the American Institute of Certified Public Accountants.

(vii)    "Gross Income from Operations" shall mean all income, computed on an accrual basis in accordance with GAAP consistently applied, derived for each full or partial month during the term of the Loan from the operation of the Property and Facility in the aggregate from whatever source, including, but not limited to, all patient or resident room revenues, revenues for services provided to patients or residents, revenues from charges imposed on patients or persons acting by or on behalf of patients or residents, or revenues received for care or services to patients or residents, all food, beverage, and merchandise sales receipts, all interest income, if any, rent, utility charges, escalations, forfeited security deposits, service fees or charges, license fees, parking fees, professional fees, rent concessions or credits, and any business interruption insurance proceeds but excluding sales, use and occupancy or other taxes on receipts applicable to the Property required to be accounted for by an Operator to any government or Governmental Authority, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, proceeds of casualty insurance and condemnation awards, and interest on credit accounts.

(viii)   "Minimum Debt Service Coverage Ratio" means a Debt Service Coverage Ratio of not less than 1.10:1.00 for the applicable period.

(ix)     "Minimum EBITDAR" means: (1) on a cumulative annualized trailing 6 month basis commencing on the first day of the ninth (9th) month after the date of this Agreement, an amount equal to not less than $4,500,000 calculated monthly for the Property, (2)

16815951v.8

on a cumulative annualized trailing 6 month basis commencing on the first day of the thirteenth (13th) month after the date of this Agreement, an amount equal to not less than $5,400,000 calculated monthly for the Property, and (3) for the period commencing the first day of the sixteenth (16th) full calendar month after the date of this Agreement through the Maturity Date, an amount equal to not less than $6,300,000 calculated monthly on a trailing 12 month basis for the Property.

(x)     Intentionally Deleted.

(xi)    "Net Operating Income" shall mean Rents (less any of the following if paid by Borrower: Taxes, insurance premiums, reserves, ground rents, utility charges, deposits for taxes, insurance and other charges as provided in the Security Instrument or other expenses paid by Borrower).

(b)     Financial Covenants. Borrower covenants and agrees that for so long as the Loan or any part thereof is unpaid:

(i)     Borrower Performance.

(A)     Minimum Debt Service Coverage Ratio.   Borrower shall in the aggregate achieve and maintain compliance with the Minimum Debt Service Coverage Ratio, tested monthly, as of the last day of each month on a trailing 12 month basis.

(B)     No Additional Debt.   Except for equipment leases as permitted under the Security Instrument, the Permitted Working Capital Financing (defined below) and the Permitted Subordinated Debt (defined below), Borrower shall have no outstanding Indebtedness, secured or unsecured, direct or contingent (including any guaranties), other than the Loan.   No Indebtedness other than the Loan will be secured (senior, subordinate or pari passu) by   the Property.

(C)     No Pledge of Ownership Interest.   The Stock or ownership interests of Borrower shall not be pledged for the benefit of any Person other than Lender.

(D)     Borrower will not, and will not permit any subsidiary to, directly or indirectly (i) declare, pay, make or set aside any amount for payment in respect of the Permitted Subordinated Debt, except for payments made in full compliance with and expressly permitted under the Subordination Agreement, (ii) amend or otherwise modify the terms of any Permitted Subordinated Debt, except for amendments or modifications made in full compliance with the Subordination Agreement, or (iii) except as otherwise expressly permitted by the Subordination Agreement, amend or otherwise modify the terms of the Permitted Subordinated Debt if the effect of such amendment or modification is to (A) increase the interest rate or fees on, or change the manner or timing of payment of, such Permitted Subordinated Debt, (B) accelerate or shorten the dates upon which payments of principal or interest are due on, or the principal amount of (other than accruals of interest paid in kind), such Permitted Subordinated Debt, (C) change in a manner adverse to Agent or Lenders any event of default or add or make more restrictive any covenant with respect to such Permitted Subordinated Debt, (D) change the prepayment provisions of such Permitted Subordinated Debt or any of the defined terms related thereto, (E) change the subordination provisions thereof (or the subordination terms of any

40

guaranty thereof), or (F) change or amend any other term if such change or amendment would materially increase the obligations of the obligor or confer additional material rights on the holder of the Permitted Subordinated Debt in a manner adverse to Borrower, Agent or Lenders. Except as otherwise expressly permitted by the Subordination Agreement, Borrower shall, prior to entering into any such amendment or modification, deliver to Agent reasonably in advance of the execution thereof, any final or execution form copy thereof.

(ii)     Intentionally Deleted.

(iii)    Operator Performance.

(A)     EBITDAR.  The EBITDAR of the Operator shall not be less than the Minimum EBITDAR, tested quarterly.

4.13    [Intentionally Deleted].

4.14    HUD Financing.

(a)     Borrower shall, and shall cause Operator to, (i) timely provide all financial statements and other information requested by the HUD Lender, (ii) otherwise cooperate with the HUD Lender with respect to the HUD Financing and the application therefore in all respects, and (iii) execute, acknowledge, certify and deliver all instruments of any kind or character reasonably required for the HUD Financing application of the HUD Financing.

(b)     Borrower shall pay or cause to be paid all fees, costs and expenses, including Agent's and Lender's reasonable attorneys' fees incident to the HUD Financing together with such fees payable to HUD Lender pursuant to the HUD Contract.

(c)     Borrower shall and shall cause Operator to cooperate to accommodate the requirements of the closing process for the HUD Financing.

4.15    Updated Appraisals.  For so long as the Loan remains outstanding, if any Event of Default shall occur hereunder, or if, in Agent's reasonable business judgment, a material depreciation in the value of the Property shall have occurred, or if required or desirable for the HUD Financing, then in any such event, Agent, may cause the Property to be appraised by an appraiser selected by Agent, and in accordance with Agent's appraisal guidelines and procedures then in effect, and Borrower agrees to cooperate, and to cause Operator to cooperate, in all respects with such appraisals and furnish to the appraisers all requested information regarding the Property and the Facility.  Borrower agrees to pay all reasonable costs incurred by Agent in connection with such appraisal which costs shall be secured by the Security Instrument and shall accrue interest at the Default Rate until paid.

4.16    Comply with Covenants and Laws.  Borrower shall comply and cause Operator to comply, in all material respects, with all applicable covenants and restrictions of record and all laws, ordinances, rules and regulations and keep, or cause to keep, the Facility and Property in compliance with all applicable laws, ordinances, rules and regulations, including, without limitation, the Americans with Disabilities Act and regulations promulgated thereunder, and laws, ordinances, rules and regulations relating to zoning, health, building codes, setback

41

requirements, Medicaid and Medicare laws and keep the Permits for the Facility in full force and effect.

4.17   Taxes and Other Charges.  Subject to Borrower's right to contest the same as set forth in Section 9(d) of the Security Instrument, Borrower shall pay or cause to be paid all Taxes, assessments, charges, claims for labor, supplies, rent, and other obligations which, if unpaid, might give rise to a Lien against property of Borrower, except Liens to the extent permitted by this Agreement.

4.18   Commitment Letter.  Borrower shall provide or cause to be provided all items and pay all amounts required by any commitment letter.  If any term of a commitment letter shall conflict with the terms of this Agreement, this Agreement shall govern and control.  As to any matter contained in a commitment letter, and as to which no mention is made in this Agreement or the other Loan Documents, the commitment letter shall continue to be in effect and shall survive the execution of this Agreement and all other Loan Documents.

4.19   Certificate.  Within ten (10) days after Agent's written request, Borrower shall furnish Agent with a certificate stating that Borrower has complied with and is in compliance with all terms, covenants and conditions of the Loan Documents to which Borrower is a party and that there exists no Default or Event of Default or, if such is not the case, that one or more specified events have occurred, and that the representations and warranties contained herein are true and correct with the same effect as though made on the date of such certificate.

4.20   Notice of Fees or Penalties.  Borrower shall immediately notify Agent, upon Borrower's knowledge thereof, of the assessment by any state or any Medicare, Medicaid, health or licensing agency of any fines or penalties against Borrower, Operator, or the Facility.

4.21   Lease Agreement.

(a)   Borrower shall maintain or cause to be maintained the Lease Agreement, with terms expiring not earlier than five (5) years after the Closing Date, and an annual aggregate triple net rent of no less than the sum of 1.10 times Debt Service, in full force and effect and timely perform all of its obligations thereunder and not permit the termination or amendment of the Lease Agreement unless the prior written consent of Agent is first obtained (which consent will not be unreasonably withheld or delayed);

(b)   In the event that proceedings are instituted to terminate the Facility License or to terminate the Facility's Medicaid or Medicare certification, immediately Borrower shall engage or cause Operator to engage oversight management services from a management company reasonably acceptable to the Agent, subject to applicable regulatory approval, if required; and

(c)   In the event that bankruptcy or insolvency proceedings are instituted by or against Operator, Borrower shall (to the extent permitted by the applicable bankruptcy court having jurisdiction over such proceedings), upon written instruction received from Agent, terminate the Lease Agreement with the Operator.

4.22   Control Agreements.  All payments due under the Loan shall be made by from an

account maintained by the Borrower for such purpose in which the Borrower shall maintain balances sufficient to pay the monthly payment due to Agent under the Loan Documents, in addition to deposits for Taxes, insurance premiums, other deposits required pursuant to the Security Instrument, and the Payment Reserves. Rents and other cash or income received by Borrower from any source shall be deposited in the demand deposit account at the financial institution (herein the "Deposit Account") specified in the control agreement executed by Borrower in connection with the Loan (the "Control Agreement"). Borrower warrants and represents to Agent and Lenders that the Deposit Account is the only deposit account maintained by Borrower. Borrower shall not, without Agent's prior written consent, close or suffer or permit to be closed the Deposit Account or maintain any other deposit accounts. Borrower will grant to Agent and each Lender a first lien security interest in such Deposit Accounts as collateral for repayment of the Loan.

4.23    Loan Closing Certification.   Immediately notify Agent in writing, in the event any representation or warranty contained in this Agreement, the other Loan Documents or any document delivered in connection with the Loan Documents, becomes untrue or there shall have been any material adverse change in any such representation or warranty.

4.24    Required Repairs.   Borrower shall complete in a good and workmanlike manner all Required Repairs to the Property described on Exhibit E attached hereto on or before the Completion Date set froth thereon.

4.25    Management.   The management of the Facility shall be by either Manager, Borrower or an Affiliate of Borrower approved by Agent, for so long as Manager, Borrower or said Affiliate is a professional management company or administrator approved by Agent and is not prohibited from providing any services to Borrower by any Governmental Authority or applicable Laws. Such management arrangement shall be pursuant to a written Management Agreement approved by Agent. In no event shall any Manager be removed or replaced or any Management Agreement modified, amended, extended, terminated, canceled or replaced without the prior written consent of Agent, which consent shall not be unreasonably withheld or delayed, and without the written consent or approval if required by applicable law, regulation, or policy of any Governmental Authority that has direct or indirect authority or oversight over the Borrower, Operator or Facility, or the operations conducted at the Facility. In the event of (a) an Event of Default hereunder which results in an acceleration of the Loan and Agent or any Lender takes an action toward foreclosure or implementation of similar remedies available under the laws of the state in which the Property is located, or (b) a change in control of the Manager (other than any involuntary change in control caused by the death of any partner, shareholder, member, joint venturer, or beneficial owner of a trust so long as Manager is reconstituted, if required, following such death, and those persons responsible for the management of the Facility remain unchanged as a result of such death), or (c) the Manager becomes insolvent or the debtor in any bankruptcy or insolvency proceeding, Agent shall have the right to terminate, or to direct Borrower to terminate or cause Operator to terminate, such Management Agreement upon 30 days' notice and to retain, or cause Operator to retain, or to direct Borrower to retain, a new Manager approved by Agent.

43

ARTICLE V
NEGATIVE COVENANTS OF BORROWER

Until the Loan Obligations have been paid in full, Borrower shall not:

5.1    Assignment of Licenses and Permits.  Assign or transfer any of its interest in any Permits (including Facility Licenses), Certificates of Need (if required) or Reimbursement Contracts (including rights to payment thereunder) pertaining to the Facility, or assign, transfer, or remove or permit any other person to assign, transfer, or remove any records pertaining to the Facility including, without limitation, patient records, medical and clinical records (except for removal of such patient records as directed by the patients owning such records), without Agent's prior written consent, which consent may be granted or refused for any reason or for no reason whatsoever in Agent's sole and absolute discretion.

5.2    No Liens; Exceptions.  Create, incur, assume or suffer to exist any Lien upon or with respect to the Property and Improvements or any of its properties, rights, income or other assets relating thereto, including, without limitation, the Collateral, whether now owned or hereafter acquired, other than the following permitted Liens ("Permitted Encumbrances"):

(a)    Liens at any time existing in favor of the Agent and Lenders;

(b)    Liens which are listed in Exhibit F attached hereto;

(c)    Inchoate Liens arising by operation of law for the purchase of labor, services, materials, equipment or supplies, provided payment shall not be delinquent and, if such Lien is a lien upon any of the Property or Improvements, such Lien must be fully disclosed to Agent and bonded off and removed from the Property and Improvements, within thirty (30) days of its creation, in a manner satisfactory to Agent;

(d)    Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure performance of tenders, statutory obligations, leases and contracts (other than for money borrowed or for credit received with respect to property acquired) entered into in the ordinary course of business as presently conducted or to secure obligations for surety or appeal bonds; and

(e)    Liens for current year's Taxes, assessments or governmental charges or levies provided payment thereof shall not be delinquent; and

(f)    Except as may otherwise be set forth in the AR Intercreditor Agreement, liens upon the Operator's accounts securing working capital financing approved by Lender which do not cause Operator to fail to meet the Operator Performance covenants set forth in Section 4.12 above and which are subject to Lender's prior written consent and to the provider thereof entering into an intercreditor agreement acceptable to Lender (the "Permitted Working Capital Financing").

5.3    Merger, Consolidation, Etc.  Except as otherwise provided in the Security Instrument, consummate or suffer or permit Operator to consummate any merger, consolidation

44

or similar transaction, or sell, assign, lease or otherwise dispose of substantially all of its assets (whether now or hereafter acquired), without the prior written consent of the Agent, which consent may be granted or refused in Agent's sole discretion.

    5.4    <u>Maintain Single-Purpose Entity Status</u>.

    (a)    Dissolve or terminate or materially amend the terms of its certificate of incorporation, articles of organization, operating agreement or partnership agreement or by-laws, as applicable, the terms of which require Borrower and Operator to be a Single-Purpose Entity;

    (b)    at any time own any encumbered asset other than (i) the Property, and (ii) incidental personal property necessary for the operation of the Property;

    (c)    at any time be engaged directly or indirectly, in any business other than the ownership, management and operation of the Property;

    (d)    incur, create or assume any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (i) the Loan, (ii) Permitted Working Capital Financing, and (iii) Indebtedness which represents trade payables or accrued expenses incurred in the ordinary course of business of owning and operating the Property; none of which shall be secured (senior, subordinate or *pari passu*) by the Property;

    (e)    become insolvent or fail to pay its debts from its assets as the same shall become due;

    (f)    fail to do all things necessary to preserve its existence as a Single-Purpose Entity, and will not, nor will any partner, limited or general, member or shareholder thereof, amend, modify or otherwise change its partnership certificate, partnership agreement, articles of organization, operating agreement, articles of incorporation or by-laws in a manner which adversely affects the Borrower's existence as a Single-Purpose Entity;

    (g)    fail to maintain books and records and bank accounts separate from those of its Affiliates, including its members, general partners or shareholders, as applicable;

    (h)    fail to at all times hold itself out to the public as a legal entity separate and distinct from any other entity (including any Affiliate thereof, including the general partner or any member or shareholder of the Borrower or any Affiliate of the general partner or any member or shareholder of the Borrower, as applicable);

    (i)    fail to file its own tax returns; or

    (j)    fail to maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other Person.

    5.5    <u>Change of Business</u>.  Make any material change in the nature of its business as it is being conducted as of the date hereof.

45

16815951v.8

5.6     Changes in Accounting.  Change its methods of accounting, unless such change is permitted by GAAP, and provided such change does not have the effect of curing or preventing what would otherwise be an Event of Default or Default had such change not taken place.

5.7     ERISA Funding and Termination.   In the event that Borrower becomes the licensed operator of the Facility, permit (a) the funding requirements of ERISA with respect to any employee plan to be less than the minimum required by ERISA at any time, or (b) any employee plan to be subject to involuntary termination proceedings at any time.

5.8     Transactions with Affiliates.  Enter into any transaction with a Person which is an Affiliate of Borrower other than in the ordinary course of its business and on fair and reasonable terms no less favorable to Borrower, than those they could obtain in a comparable arms-length transaction with a Person not an Affiliate, provided that the Management Agreement is permitted hereunder.

5.9     Transfer of Property or any Ownership Interests.  Borrower shall not: (a) permit or suffer the Transfer of any of the Stock or ownership interests of an Operator or Borrower or (b) permit or suffer any other Transfer.  Notwithstanding any other provision of this Section 5.9 to the contrary and subject to Patriot Act compliance, Transfers of partnership interests, membership interests or corporate shares in Borrower, Operator or any Person holding an interest in Borrower or Operator between or among partners, members or shareholders existing as such on the date hereof, or Transfers of such interests to immediate family members of existing partners, members or shareholders or to trusts for estate planning purposes for the benefit of existing partners, members or shareholders or members of the transferor's immediate family shall be permitted with Lender's consent, which will not be unreasonably withheld  and without an assumption fee or review fee, provided that (i) no Event of Default shall have occurred and be continuing, (ii) in no event shall Borrower, Operator and any Person holding an interest in Borrower or Operator who is a Single-Purpose Entity cease to be a Single-Purpose Entity, (iii) no such Transfer results in a change of control of Borrower or Operator, and (iv) shall pay on demand  all  expenses  (including,  without  limitation,  reasonable  attorney's  fees  and disbursements, title search costs and title insurance endorsement premiums) incurred by Lender in connection with the review, approval and documentation.

5.10     Change of Use.  Alter or change the use of the Facility or permit the termination or amendment of any management agreement for the Facility or enter into any Lease for the Facility, unless Borrower first notifies Agent and provides Agent a copy of the proposed lease agreement or management agreement, obtains Agent's written consent thereto, which consent may be withheld for any reason or for no reason whatsoever in Agent's sole and absolute discretion, and obtains and provides Agent with a subordination agreement in form satisfactory to Agent, as determined by Agent in its sole discretion, from such Manager or Operator subordinating to all rights of Agent.

5.11     Place of Business.  Change its chief executive office or its principal place of business without first giving Agent at least thirty (30) days prior written notice thereof and promptly providing Agent such information and amendatory financing statements as Agent may request in connection therewith.

16815951v.8

5.12   Acquisitions.   Directly or indirectly, purchase, lease, manage, own, operate, or otherwise acquire any property or other assets (or any interest therein) which are not used in connection with the operation of the Property and Improvements.

5.13   Dividends, Distributions and Redemptions.   As long as any Event of Default exists, or if any Event of Default would result from a distribution, Borrower shall not, nor shall Borrower suffer or permit an Operator to, declare or pay any distributions to its shareholders, members or partners, as applicable, or purchase, redeem, retire, or otherwise acquire for value, any Stock or ownership interests in Borrower or Operator now or hereafter outstanding, return any capital to its shareholders, members or partners as applicable, or make any distribution of assets to its shareholders, members or partners, as applicable.

ARTICLE VI
ENVIRONMENTAL HAZARDS

6.1   Prohibited Activities and Conditions.   Borrower shall not cause or permit, or suffer or permit an Operator to cause, permit or suffer, any of the following:

(a)   The presence, use, generation, release, treatment, processing, storage (including storage in above ground and underground storage tanks), handling, or disposal of any Hazardous Materials in, on, under, at or from the Property or any Improvements;

(b)   The transportation of any Hazardous Materials to, from, or across the Property,

(c)   Any occurrence or condition on the Property or in the Improvements or any other property of Borrower that is adjacent to the Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(d)   Any violation of or noncompliance with the terms of any Environmental Permit with respect to the Property, the Improvements or any property of Borrower that is adjacent to the Property.

The matters described in clauses (a) through (d) above are referred to collectively in this Article VI as "Prohibited Activities and Conditions" and individually as a "Prohibited Activity and Condition."

6.2   Exclusions.   Notwithstanding any other provision of this Article VI to the contrary, "Prohibited Activities and Conditions" shall not include the safe and lawful use and storage of quantities of: (a) pre-packaged supplies, medical waste, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable facilities; (b) cleaning materials, personal grooming items and other items sold in pre-packaged containers for consumer use and used by occupants of the Facility; and (c) petroleum products used in the operation and maintenance of motor vehicles from time to time located on the Property's parking areas or used to maintain or repair the Property or Improvements, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

47

6.3     Preventive Action.    Borrower shall take all appropriate steps (including the inclusion of appropriate provisions in any Leases approved by Agent which are executed after the date of this Agreement) to prevent its employees, agents, contractors, tenants and occupants of the Facility from causing or permitting any Prohibited Activities and Conditions.

6.4     O&M Program Compliance.    Borrower shall implement and comply with the O&M Program, as applicable, in a timely manner, and cause all employees, agents, and contractors of Borrower and any other persons present on the Property to comply with the O&M Program. All costs of performance of Borrower's obligations under any O&M Program shall be paid by Borrower, and Agent and Lenders' out-of-pocket costs incurred in connection with the monitoring and review of the O&M Program and Borrower's performance shall be paid by Borrower upon demand by Agent. Any such out-of-pocket costs of Agent and Lenders which Borrower fails to pay promptly shall become an additional part of the Loan Obligations.

6.5     Borrower's Environmental Representations and Warranties.    Borrower represents and warrants to Agent and Lenders that:

(a)     Borrower has not at any time caused or permitted any Prohibited Activities and Conditions;

(b)     To the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities and Conditions exist or have existed;

(c)     Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials. Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits required for the operation of the Facility, Property and the Improvements in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect. To the best of Borrower's knowledge after reasonable and diligent inquiry, no event has occurred or condition exists with respect to the Facility, Property and/or Improvements that constitutes, or with the passing of time or the giving of notice would constitute, noncompliance with any Hazardous Materials Law or the terms of any Environmental Permit;

(d)     There are no actions, suits, claims or proceedings pending, or to Borrower's knowledge, threatened that involves the Facility, Property and/or the Improvements or allege, arise out of, or relate to any Prohibited Activity, and Condition;

(e)     Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Facility, Property, the Improvements or any other property of Borrower that is adjacent to the Property. The representations and warranties in this Article VI shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan evidenced by the Note, and shall survive until and after the Loan Obligations have been paid in full.

6.6     Notice of Certain Events.    Borrower shall promptly notify Agent in writing of any and all of the following that may occur:

48

        (a)      Borrower's or Operator's discovery of any Prohibited Activity and Condition;

        (b)      Borrower's or Operator's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present, or future alleged violations of Hazardous Materials Law, Prohibited Activities and Conditions or any other environmental, health or safety matters affecting the Property, the Improvements or any other property of Borrower that is adjacent to the Property; or

        (c)      Any representation or warranty in this Article VI or the Environmental Indemnity Agreement which becomes untrue at any time after the date of this Agreement.

        Any such notice given by Borrower shall not relieve Borrower or any other Person of, or result in a waiver of, any obligation under this Agreement, the Note, or any of the other Loan Documents.

    6.7    <u>Costs of Inspection</u>.  Borrower shall pay promptly the costs of any environmental inspections, tests or audits required by Agent in connection with any foreclosure or deed in lieu of foreclosure, or, if required by Agent, as a condition of Agent's consent to any "Transfer", or required by Agent following a reasonable determination by Agent that Prohibited Activities and Conditions may exist.  Any such costs incurred by Agent and Lenders (including the reasonable fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Loan Obligations.

    6.8    <u>Remedial Work</u>.  If any investigation, site monitoring, containment, clean-up, restoration or other remedial work ("<u>Remedial Work</u>") is necessary to comply with any Hazardous Materials Law or order of any Governmental Authority that has or acquires jurisdiction over the Property, the Improvements or the use, operation or improvement of the Property under any Hazardous Materials Law, Borrower shall, by the earlier of (a) the applicable deadline required by Hazardous Materials Law or (b) thirty (30) days after notice from Agent demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete such work by the time required by applicable Hazardous Materials Law.  If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Agent may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Agent and Lenders on demand for the cost of doing so.  Any reimbursement due from Borrower to Agent and Lenders shall become part of the Loan Obligations and shall assume interest the Default Rate.

    6.9    <u>Cooperation with Governmental Authorities</u>.  Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any Hazardous Materials Law or any alleged Prohibited Activity and Condition.

    6.10   <u>Indemnity</u>.

        (a)      Borrower shall hold harmless, defend and indemnify: (i) Agent, (ii) Lender; (iii) any prior owner or holder of the Note; (iv) the officers, directors, partners, agents,

49

shareholders, employees and trustees of any of the foregoing; and (iv) the heirs, legal representatives, successors and assigns of each of the foregoing (together, the "Indemnitees") against all proceedings, claims, damages, losses, liabilities, expenses, penalties and costs (whether initiated or sought by any Governmental Authority or private parties), including fees and expenses of attorneys, expert witnesses and Remedial Work, whether incurred in connection with any judicial or administrative process or otherwise, arising directly or indirectly from any of the following:

(A)     Any breach of any representation or warranty of Borrower in this Article VI or the Environmental Indemnity Agreement;

(B)     Any failure by Borrower to perform any of their obligations under this Article VI or the Environmental Indemnity Agreement;

(C)     The existence or alleged existence of any Prohibited Activity and Condition;

(D)     The presence or alleged presence of Hazardous Materials in, on, around or under the Property, the Improvements or any property of Borrower that is adjacent to the Property; or

(E)     Compliance with or actual or alleged violation of any Hazardous Materials Law.

(b)     Counsel selected by Borrower to defend Indemnitees shall be subject to the reasonable approval of those Indemnitees, which approval shall not be unreasonably withheld, delayed or conditioned.  Notwithstanding anything contained herein, any Indemnitee may elect to defend any claim or legal or administrative proceeding at the Borrower's expense if such Indemnitee has reason to believe that its interests are not being adequately represented or diverge from other interests being represented by such counsel (but Borrower shall be obligated to bear the expense of at most only one such separate counsel).  Nothing contained herein shall prevent an Indemnitee from employing separate counsel in any such action at any time and participating in the defense thereof at its own expense.

(c)     Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (a "Claim") settle or compromise the Claim if the settlement (i) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Agent and each Lender of a written release of those Indemnitees, satisfactory in form and substance to Agent; or (ii) may materially and adversely affect any Indemnitee, as determined by such Indemnitee in its sole discretion.

(d)     The liability of Borrower to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of Borrower to receive notice of or consideration for any of the following:

(i)     Any amendment or modification of any Loan Document;

16815951v.8

(ii)     Any extensions of time for performance required by any of the Loan Documents;

(iii)    The accuracy or inaccuracy of any representations and warranties made by Borrower under this Agreement or any other Loan Document;

(iv)    The release of Borrower or any other Person, by Agent or any Lender or by operation of law, from performance of any obligation under any of the Loan Documents;

(v)     The release or substitution in whole or in part of any security for the Loan Obligations; and

(vi)    Agent's or any Lender's failure to properly perfect any lien or security interest given as security for the Loan Obligations.

(e)     Borrower shall, at its own cost and expense, do all of the following:

(i)     Pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Article VI or the Environmental Indemnity Agreement;

(ii)    Reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Article VI or the Environmental Indemnity Agreement; and

(iii)   Reimburse Indemnitees for any and all expenses, including reasonable fees and costs of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Article VI or the Environmental Indemnity Agreement, or in monitoring and participating in any legal or administrative proceeding.

(f)     In any circumstances in which the indemnity under this Article VI applies, Agent and each Lender may, if it deems it reasonable necessary, employ its own separate legal counsel and consultants to prosecute, defend or negotiate any Claim or legal or administrative proceeding and Agent and each Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned) may settle or compromise any Claim or legal or administrative proceeding.  Borrower shall reimburse Lender upon demand for all costs and expenses incurred by Agent and each Lender, including all costs of settlements entered into in good faith, and the reasonable fees and out of pocket expenses of such attorneys and consultants.

(g)     The provisions of this Article VI shall be in addition to any and all other obligations and liabilities that Borrower may have under the applicable law or under the other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Article VI without regard to whether Agent, Lender or that Indemnitee has exercised any rights against the Property and/or any Improvements or any other security, pursued any rights against any

51

Indemnitee, or pursued any other rights available under the Loan Documents or applicable law. If Borrower consists of more than one person or entity, the obligation of those persons or entities to indemnify the Indemnitees under this Article VI shall be joint and several. The obligations of Borrower to indemnify the Indemnitees under this Article VI shall survive any repayment or discharge of the Loan Obligations, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of the Security Instrument.

ARTICLE VII
PAYMENT RESERVES

7.1    Establishment of Payment Reserves.    Borrower understands and agrees that, notwithstanding the establishment of the Payment Reserves as herein required, all of the proceeds of the Loan have been, and shall be considered, fully disbursed and shall bear interest and be payable on the terms provided in the Loan Documents.

7.2    Required Repair Reserve .    Borrower shall perform or cause Operator to perform all of the repairs or replacements to the Property as more particularly set forth on Exhibit E (the "Required Repairs"). The Required Repairs shall be completed in a good and workmanlike manner on or before the "completion date" if any, set forth on Exhibit E for the particular item of the Required Repairs. On the Closing Date, Borrower shall deposit with Agent the amount set forth on Exhibit E to perform the Required Repairs. Amounts so deposited with Agent are referred to as the "Required Repair Reserve". If the Required Repairs are not completed when and as provided under this Agreement, or upon the occurrence of an Event of Default, Agent at its option, in addition all other rights and remedies of Agent under this Agreement or other Loan Documents, may withdraw all funds in the Required Repair Reserve and apply such funds either to completion of the Required Repairs or towards payment of the Loan Obligations in such order, proportion and priority as Agent may determine in its sole discretion.

7.3    Replacement Reserve.    Borrower shall pay to Agent, for the benefit of the Lenders, on the first day of each month, one-twelfth of the annual amount per bed set forth on Exhibit G (the "Replacement Reserve Monthly Deposit"), which is the amount estimated by Agent in its sole discretion to be due for replacements and repairs required to be made to the Property. Amounts so deposited are referred to as the "Replacement Reserve". Agent may reassess its estimate of the amount necessary for the Replacement Reserve from time to time and increase the monthly amounts required to be deposited into Replacement Reserve upon thirty (30) days written notice to Borrower if Agent determines in its reasonable discretion that an increase is necessary to maintain the proper maintenance and operation of the Property.

7.4    Disbursements from the Required Repair Reserve and the Replacement Reserve.

(a)    So long as no Default or Event of Default exists and except as may be otherwise provided in this Agreement or other Loan Documents, Agent shall, to the extent funds are available in the Required Repair Reserve make disbursements to the Property from the Required Repair Reserve to or for the benefit of the Borrower to reimburse the Borrower for the Required Repairs and, make disbursements from the Replacement Reserve upon Borrower's written request, as provided in Section 7.4(b)(ii) below.

52

16815951v.8

(b)     Agent shall have no obligation to disburse any amount from the Required Repair Reserve or the Replacement Reserve unless the following additional conditions are satisfied:

(i)     Agent receives a written request from Borrower for the applicable disbursement from the Required Repair Reserve or the Replacement Reserve and a certification by Borrower in a form acceptable to Agent that the applicable item of repair and/or replacement has been completed;

(ii)     The delivery to Agent by Borrower of invoices, receipts, or other evidence satisfactory to Agent verifying the cost of performing the repair, the replacement, or completing the applicable work, or otherwise evidencing the obligation to be paid;

(iii)     To the extent applicable, the delivery to Agent of affidavits, lien waivers, and other evidence reasonably satisfactory to Agent showing that all materialmen, laborers, subcontractors, and any other parties who might or could claim statutory or common law liens and are furnishing or have furnished labor, material, or equipment to the Property have been paid all amounts due for labor, materials or equipment furnished to said Property; and

(iv)     Such other terms and conditions as may be provided in this Agreement or which are reasonably required by Agent.

7.5     <u>HUD Fee Reserve</u>.  On the Closing Date, Agent shall fund for each Property the amount of the HUD Fee Reserve set forth on <u>Exhibit G</u> for the cost of the application fee for the HUD Refinancing (the "<u>HUD Fee Reserve</u>").

7.6     <u>HUD Financing Cost Reserve</u>.  On the Closing Date, Agent shall fund for each Property the amount of the HUD Financing Cost Reserve set forth on <u>Exhibit G</u> for pre-paid HUD fees to third parties, closing costs, and other fees and expenses of third parties relating to the HUD Financing (collectively, the "<u>HUD Financing Cost Reserve</u>").

7.7     <u>Disposition of the HUD Fee and the HUD Financing Cost Reserves</u>.

(a)     Agent will disburse the HUD Fee Reserve and the HUD Financing Cost Reserves in accordance with the HUD Contract when and as required for the purposes of the HUD Financing as determined by Agent.

(b)     Prior to submission of applications with respect to the HUD Financing, a portion of the HUD Financing Cost Reserve and HUD Fee Reserve (collectively, the "HUD Expenses") equal to two percent (2%) of the HUD Financing shall be non-refundable to Borrower, and following submission of applications with respect to the HUD Financing, no part of the HUD Expenses shall be refundable to Borrower; provided however, in the event that: (A) the HUD Lender is unable to deliver a commitment for the HUD Financing to Borrower consistent with the HUD Contract or as otherwise provided in this Agreement, (B) there is no Event of Default under this Agreement nor under any of the Loan Documents, (C) Borrower, Operator and Manager timely provide all financial statements and other information requested by the HUD Lender and otherwise cooperate with HUD and the HUD Lender with respect to the HUD Financing in all respects, (D) there is no material negative or adverse change in the

53

financial condition of Borrower, Operator or Manager, and (E) there is no lien, pending or threatened litigation or other event effecting any Property or the Borrower or the Operator or Manager, which causes the Property, Borrower, Operator, Manager, or the Facility not to be eligible for a HUD Financing, then and in that event, the HUD Expenses, to the extent not disbursed as set forth in Section 7.7(a) above, shall be credited against the outstanding balance of the Loan.

7.8     Cash Collateral Reserve.

(a)     On the Closing Date, if applicable, Borrower shall deposit with Lender for each Property, for the purpose of establishing a Cash Collateral Reserve for purposes of the payment of the Debt and satisfaction of the Loan Obligations, the amount set forth on Exhibit G for the Cash Collateral Reserve (the "Cash Collateral Reserve").

(b)     The Cash Collateral Reserve shall be disbursed by the Lender and applied to the Debt and other Loan Obligations as determined by Lender during the Term of the Loan. Upon payment of the Debt and satisfaction of all other Loan Obligations of Borrower under the Loan Documents, to the extent not disbursed, the Cash Collateral Reserve, including any interest earned thereon, shall be refunded to Borrower.

7.9     Security Interest in Payment Reserves.

(a)     Agent or its assignee may either hold the Payment Reserves in a separate account or accounts at CFG Community Bank or another depository institution or trust company determined by Agent in its sole discretion. Borrower shall not be entitled to interest on any part of the Payment Reserves. As additional security for the payment and performance by Borrower of the Loan Obligations, Borrower hereby unconditionally and irrevocably assigns, conveys, pledges, mortgages, transfers, delivers, deposits, sets over and confirms unto Agent, and hereby grants to Agent and Lenders, a security interest in (A) the Payment Reserves, (B) the depository or other accounts into which the Payment Reserves have been deposited, (C) all insurance on said accounts, (C) all accounts, contract rights, and general intangibles or other rights and interests pertaining thereto, (E) all sums now or hereinafter therein or represented thereby, (F) all replacements, substitutions or proceeds thereof, (G) all instruments and documents, now or hereafter evidencing the Payment Reserves or such accounts, (H) all powers, options, rights, privileges, and immunities pertaining to the Payment Reserves (including the right to make withdrawals therefrom), and (I) all proceeds of the foregoing. Borrower hereby expressly authorizes and consents to the accounts into which the Payment Reserves have been deposited being held in Agent's name or the name of any entity servicing the Note for Agent, and hereby acknowledges and agrees that Agent, or at Agent's election, such servicing agent, shall have exclusive control over said accounts. Notice of the assignment and security interest granted to Agent and Lenders herein may be delivered by Agent at any time to the financial institution wherein the Payment Reserves have been established, and Agent, or such servicing entity, shall have possession of all passbooks or other evidences of such accounts. Borrower hereby assumes all risk of loss with respect to amounts on deposit in the Payment Reserves.

(b)     Upon an Event of Default, Agent may, but shall not be obligated to, apply at any time the balance then remaining in the Payment Reserves against the Loan Obligations in

whatever order Agent shall determine in Agent's sole and absolute discretion. To the extent Agent withdraws any funds from the Payment Reserves as a result of Borrower's Default, Borrower shall replenish the Payment Reserves within fourteen (14) days of Agent's demand. No such application of the Payment Reserves by Agent shall be deemed to cure any Default or Event of Default hereunder, and any such application shall not limit Borrower's obligation to deposit any deficiency of which Agent gives notice. Upon full payment and performance of the Loan Obligations and in accordance with its terms or at such earlier time as Agent may elect, the balance of the Payment Reserves then in Agent's possession shall be paid over to Borrower and no other party shall have any right or claim thereto.

(c)     Borrower hereby knowingly, voluntarily, and intentionally stipulates, acknowledges and agrees that the advancement of the funds from the Payment Reserves as set forth herein is at Borrower's direction and is not the exercise by Agent of any right of set off or other remedy upon an Event of Default. Borrower hereby waives all right to withdraw funds from the Payment Reserves, and all rights to receive disbursements from the Payment Reserves except in compliance with the Loan Documents.

(d)     Upon an Event of Default, Agent may, without notice or demand (it being expressly agreed by Borrower that Borrower is waiving any notice of acceleration and intent to accelerate) on Borrower, at its option (A) withdraw any and all funds (including, without limitation, interest) then remaining in the Payment Reserves and apply the same, after deducting all reasonable costs and expenses of safekeeping, collection, and delivery (including, but not limited to, attorneys' fees, costs, and expenses) to the Loan Obligations in such manner as Agent shall determine in its sole and absolute discretion, (B) exercise any and all rights and remedies of a secured party under the applicable Uniform Commercial Code, and/or (C) exercise any other remedies available at law or in equity.

The exercise of any or all of Agent's right to initiate and complete a judicial or non-judicial foreclosure under the Security Instrument shall not preclude its exercise of its rights under this <u>ARTICLE VII</u>.

ARTICLE VIII
EVENTS OF DEFAULT AND REMEDIES

8.1     <u>Events of Default</u>. The occurrence of any one or more of the following shall constitute an "<u>Event of Default</u>" hereunder:

(a)     Borrower's failure to pay the entire amount of the Debt and other Loan Obligations on or before the Maturity Date; or

(b)     Borrower's failure to pay on or before the sixth (6th) day of the month, for credit to the Loan, any regularly scheduled monthly installment of principal or interest (other than the amount payable on the Maturity Date) that is payable on the first (1st) day of the month pursuant to this Agreement or any Loan Document; or

(c)     The failure to pay when due, any Taxes, insurance premiums or payment of money (other than as provided in <u>Section 8.1(a)</u> or <u>(b)</u>) required by the Note, this Agreement, a

55

Security Instrument, or any of the other Loan Documents or owed to the Agent or any Lender by Borrower; or

(d)     Dissolution or a change in composition of any Borrower (including without limitation the sale or transfer of any ownership interest in any Borrower, or any Transfer not expressly permitted in the this Agreement, the Security Instrument or any of the other Loan Documents, or any failure to furnish to Agent financial statements and other information required by Section 4.6 when due; or

(e)     The failure of Borrower to perform or keep or abide by any term, covenant or term, covenant or condition of any of the Loan Documents (other than as set forth in Section 8.1(a), (b), (c) or (d) ), which can be cured with the payment of money, within seven (7) days after notice from Agent; or

(f)     The failure of Borrower to perform or keep or abide by any term, covenant or term, covenant or condition of any of the Loan Documents (other than as set forth in Section 8.1(a), (b), (c) or (d)), that cannot be cured with the payment of money (but is otherwise susceptible of curing), within fifteen (15) days after notice from Agent, provided that if such failure cannot reasonably be cured within such fifteen (15) day period and Borrower shall have commenced to cure within such fifteen (15) day period and thereafter diligently and expeditiously proceeds to cure the same, such fifteen (15) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such failure, it being agreed that no such extension shall be for a period in excess of sixty (60) days; or

(g)     the filing of a bankruptcy proceeding, assignment for the benefit of creditors, issuance of a judgment in excess of $100,000.00 hereafter awarded against any Borrower by any court of competent jurisdiction that remains unsatisfied or otherwise in force and effect for a period of thirty (30) days after the date of such award and the enforcement of said judgment against the assets of any Borrower has not been stayed by an order of a court of competent jurisdiction, execution, garnishment, or levy against, or the appointment of a representative of any kind for the commencement of any proceeding for relief from indebtedness by or against any Borrower; or

(h)     the happening of any event which, in the reasonable judgment of the Agent, adversely affects the Borrower's ability to repay the Loan or the value of the Collateral; or

(i)     if any written representation, covenant or warranty made to the Agent or any Lender by any Borrower is breached or is untrue in any material respect when made;

(j)     the occurrence of a breach or default under any other document or instrument given to Agent or any Lender in connection with this Loan after the expiration of all notice, grace or cure periods set forth in the Loan Documents; or

(k)     inability to manage the affairs of the Borrower or Operator; or

(l)     failure to timely provide any financial information on request or to permit an examination of books and records, after the expiration of all notice, grace or cure periods, if any, set forth in the Loan Documents; or

16815951v.8

(m)     the Borrower shall convey, transfer or otherwise divest itself of title to the Property; or

(n)     the Borrower shall encumber the Property or the Property with any secondary financing, without the prior written approval of Agent which approval may be granted or withheld for any reason or for no reason whatsoever in Agent's sole and absolute discretion; or

(o)     if at any time while the Loan remains outstanding, the Borrower shall fail to comply with the Financial Covenants set forth herein; or revocation or suspension of an Operator's or a Borrower's Certificate of Need (if required), Facility License, the Medicaid or Medicare provider agreements or any other Permit or Reimbursement Contract necessary to operate the Facility; or

(p)     Intentionally Deleted;

(q)     if Borrower or any Operator incurs additional Indebtedness without the prior written approval of the Agent; or

(r)     a default by any Borrower or any Affiliate of Borrower on any other obligations owed by them to Agent or any Lender; or

(s)     the occurrence of any material adverse change in the financial condition or prospects of Borrower or the existence of any other condition which, in Agent's reasonable determination, constitutes a material impairment of any such Person's ability to operate the Facility or of such Person's ability to perform their respective obligations under the Loan Documents, which is not remedied within thirty (30) days after written notice; or

(t)     the occurrence of any "Reportable Event" under ERISA which Agent determines in good faith constitutes grounds for imposition of liability against Borrower under Section V, Subtitle D of ERISA;

(u)     the failure to satisfy any of the Financial Covenants; or

(v)     if Borrower or any Operator or Lessee of any of the Property should be assessed fines or penalties in excess of $50,000 in the aggregate in any calendar year or on more than two (2) separate occasions by any Governmental Authority with jurisdiction over the Facility.

Notwithstanding anything in this Section, all requirements of notice shall be deemed eliminated if Lender is prevented from declaring an Event of Default by bankruptcy or other applicable law. The cure period, if any, shall then run from the occurrence of the event or condition of Default rather than from the date of notice.

8.2     Remedies.  Upon the occurrence of any one or more of the foregoing Events of Default, Agent or any Lender may, at its option:

(a)     Declare the entire unpaid principal and accrued but unpaid interest of the Loan Obligations to be, and the same shall thereupon become, immediately due and payable,

57

without presentment, protest or further demand or notice of any kind (including, without limitation, notice of acceleration and notice of intent to accelerate), all of which are hereby expressly waived; and/or

(b)   Proceed to protect and enforce its rights by action at law (including, without limitation, bringing suit to reduce any claim to judgment), suit in equity and other appropriate proceedings including, without limitation, for specific performance of any covenant or condition contained in this Agreement; and/or

(c)   Exercise any and all rights and remedies afforded by the laws of the United States, the states in which any of the Property or other Collateral is located or any other appropriate jurisdiction as may be available for the collection of debts and enforcement of covenants and conditions such as those contained in this Agreement and the Loan Documents; and/or

(d)   Exercise the rights and remedies of setoff and/or banker's lien against the interest of Borrower in and to every account and other property of Borrower which is in the possession of Agent or any Lender or any person who then owns a participating interest in the Loan, to the extent of the full amount of the Loan; and/or

(e)   Exercise its rights and remedies pursuant to any of the Loan Documents.

Any failure of Agent or any Lender to make any election of remedies following an Event of Default shall not constitute a waiver of Agent's or any Lender's right to make the election in the event of any subsequent Event of Default.

8.3    Costs of Collection and Enforcement.   Borrowers agree, jointly and severally, to pay (a) all reasonable attorneys' fees and other costs and expenses of any nature incurred by Agent and each Lender in connection with this Agreement or the enforcement of Agent's or any Lender's rights and remedies under the Loan Documents, including reasonable attorneys' fees incurred by Agent and each Lender for legal advice concerning Agent and each Lender's rights and remedies (whether or not an Event of Default in fact occurs, and whether or not any remedies are in fact exercised); (b) all reasonable attorneys' fees, as determined by the court, and all other costs, expenses and fees incurred by Agent and each Lender in connection with any suit or proceeding instituted to collect the Loan Obligations or to enforce Agent's and each Lender's rights and remedies under the Loan Documents, whether or not such suit or proceeding is prosecuted to judgment or conclusion; (c) all reasonable attorneys' fees and other costs and expenses incurred by Agent and each Lender in connection with any bankruptcy, insolvency or reorganization proceeding or receivership involving Borrower or any affiliate of Borrower, including any guarantor, and including all reasonable attorneys' fees incurred in making any appearances in any such proceeding or in seeking relief from any stay or injunction issued in or arising out of any such proceeding; and (d) all reasonable attorneys' fees and other costs and expenses incurred in any appellate proceedings and any post-judgment proceedings to collect or enforce the judgment.

8.4    Offsets.   No indebtedness shall be deemed to have been offset or shall be offset or compensated by all or part of any claim, cause of action, counterclaim or cross-claim, whether

16815951v.8

liquidated or unliquidated, which Borrower now or hereafter may have or may claim to have against Agent or any Lender. Furthermore, in respect to the present indebtedness of, or any future indebtedness incurred by, Borrower to Agent or any Lender, Borrower waives, to the fullest extent permitted by law, the benefits of any applicable law, regulation, or procedure which substantially provides that, where cross-demands for money have existed between persons at any point in time when neither demand was barred by the applicable statute of limitations, and an action is thereafter commenced by one such person, the other may assert in his answer the defense of payment in that the two demands are compensated so far as they equal each other, notwithstanding that an independent action asserting the claim would at the time of filing the answer be barred by the applicable statute of limitations. The Loan Agreement and the other Loan Documents are not subject to any right of rescission, set-off, abatement, diminution, counterclaim or defense as against Agent or any Lender, including, without limitation, any assignee of Agent or any Lender, including the defense of usury, and the operation of any of the terms of the Loan, or the exercise of any right thereunder, will not render the Loan unenforceable, in whole or in part, or subject to any right of rescission, set-off, abatement, diminution, counterclaim or defense, including the defense of usury and whether or not such rescission, set-off, abatement, diminution, counterclaim or other defense arises out of or relates to the Loan Documents or any agreement between Borrower, Agent or any Lender or any affiliate of Agent or any Lender, and Capital Funding Group, Inc., a Maryland corporation ("CFG") with respect to any obligation or commitment of or by CFG to make a Loan to Borrower insured by the U.S. Department of Housing and Urban Development Federal Housing Administration ("HUD") under the provisions of Section 232 of the National Housing Act, and the Regulations thereunder.

ARTICLE IX
EXIT FEE

9.1     Exit Fee.

(a)     As used in this Agreement, "Exit Fee" means, with respect to the Property, the amount set forth on Exhibit H.

(b)     Borrower shall pay the Exit Fee to Agent, solely for the benefit of the HUD Lender, on demand in any of the following events: (i) Agent delivers a commitment for a HUD Financing for the Property consistent with the HUD Contract or as otherwise provided in this Agreement and Borrower does not accept the HUD Financing, or (ii) Borrower has defaulted in its obligation to cooperate with Agent to obtain the HUD Financing for the Property as provided in Section 4.14, or (iii) the HUD Lender is unable to obtain a commitment for the HUD Financing for the Property on account of any matter not within the control of the HUD Lender, including, without limitation, any material negative or adverse change in the financial condition of Borrower or Operator or any Manager of the Facility, any lien, pending or threatened litigation or other event effecting the Property or the Borrower or any Operator which causes the Property, Borrower, Operator or the Facility not to be eligible for a HUD Financing, or (iv) in the event Borrower repays the Loan other than as a result of a HUD Financing, in which event the Exit Fee shall be payable. Agent and Borrower acknowledge and agree that the Exit Fee shall be paid to Agent out of the HUD Expenses set forth in Section 7.7 herein, in accordance with the HUD Contract.

59

(c)    In the event that Borrower and Operator have completely cooperated with Agent and HUD Lender and have complied with the requirements set forth in Section 4.14 and HUD Lender is unable to obtain a commitment for the HUD Financing for the Property within six (6) months of the Closing Date, then the Exit Fee shall be deemed to be waived by Agent.

## ARTICLE X
## MISCELLANEOUS

10.1    Waiver.  No remedy conferred upon, or reserved to, Agent or any Lender in this Agreement or any of the other Loan Documents is intended to be exclusive of any other remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing in law or in equity. Exercise of or omission to exercise any right of Agent or any Lender shall not affect any subsequent right of Agent or any Lender to exercise the same.  No course of dealing between Borrower and Agent or any Lender or any delay on Agent's or any Lender's part in exercising any rights shall operate as a waiver of any of Agent's or any Lender's rights.  No waiver of any Default under this Agreement or any of the other Loan Documents shall extend to or shall affect any subsequent or other then existing Default or shall impair any rights, remedies or powers of Agent or any Lender.  If Borrower consists of more than one person or entity, each such person or entity shall be jointly and severally liable for the performance of each of the obligations of Borrower to Lender hereunder.

10.2    Costs and Expenses.  Borrower will bear all taxes, fees and expenses (including actual reasonable attorneys' fees and expenses of counsel for Agent and Lenders) in connection with the Loan, the Note, the preparation of this Agreement and the other Loan Documents (including any amendments hereafter made), and in connection with any modifications thereto and the recording of any of the Loan Documents.  If, at any time, an Event of Default occurs or Agent or any Lender becomes a party to any suit or proceeding in order to protect its interests or priority in any collateral for any of the Loan Obligations or its rights under this Agreement or any of the Loan Documents, or if Agent or any Lender is made a party to any suit or proceeding by virtue of the Loan, this Agreement or any Collateral and as a result of any of the foregoing, Agent or any Lender employs counsel to advise or provide other representation with respect to this Agreement, or to collect the balance of the Loan Obligations, or to take any action in or with respect to any suit or proceeding relating to this Agreement, any of the other Loan Documents, any Collateral, Borrower, or to protect, collect, or liquidate any of the security for the Loan Obligations, or attempt to enforce any security interest or lien granted to Agent or any Lender by any of the Loan Documents, then in any such events, all of the actual reasonable attorney's fees arising from such services, including attorneys' fees for preparation of litigation and in any appellate or bankruptcy proceedings, and any expenses, costs and charges relating thereto shall constitute additional obligations of Borrower to Agent or any Lender payable on demand of Agent or any Lender.  Without limiting the foregoing, Borrower has undertaken the obligation for payment of, and shall pay, all recording and filing fees, revenue or documentary stamps or taxes, intangibles taxes, and other taxes, expenses and charges payable in connection with this Agreement (excluding any taxes on behalf of Agent which are measured by the income of the Borrower), any of the Loan Documents, the Loan Obligations, or the filing of any financing statements or other instruments required to effectuate the purposes of this Agreement, and should Borrower fail to do so, Borrower agrees to reimburse Agent and each Lender for the amounts

16815951v.8

paid by Agent and each Lender, together with penalties or interest, if any, incurred by Agent and each Lender as a result of underpayment or nonpayment. Such amounts shall constitute a portion of the Loan Obligations, shall be secured by the Security Instrument and shall bear interest at the Default Rate from the date advanced until repaid.

10.3   Performance of Agent and Lenders. At its option, upon Borrower's failure to do so, Agent or any Lender may make any payment or do any act on Borrower's behalf that Borrower or others are required to do to remain in compliance with this Agreement or any of the other Loan Documents, and Borrower agrees to reimburse Agent and each Lender, on demand, for any payment made or expense incurred by Agent or such Lender pursuant to the foregoing authorization, including, without limitation, reasonable attorneys' fees, and until so repaid any sums advanced by Agent or any Lender shall constitute a portion of the Loan Obligations, shall be secured by the Security Instrument and shall bear interest at the Default Rate from the date advanced until repaid.

10.4   Indemnification. Borrower shall, at its sole cost and expense, protect, defend, indemnify and hold harmless the Indemnified Parties (as defined below) from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense) (collectively "Losses") imposed upon or incurred by or asserted against Lender by reason of: (a) ownership of the Note, the Security Instrument, the Property, or any interest therein or receipt of any Rents; (b) any amendment to, or restructuring of, the Loan Obligations and/or any of the Loan Documents; (c) any and all lawful action that may be taken by Lender in connection with the enforcement of the provisions of the Security Instrument, or the Note or any of the other Loan Documents, whether or not suit is filed in connection with same, or in connection with Borrower, Operator, or Manager and/or any partner, joint venturer, member or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (d) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property, the Improvements or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (e) any use, nonuse or condition in, on or about the Property, the Improvements or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (f) any failure on the part of Borrower, Operator, or Manager to perform or comply with any of the terms of this Agreement or any of the other Loan Documents; (g) any claims by any broker, person or entity claiming to have participated in arranging the making of the Loan evidenced by the Note; (h) any failure of the Property to be in compliance with any applicable laws; (i) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in a Lease Agreement or any replacement or renewal thereof or substitution therefore; (j) performance of any labor or services or the furnishing of any materials or other property with respect to the Property, the Improvements or any part thereof; (k) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-b, statement for recipients of proceeds from real estate, broker and barter exchange transactions, which may be required in connection with any of the Security Instrument, or to supply a copy

61

thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which the Loan is made; (l) any misrepresentation made to Lender in this Agreement or in any of the other Loan Documents; (m) any tax on the making and/or recording of any of the Security Instrument, the Note or any of the other Loan Documents; (n) the violation of any requirements of the Employee Retirement Income Security Act of 1974, as amended; (o) any fines or penalties assessed or any corrective costs incurred by Lender if the Facility or any part of the Property is determined to be in violation of any covenants, restrictions of record, or any applicable laws, ordinances, rules or regulations; or (p) the enforcement by any of the Indemnified Parties of the provisions of this Section 10.4.  Any amounts payable to Lender by reason of the application of this Section 10.4 shall become immediately due and payable, and shall constitute a portion of the Loan Obligations, shall be secured by any of the Security Instrument, and shall accrue interest at the Default Rate.  The obligations and liabilities of Borrower under this Section 10.4 shall survive any termination, satisfaction, assignment, entry of a judgment of foreclosure or exercise of a power of sale or delivery of a deed in lieu of foreclosure of the Security Instrument.  For purposes of this Section 10.4, the term "Indemnified Parties" means Lender and any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by any of the Security Instrument is or will have been recorded, any Person who may hold or acquire or will have held a full or partial interest in the Loan (including, without limitation, any investor in any securities backed in whole or in part by the Loan) as well as the respective directors, officers, shareholder, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including, without limitation, any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Security Instrument or as a part of or following a foreclosure of the Loan and including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).  In no event shall Borrower be liable for any Losses arising on account of the gross negligence or willful misconduct of the Agent.

10.5    Headings.  The headings of the Sections of this Agreement are for convenience of reference only, are not to be considered a part hereof, and shall not limit or otherwise affect any of the terms hereof.

10.6    Survival of Covenants.  All covenants, agreements, representations and warranties made herein and in certificates or reports delivered pursuant hereto shall be deemed to have been material and relied on by Lender, notwithstanding any investigation made by or on behalf of Lender, and shall survive the execution and delivery to Lender of the Note and this Agreement.

10.7    Notices, etc.  Any notice or other communication required or permitted to be given by this Agreement or the other Loan Documents or by applicable law shall be in writing and shall be deemed received: (a) on the date delivered, if sent by hand delivery (to the person or department if one is specified below) with receipt acknowledged by the recipient thereof; (b) three (3) Business Days following the date deposited in U.S. mail, postage prepaid, certified or registered, with return receipt requested; or (c) one (1) Business Day following the date deposited with Federal Express or other national overnight carrier, and in each case addressed as follows:

If to Borrower:           c/o Synergy Health Centers LLC
260 Chambers Bridge Road, Suite 2A
Brick, New Jersey 08723
Attention: Zisha Lipschultz
Email: Zisha@newenglandhc.com

with a copy to:          GUTNICKI LLP
4711 Golf Road, Suite 200
Skokie, Illinois 60076
Attention: Abraham A. Gutnicki, Esq.
Email: agutnicki@gutnicki.com

If to Agent and/or    Capital Funding, LLC
Lenders:               1422 Clarkview Road
Baltimore, Maryland 21209
Attention: Timothy Sanders, Managing Director

with a copy to:          Seyfarth Shaw LLP
131 South Dearborn, Suite 2400
Chicago, Illinois 60603
Attention: Deborah Gordon
Phone: 312.460.5620
Fax:   312.460.7620

Any party may change its or its attorney address to another single address by notice given as herein provided, except any change of address notice must be actually received in order to be effective.

    10.8    Benefits.  All of the terms and provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.  No Person other than Borrower, Agent or each Lender shall be entitled to rely upon this Agreement or be entitled to the benefits of this Agreement.

    10.9    Supersedes Prior Agreements; Counterparts.  This Agreement and the instruments referred to herein supersede and incorporate all representations, promises, and statements, oral or written, made by Agent or any Lender in connection with the Loan.  This Agreement may not be varied, altered, or amended except by a written instrument executed by an authorized officer of Agent and the Required Lenders.  This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument.  This Agreement and the other Loan Documents represent the final agreement between the parties with respect to the subject matter hereof and thereof.  There are no unwritten oral agreements between the parties.

16815951v.8

10.10  Loan Agreement Governs.  The Loan is governed by terms and provisions set forth in this Agreement and the other Loan Documents and in the event of any irreconcilable conflict between the terms of the other Loan Documents and the terms of this Agreement, the terms of this Agreement shall control; provided, however, in the event there is any apparent conflict between any particular term or provision which appears in both this Agreement and the other Loan Documents and it is possible and reasonable for the terms of both this Agreement and the Loan Documents to be performed or complied with then (except with respect to the Maturity Date or any extension thereof, in which case this Agreement shall be controlling) notwithstanding the foregoing both the terms of this Agreement and the other Loan Documents shall be performed and complied with.

10.11  **CONTROLLING LAW. THE PARTIES HERETO AGREE THAT THE VALIDITY, INTERPRETATION, ENFORCEMENT AND EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MARYLAND AND THE PARTIES HERETO SUBMIT (AND WAIVE ALL RIGHTS TO OBJECT) TO NON-EXCLUSIVE PERSONAL JURISDICTION IN THE STATE OF MARYLAND, CITY OF BALTIMORE FOR THE ENFORCEMENT OF ANY AND ALL OBLIGATIONS UNDER THE LOAN DOCUMENTS EXCEPT THAT IF ANY SUCH ACTION OR PROCEEDING ARISES UNDER THE CONSTITUTION, LAWS OR TREATIES OF THE UNITED STATES OF AMERICA, OR IF THERE IS A DIVERSITY OF CITIZENSHIP BETWEEN THE PARTIES THERETO, SO THAT IT IS TO BE BROUGHT IN A UNITED STATES DISTRICT COURT, IT SHALL BE BROUGHT IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MARYLAND OR ANY SUCCESSOR FEDERAL COURT HAVING ORIGINAL JURISDICTION.**

10.12  **WAIVER OF JURY TRIAL. BORROWER HEREBY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE LOAN, OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF AGENT, LENDERS AND/OR BORROWER WITH RESPECT TO THE LOAN DOCUMENTS OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. BORROWER AGREES THAT AGENT MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED AGREEMENT OF BORROWER IRREVOCABLY TO WAIVE ITS RIGHTS TO TRIAL BY JURY AS AN INDUCEMENT OF AGENT AND LENDERS TO MAKE THE LOAN, AND THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY DISPUTE OR CONTROVERSY WHATSOEVER (WHETHER OR NOT MODIFIED HEREIN) AMONG BORROWER, AGENT AND LENDERS SHALL INSTEAD BE TRIED IN A**

16815951v.8

**COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.**

10.13   Management Agreement.   Agent shall have the right in its sole and absolute discretion to approve any management company with respect to the management of the Facility. The Management Agreement will be assigned to Agent as additional security for repayment of the Loan and payment of all management fees shall be subordinate to the Loan. Agent shall have the further right to approve in its sole and absolute discretion any contract entered into by the Facility with any Affiliate of Borrower for the provisions of any services to the Borrower and/or the Facility; provided that the Management Agreement shall be permitted hereunder. Any such ancillary service contract will be assigned to Agent as additional security for repayment of the Loan.

10.14   Patriot Act Compliance.

(a)   Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act (as defined below) and all applicable requirements of governmental authorities having jurisdiction of the Borrower and the Property, including those relating to money laundering and terrorism.  Agent shall have the right to audit the Borrower's compliance with the Patriot Act and all applicable requirements of governmental authorities having jurisdiction of the Borrower and the Property, including those relating to money laundering and terrorism.   In the event that the Borrower fails to comply with the Patriot Act or any such requirements of governmental authorities, then Agent may, at its option, cause the Borrower to comply therewith and any and all reasonable costs and expenses incurred by Agent and Lenders in connection therewith shall be secured by the Security Instrument and the other Loan Documents and shall be immediately due and payable.  For purposes hereof, the term "Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

(b)   Neither the Borrower nor any partner, member, shareholder or other constituent (each a "Constituent of Borrower") or a partner, member or shareholder of a Constituent of Borrower nor any owner of a direct or indirect interest in the Borrower (i) is listed on any Government Lists (as defined below), (ii) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC (as defined below) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (iii) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense (as defined below), or (iv) is not currently under investigation by any governmental authority for alleged criminal activity.  For purposes hereof, the term "Patriot Act Offense" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (i) the criminal laws against terrorism; (ii) the criminal laws against money laundering, (iii) the Bank Secrecy Act, as amended, (iv) the Money Laundering Control Act of 1986, as amended, or the (v) Patriot Act.  "Patriot Act Offense" also includes the crimes of

65

conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.  For purposes hereof, the term "Government Lists" means (i) the Specially Designated Nationals and Blocked Persons Lists maintained by Office of Foreign Assets Control ("OFAC"), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Agent notified Borrower in writing is now included in "Governmental Lists", or (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America that Agent notified Borrower in writing is now included in "Governmental Lists".

10.15   <u>Syndication</u>.

(a)     Borrowers hereby acknowledge that Lenders may, with Agent's prior written consent (which may be given as to each instance or generally as to all instances), in one or more transactions (i) sell, or otherwise transfer the Loan or any portion thereof one or more times, (ii) sell participation interests in the Loan one or more times, (iii) further divide or re-divide the Loan into two or more separate notes or components which may take the form of senior/junior/mezzanine notes or components or senior/subordinate notes or components or multiple components of such division, and which may be secured by some or all of the Collateral, or (iv) grant, pledge, assign a security interest in or otherwise collaterally transfer all or any portion of its rights under this Agreement and the Loan Documents to secure obligations of such Lender to any other Person (the transactions referred to in clauses (i) through (iv) above, each a "<u>Secondary Market Transaction</u>", and collectively "<u>Secondary Market Transactions</u>"). With respect to any Secondary Market Transaction described in clause (iii) above, such notes or note components may be assigned different interest rates, so long as, at such time the weighted average of the relevant interest rates equals the Libor Rate.  Borrowers shall cooperate with Lenders and use Borrowers' good faith efforts to facilitate the consummation of each Secondary Market Transaction including, without limitation, by:  (i) amending or causing the amendment of any Loan Document, and executing such additional documents, instruments and agreements as may be reasonably required by Lenders in connection with the relevant Secondary Market Transaction; (ii) promptly and reasonably providing such information (including, without limitation, financial information) as may be requested in connection with the preparation of a private placement memorandum, prospectus or a registration statement required to privately place or publicly distribute the securities in a manner which does not conflict with federal or state securities laws; (iii) providing in connection with each of (A) a preliminary and a final private placement memorandum or other offering documents or (B) a preliminary and final prospectus, as applicable (each, a "<u>Disclosure Document</u>"), a certificate certifying that Borrowers have carefully examined those sections of such Disclosure Documents, as applicable, pertaining to Borrowers, their Affiliates, the Loan, the Manager and the Property and that such sections (and any other sections reasonably requested by a Lender) do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; (iv) causing to be rendered such opinion letters reasonably requested by the Lender for the relevant Secondary Market Transaction; (v) making such representations, warranties and covenants, as may be reasonably requested by a Lender for the Secondary Market Transaction; and (vi) providing any other information and materials reasonably required in the Secondary Market Transaction. Borrowers shall be responsible only for their own costs and expenses (including attorneys' fees)

66

16815951v.8

and shall not be responsible for any third party costs and expenses incurred by Lenders in connection with any Secondary Market Transaction.

10.16   Construction.  Captions in this Agreement are included solely for convenience and are not to be referred to in construing or interpreting this Agreement.  Defined terms may be used in the singular or the plural, as the context requires.  All references to time of day mean the then applicable time in Baltimore, Maryland, unless otherwise expressly provided.  Each reference in this Agreement to a particular section is a reference to a section of this Agreement unless otherwise expressly indicated.  The words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation".  Unless the context in which it is used otherwise clearly requires, the word "or" has the inclusive meaning represented by the phrase "and/or".  Unless the context in which it is used otherwise clearly requires, all references to days, weeks and months mean calendar days, weeks and months.  If any portion of this Agreement is declared invalid, illegal or unenforceable by any court of competent jurisdiction, such portion shall be deemed severed from this Agreement and the remaining portions shall continue in full force and effect.  Time is strictly of the essence of each and every provision of this Agreement.  This Agreement shall be governed by and interpreted and enforced under the laws of the United States and the regulations, rules, orders, requirements and policies of any federal departments, offices, bureaus, boards and other agencies, instrumentalities and authorities that have jurisdiction over Agent or Lender or this Agreement to the extent that Agent or Lender or this Agreement is subject to or governed by such federal laws, regulations, rules, orders, requirements and policies.

10.17   No Partnership.  Borrower acknowledges and agrees that the provisions of this Agreement shall not create a partnership, joint venture or any other relationship among the Borrower, Agent and Lender except the relationship of Borrower and Lender.  Accordingly, nothing contained in this Agreement or in the other Loan Documents shall obligate or be deemed to obligate Agent or any Lender to pay any costs, fees or expenses of the Property, or to reimburse Borrower for any such costs or otherwise.  In addition, nothing in this note or in any of the other Loan Documents shall be deemed to imply that Lender is an owner or operator of the Property or any business or businesses located thereon or in connection therewith and Lender shall not be deemed to control or review Borrower's ownership or operation of the Property, or any business or businesses located thereon or in connection therewith.

10.18   Post-Closing Obligations.  Borrower undertakes, covenants and agrees, at its sole cost and expense, to deliver to Lender the items set forth on Exhibit I attached hereto within the time set forth therein for delivery of the applicable item.

ARTICLE XI
AGENT

11.1   Appointment and Authorization.  Each Lender hereby irrevocably appoints and authorizes Agent to enter into each of the Loan Documents to which it is a party (other than this Agreement) on its behalf and to take such actions as Agent on its behalf and to exercise such powers under the Loan Documents as are delegated to Agent by the terms thereof, together with all such powers as are reasonably incidental thereto.  Subject to the terms of Section 11.16 and to the terms of the other Loan Documents, Agent is authorized and empowered to amend, modify, or waive any provisions of this Agreement or the other Loan Documents on behalf of Lenders.

16815951v.8

The provisions of this Article XI are solely for the benefit of Agent and Lenders and neither any Borrower nor any other Loan Party shall have any rights as a third party beneficiary of any of the provisions hereof.  In performing its functions and duties under this Agreement, Agent shall act solely as agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Borrower or any other Loan Party.  Agent may perform any of its duties hereunder, or under the Loan Documents, by or through its agents or employees.

11.2   Agent and Affiliates.  Agent shall have the same rights and powers under the Loan Documents as any other Lender and may exercise or refrain from exercising the same as though it were not Agent, and Agent and its Affiliates may lend money to, invest in and generally engage in any kind of business with each Loan Party or Affiliate of any Loan Party as if it were not Agent hereunder.

11.3   Action by Agent.  The duties of Agent shall be mechanical and administrative in nature.  Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender.  Nothing in this Agreement or any of the Loan Documents is intended to or shall be construed to impose upon Agent any obligations in respect of this Agreement or any of the Loan Documents except as expressly set forth herein or therein.

11.4   Consultation with Experts.  Agent may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

11.5   Liability of Agent.  Neither Agent nor any of its directors, officers, agents or employees shall be liable to any Lender for any action taken or not taken by it in connection with the Loan Documents, except that Agent shall be liable with respect to its specific duties set forth hereunder but only to the extent of its own gross negligence or willful misconduct in the discharge thereof as determined by a final non-appealable judgment of a court of competent jurisdiction.  Neither Agent nor any of its directors, officers, agents or employees shall be responsible for or have any duty to ascertain, inquire into or verify (a) any statement, warranty or representation made in connection with any Loan Document or any borrowing hereunder; (b) the performance or observance of any of the covenants or agreements specified in any Loan Document; (c) the satisfaction of any condition specified in any Loan Document; (d) the validity, effectiveness, sufficiency or genuineness of any Loan Document, any Lien purported to be created or perfected thereby or any other instrument or writing furnished in connection therewith; (e) the existence or non-existence of any Default or Event of Default; or (f) the financial condition of any Loan Party.  Agent shall not incur any liability by acting in reliance upon any notice, consent, certificate, statement, or other writing (which may be a bank wire, telex, facsimile or electronic transmission or similar writing) believed by it to be genuine or to be signed by the proper party or parties.  Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error.  The sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount to which they are determined to be entitled (and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them).

11.6   <u>Indemnification</u>.   Each Lender shall, in accordance with its Pro Rata Share, indemnify Agent (to the extent not reimbursed by Borrowers) upon demand against any cost, expense (including counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction) that Agent may suffer or incur in connection with the Loan Documents or any action taken or omitted by Agent hereunder or thereunder.   If any indemnity furnished to Agent for any purpose shall, in the opinion of Agent, be insufficient or become impaired, Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against even if so directed by Required Lenders until such additional indemnity is furnished.

11.7   <u>Right to Request and Act on Instructions</u>.   Agent may at any time request instructions from Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Loan Documents Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Person for refraining from any action or withholding any approval under any of the Loan Documents until it shall have received such instructions from Required Lenders or all or such other portion of the Lenders as shall be prescribed by this Agreement.   Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions of Required Lenders (or such other applicable portion of the Lenders), Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate applicable Law or exposes Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of Section 11.6.

11.8   <u>Credit Decision</u>.   Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.   Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Loan Documents.

11.9   <u>Collateral Matters</u>.   Lenders irrevocably authorize Agent, at its option and in its discretion, to (a) release any Lien granted to or held by Agent under any Security Document (i) upon termination of the Loan Commitment and payment in full of all Obligations; or (ii) constituting property sold or disposed of as part of or in connection with any disposition permitted under any Loan Document (it being understood and agreed that Agent may conclusively rely without further inquiry on a certificate of Borrower as to the sale or other disposition of property being made in full compliance with the provisions of the Loan Documents); and (b) release or subordinate any Lien granted to or held by Agent under any Security Document constituting personal property described herein (it being understood and agreed that Agent may conclusively rely without further inquiry on a certificate of Borrower as to the identification of any personal property described herein).   Upon request by Agent at any time,

Lenders will confirm Agent's authority to release and/or subordinate particular types or items of Collateral pursuant to this Section 11.9.

11.10   <u>Agency for Perfection</u>.   Agent and each Lender hereby appoint each other Lender as agent for the purpose of perfecting Agent's security interest in assets which, in accordance with the Uniform Commercial Code in any applicable jurisdiction, can be perfected by possession or control.  Should any Lender (other than Agent) obtain possession or control of any such assets, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor, shall deliver such assets to Agent or in accordance with Agent's instructions or transfer control to Agent in accordance with Agent's instructions.  Each Lender agrees that it will not have any right individually to enforce or seek to enforce any Security Document or to realize upon any Collateral for the Loan unless instructed to do so by Agent (or consented to by Agent, as provided in Section 11.5), it being understood and agreed that such rights and remedies may be exercised only by Agent.

11.11   <u>Notice of Default</u>.  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default except with respect to defaults in the payment of principal, interest and fees required to be paid to Agent for the account of Lenders, unless Agent shall have received written notice from a Lender or a Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  Agent will notify each Lender of its receipt of any such notice.  Agent shall take such action with respect to such Default or Event of Default as may be requested by Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) in accordance with the terms hereof.  Unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interests of Lenders.

11.12   <u>Assignment by Agent; Resignation of Agent; Successor Agent</u>.

(a)     Agent may at any time assign its rights, powers, privileges and duties hereunder to (i) another Lender or (ii) any Person to whom Agent, in its capacity as a Lender, has assigned (or will assign, in conjunction with such assignment of agency rights hereunder) 50% or more of its Loan, in each case without the consent of the Lenders or Borrowers.  Following any such assignment, Agent shall give notice to the Lenders and Borrowers.  An assignment by Agent pursuant to this subsection (a) shall not be deemed a resignation by Agent for purposes of subsection (b) below.

(b)     Without limiting the rights of Agent to designate an assignee pursuant to subsection (a) above, Agent may at any time give notice of its resignation to the Lenders and Borrowers.  Upon receipt of any such notice of resignation, Required Lenders shall have the right to appoint a successor Agent.  If no such successor shall have been so appointed by Required Lenders and shall have accepted such appointment within ten (10) Business Days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent; provided that if Agent shall notify Borrowers and the Lenders that no Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice from Agent that no Person has accepted such appointment and, from and following delivery of such notice, (i) the retiring Agent shall be

discharged from its duties and obligations hereunder and under the other Loan Documents and (ii) all payments, communications and determinations provided to be made by, to or through Agent shall instead be made by or to each Lender directly, until such time as Required Lenders appoint a successor Agent as provided for above in this paragraph.

(c)     Upon (i) an assignment permitted by subsection (a) above or (ii) the acceptance of a successor's appointment as Agent pursuant to subsection (b) above, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrowers and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article shall continue in effect for the benefit of such retiring Agent and its sub-agents in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting or was continuing to act as Agent.

11.13   Payment and Sharing of Payment.

(a)     Loan Payments.  Payments of principal, interest and fees in respect of the Loan will be settled on the date of receipt if received by Agent on the last Business Day of a month or on the Business Day immediately following the date of receipt if received on any day other than the last Business Day of a month.

(b)     Return of Payments.

(i)      If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from a Borrower and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind, together with interest accruing on a daily basis at the Federal Funds Rate.

(ii)     If Agent determines at any time that any amount received by Agent under this Agreement must be returned to any Borrower or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to any Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(c)     Defaulted Lenders.  The failure of any Defaulted Lender to make any payment required by it hereunder shall not relieve any other Lender of its obligations to make payment, but neither any other Lender nor Agent shall be responsible for the failure of any Defaulted Lender to make any payment required hereunder.  Notwithstanding anything set forth herein to the contrary, a Defaulted Lender shall not have any voting or consent rights under or

with respect to any Loan Document or constitute a "**Lender**" (or be included in the calculation of "**Required Lenders**" hereunder) for any voting or consent rights under or with respect to any Loan Document.

(d)     Sharing of Payments.  If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan in excess of its Pro Rata Share of payments entitled pursuant to the other provisions of this Section, such Lender shall purchase from the other Lenders such participations in extensions of credit made by such other Lenders (without recourse, representation or warranty) as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably with each of them; *provided, however*, that if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Lender, the purchase shall be rescinded and each Lender which has sold a participation to the purchasing Lender shall repay to the purchasing Lender the purchase price to the ratable extent of such recovery, without interest. Each Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this clause (d) may, to the fullest extent permitted by law, exercise all its rights of payment with respect to such participation as fully as if such Lender were the direct creditor of Borrowers in the amount of such participation). If under any applicable bankruptcy, insolvency or other similar law, any Lender receives a secured claim in lieu of a setoff to which this clause (d) applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this clause (d) to share in the benefits of any recovery on such secured claim.

11.14   Right to Perform, Preserve and Protect.  If any Loan Party fails to perform any obligation hereunder or under any other Loan Document (after giving effect to any cure periods provided for in this Agreement or such other Loan Document), Agent itself may, but shall not be obligated to, cause such obligation to be performed at Borrowers' expense. Agent is further authorized by Borrowers and the Lenders to make expenditures from time to time which Agent, in its reasonable business judgment, deems necessary or desirable to (a) preserve or protect the business conducted by Borrowers, the Collateral, or any portion thereof, and/or (b) enhance the likelihood of, or maximize the amount of, repayment of the Loan and other Obligations. Each Borrower hereby agrees to reimburse Agent on demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this Section. Each Lender hereby agrees to indemnify Agent upon demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this Section, in accordance with the provisions of Section 11.6.

11.15   Additional Titled Agents.  Except for rights and powers, if any, expressly reserved under this Agreement to any bookrunner, arranger or to any titled agent named on the cover page of this Agreement, other than Agent (collectively, the "**Additional Titled Agents**"), and except for obligations, liabilities, duties and responsibilities, if any, expressly assumed under this Agreement by any Additional Titled Agent, no Additional Titled Agent, in such capacity, has any rights, powers, liabilities, duties or responsibilities hereunder or under any of the other Loan Documents. Without limiting the foregoing, no Additional Titled Agent shall have nor be deemed to have a fiduciary relationship with any Lender. At any time that any Lender serving as an Additional Titled Agent shall have transferred to any other Person (other than any Affiliates) all of its interests in the Loan, such Lender shall be deemed to have concurrently resigned as such Additional Titled Agent.

72

16815951v.8

11.16   Amendments and Waivers.

(a)   No provision of this Agreement or any other Loan Document may be amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by Borrowers, the Required Lenders and any other Lender to the extent required under Section 11.16(b).

(b)   In addition to the required signatures under Section 11.16(a), no provision of this Agreement or any other Loan Document may be amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by the following Persons:

(i)   if any amendment, waiver or other modification would increase a Lender's funding obligations in respect of any Loan, by such Lender; and/or

(ii)   if the rights or duties of Agent are affected thereby, by Agent;

*provided, however*, that, in each of (i) and (ii) above, no such amendment, waiver or other modification shall, unless signed by all the Lenders directly affected thereby, (i) reduce the principal of, rate of interest on or any fees with respect to any Loan or forgive any principal, interest (other than default interest) or fees (other than late charges) with respect to any Loan; (ii) postpone the date fixed for, or waive, any payment (other than any mandatory prepayment under this Agreement) of principal of any Loan, or of interest on any Loan (other than default interest) or any fees provided for hereunder (other than late charges) or for any termination of any commitment; (iii) change the definition of the term Required Lenders or the percentage of Lenders which shall be required for Lenders to take any action hereunder; (iv) release all or substantially all of the Collateral, authorize any Borrower to sell or otherwise dispose of all or substantially all of the Collateral or release any Guarantor of all or any portion of the Obligations or its Guarantee obligations with respect thereto, except, in each case with respect to this clause (iv), as otherwise may be provided in this Agreement or the other Loan Documents (including in connection with any disposition permitted hereunder); (v) amend, waive or otherwise modify this or the definitions of the terms used in this Section insofar as the definitions affect the substance of this Section; or (vi) consent to the assignment, delegation or other transfer by any Loan Party of any of its rights and obligations under any Loan Document or release any Borrower of its payment obligations under any Loan Document, except, in each case with respect to this clause (vi), pursuant to a merger or consolidation permitted pursuant to this Agreement. It is hereby understood and agreed that all Lenders shall be deemed directly affected by an amendment, waiver or other modification of the type described in the preceding clauses (iii), (iv), (v) and (vi) of the preceding sentence.

(c)   Notwithstanding anything to the contrary set forth herein, Borrower hereby acknowledges and agrees that Agent shall not be permitted to consent to any of the following actions without Agent's receipt of unanimous consent from all Lenders:

(i)   increase the principal amount of the Loan;

(ii)   reduce the principal amount of the Loan through a forgiveness of debt;

16815951v.8

(iii)    change the definition of Effective LIBOR Rate which would reduce such rate;

(iv)    modify any redemption or prepayment provisions; except that Agent may increase the premium therefor;

(v)    change any due dates for interest or principal, including without limitation, the Maturity Date, or grant any waiver or consent, or enter into any forbearance or other agreement, or take any action or omission, as would have the same effect;

(vi)    insert in this Agreement or other Loan Document additional events of default or amend or modify the definition of Default or Event of Default;

(vii)    eliminate from this Agreement or other Loan Document any Events of Default; provided, however, that such shall not otherwise restrict Agent's authority to waive any such Event of Default;

(viii)    modify any subordination provision with respect to a subordinated lender;

(ix)    make any material modifications to any intercreditor agreements related to the Loan;

(x)    increase any obligation of a Borrower in any material respect;

(xi)    approve changes to any Lease which would result in a reduction of rent below ninety-five percent (95%) of its current level, except in connection with Agent's exercise of remedies in connection with a workout or after the occurrence and continuance of a Default or Event of Default.

(xii)    grant additional material rights to a subordinated lender;

(xiii)    release any Guarantor as a guarantor of the Loan; and

(xiv)    release material Collateral.

11.17    <u>Assignments and Participations</u>.

(a)    <u>Assignments</u>.

(i)    Any Lender may at any time assign to one or more Eligible Assignees all or any portion of such Lender's Loan together with all related obligations of such Lender hereunder.  Except as Agent may otherwise agree, the amount of any such assignment (determined as of the date of the applicable Assignment Agreement or, if a "Trade Date" is specified in such Assignment Agreement, as of such Trade Date) shall be in a minimum aggregate amount equal to $1,000,000 or, if less, the assignor's entire interests in the outstanding Loan; *provided, however*, that, in connection with simultaneous assignments to two or more related Approved Funds, such Approved Funds shall be treated as one assignee for purposes of

determining compliance with the minimum assignment size referred to above. Borrowers and Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned to an Eligible Assignee until Agent shall have received and accepted an effective Assignment Agreement executed, delivered and fully completed by the applicable parties thereto and a processing fee of $3,500 to be paid by the assigning Lender; *provided, however*, that only one processing fee shall be payable in connection with simultaneous assignments to two or more related Approved Funds. Notwithstanding the foregoing, or anything to the contrary herein, the assignment by any Lender of its Pro Rata Share of the Loan to any Affiliate (or by AP MA Funding LLC of its Pro Rata Share of the Loan to any Affiliate or to any Affiliate of Alliance Partners LLC) shall be without charge of a registration or processing fee and shall require prior notice to Agent and completion of an Assignment Agreement but not Agent's consent; provided, however, that the assigning Lender shall pay all costs and fees incurred by Agent in connection with the review and approval of the Assignment Agreement.

(ii)     From and after the date on which the conditions described above have been met, (A) such Eligible Assignee shall be deemed automatically to have become a party hereto and, to the extent of the interests assigned to such Eligible Assignee pursuant to such Assignment Agreement, shall have the rights and obligations of a Lender hereunder, and (B) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, shall be released from its rights and obligations hereunder (other than those that survive termination pursuant to Section __). Upon the request of the Eligible Assignee (and, as applicable, the assigning Lender) pursuant to an effective Assignment Agreement, each Borrower shall execute and deliver to Agent for delivery to the Eligible Assignee (and, as applicable, the assigning Lender) Notes in the aggregate principal amount of the Eligible Assignee's Loan (and, as applicable, Notes in the principal amount of that portion of the principal amount of the Loan retained by the assigning Lender). Upon receipt by the assigning Lender of such Note, the assigning Lender shall return to Borrower any prior Note held by it.

(iii)     Agent, acting solely for this purpose as an agent of Borrower, shall maintain at its offices located in Baltimore, Maryland a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of each Lender, and the commitments of, and principal amount of the Loan owing to, such Lender pursuant to the terms hereof. The entries in such register shall be conclusive absent manifest error, and Borrower, Agent and Lenders may treat each Person whose name is recorded therein pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. Such register shall be available for inspection by Borrower and any Lender, at any reasonable time upon reasonable prior notice to Agent.

(iv)     Notwithstanding the foregoing provisions of this Section or any other provision of this Agreement, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided, however*, that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(v)     Notwithstanding the foregoing provisions of this Section or any other provision of this Agreement, Agent has the right, but not the obligation, to effectuate assignments of Loan via an electronic settlement system acceptable to Agent as designated in writing from time to time to the Lenders by Agent (the "**Settlement Service**"). At any time when the Agent elects, in its sole discretion, to implement such Settlement Service, each such assignment shall be effected by the assigning Lender and proposed assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be consistent with the other provisions of this Section. Each assigning Lender and proposed Eligible Assignee shall comply with the requirements of the Settlement Service in connection with effecting any assignment of Loan pursuant to the Settlement Service. If so elected by each of Agent and the Borrowers, Agent's and the Borrowers' approval of such Eligible Assignee shall be deemed to have been automatically granted with respect to any transfer effected through the Settlement Service. Assignments and assumptions of the Loan shall be effected by the provisions otherwise set forth herein until Agent notifies Lenders of the Settlement Service as set forth herein.

(b)     <u>Replacement of Lenders</u>.   Within thirty (30) days after: (i) receipt by Agent of notice and demand from any Lender for payment of additional costs as provided, which demand shall not have been revoked, (ii) any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender, (iii) any Lender is a Defaulted Lender, and the circumstances causing such status shall not have been cured or waived; or (iv) any failure by any Lender to consent to a requested amendment, waiver or modification to any Loan Document in which Required Lenders have already consented to such amendment, waiver or modification but the consent of each Lender, or each Lender affected thereby, is required with respect thereto (each relevant Lender in the foregoing clauses (i) through (iv) being an "**Affected Lender**") each of Borrower and Agent may, at its option, notify such Affected Lender and, in the case of Borrowers' election, the Agent, of such Person's intention to obtain, at Borrowers' expense, a replacement Lender ("**Replacement Lender**") for such Lender, which Replacement Lender shall be an Eligible Assignee and, in the event the Replacement Lender is to replace an Affected Lender described in the preceding clause (iv), such Replacement Lender consents to the requested amendment, waiver or modification making the replaced Lender an Affected Lender.  In the event Borrowers or Agent, as applicable, obtains a Replacement Lender within ninety (90) days following notice of its intention to do so, the Affected Lender shall sell, at par, and assign all of its Loan and funding commitments hereunder to such Replacement Lender in accordance with the procedures set forth in Section 11.17(a); *provided, however*, that (i) Borrowers shall have reimbursed such Lender for its increased costs and additional payments for which it is entitled to reimbursement under this Agreement through the date of such sale and assignment, and (ii) Borrowers shall pay to Agent the $3,500 processing fee in respect of such assignment.  In the event that a replaced Lender does not execute an Assignment Agreement pursuant to Section 11.17(a) within five (5) Business Days after receipt by such replaced Lender of notice of replacement pursuant to this Section and presentation to such replaced Lender of an Assignment Agreement evidencing an assignment pursuant to this Section, such replaced Lender shall be deemed to have consented to the terms of such Assignment Agreement, and any such Assignment Agreement executed by Agent, the Replacement Lender and, to the extent required pursuant to Section 11.17(a), Borrowers, shall be effective for purposes of this Section and Section 11.17(a).  Upon any such assignment and payment, such replaced Lender shall no longer constitute a "Lender" for purposes hereof, other

76

than with respect to such rights and obligations that survive termination as set forth herein.

(c)   Loan Party Assignments.   No Loan Party may assign, delegate or otherwise transfer any of its rights or other obligations hereunder or under any other Loan Document without the prior written consent of Agent and each Lender.

11.18   Right to Purchase and Buy-Out Upon Refinancing.   If Lenders fail to unanimously agree on any action set forth in Section 11.16(c), Agent and the consenting Lenders or their Affiliates ("Consenting Lenders") shall have the option to purchase the entire Loan from the non-consenting Lenders ("Non-Consenting Lenders") by sending a notice to Agent and the Non-Consenting Lenders indicating the Consenting Lenders' intention to purchase from the Non-Consenting Lenders all of their respective interests in the Loan at par (excluding the Exit Fee or any other fees due solely to Agent or its Affiliates) (a "Consenting Lender Purchase Notice"), which Consenting Lender Purchase Notice shall be irrevocable.   The Non-Consenting Lenders shall have a period of ten (10) days: (a) to accept the purchase set forth in the Consenting Lender Purchase Notice (with the failure to respond within the foregoing ten (10) day period being deemed to constitute an acceptance), or (b) to notify Agent of the intention of one or more of the Non-Consenting Lenders to purchase the from the Consenting Lenders all of their respective interests in the Loan at par (excluding the Exit Fee or any other fees due solely to Agent or its Affiliates) (a "Non-Consenting Lender Purchase Notice").   If one or more of the Non-Consenting Lenders are parties to such notice, then the purchase shall be on a pro rata basis unless otherwise agreed to by the Non-Consenting Lenders.

Closing on the sale of a Lender's interest in the Loan to any other Lender under this Section will be held at purchasing Lender's principal office (or the majority in interest if multiple lenders) or at the office of its attorney and will take place on a mutually agreeable date within 20 Business Days from the date of receipt by the selling Lender of the applicable purchase notice (the "Deadlock/Discretionary Purchase Date").   All closing costs, including transfer, stamp, and recording taxes imposed on the transfer, will be paid equally by all parties; further, each party shall pay its own legal fees and costs.   The selling Lender(s) shall deliver all applicable Loan Documents in its/their possession to purchasing Lender(s) and shall execute such documents as are necessary to vest full title to the interest of selling Lender'(s) interest in the Loan to the purchasing Lender(s).   If Agent's interest is being purchased, then Agent shall take all actions reasonably requested by the majority Lender and which comply with the terms of the Loan Agreement to cause such majority Lender to be appointed as the successor agent under the Loan Agreement as of the closing date.   Each of the Lenders will be entitled to enforce its rights under this Section 11.18 by specific performance.

Anything herein to the contrary notwithstanding, if Agent's interest in the Loan is purchased in connection with the foregoing process, the then purchasing Lender(s) shall have the right to replace Agent.   In such case, any fees due and payable to the predecessor Agent for any month, or portion thereof, that have not yet been collected shall paid to predecessor Agent by the successor Agent promptly after collection, including reimbursement of out of pocket third party expenses advanced by the predecessor Agent for the benefit of Lenders in the ordinary course and not yet reimbursed to processor agent.   In addition, if the HUD Contract is still in effect, CF's replacement as Agent shall not impact its ability to receive the HUD Fees as set forth in the HUD Contract.

I6815951v.8

11.19 <u>Lender's Rights to Offset, Set-Off</u>.   Notwithstanding anything to the contrary contained in Section 11.5, each Lender hereby acknowledges that the exercise by any Lender of offset, set-off, banker's lien or similar rights against any deposit or other indebtedness of Borrowers whether or not located in any state with certain laws restricting lenders from pursuing multiple collection methods could result under such laws in significant impairment of the ability of all Lenders to recover further amounts in respect of the Loan.   **THEREFORE, EACH LENDER AGREES THAT NO LENDER SHALL EXERCISE ANY SUCH RIGHT OF SET-OFF, BANKER'S LIEN, OR OTHERWISE, AGAINST ANY ASSETS OF ANY BORROWER (INCLUDING ALL GENERAL OR SPECIAL, TIME OR DEMAND, PROVISIONAL OR OTHER DEPOSITS AND OTHER INDEBTEDNESS OWING BY SUCH LENDER TO OR FOR THE CREDIT OR THE ACCOUNT OF ANY BORROWER) WITHOUT THE PRIOR WRITTEN CONSENT OF AGENT AND THE REQUIRED LENDERS.**

11.20 <u>Definitions</u>.   As used in this Article, the following terms have the following meanings:

"**Additional Titled Agents**" has the meaning set forth in Section 11.15.

"**Affected Lender**" has the meaning set forth in Section 11.17(c).

"**Approved Fund**" means any (a) investment company, fund, trust, securitization vehicle or conduit that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the Ordinary Course of Business or (b) any Person (other than a natural person) which temporarily warehouses loans for any Lender or any entity described in the preceding clause (a) and that, with respect to each of the preceding clauses (a) and (b), is administered or managed by (i) a Lender, (ii) an Affiliate of a Lender, or (iii) a Person (other than a natural person) or an Affiliate of a Person (other than a natural person) that administers or manages a Lender.

"**Assignment Agreement**" means an assignment agreement in form and substance acceptable to Agent.

"**Defaulted Lender**" means, so long as such failure shall remain in existence and uncured, any Lender which shall have failed to make any Loan or other credit accommodation, disbursement, settlement or reimbursement required pursuant to the terms of any Loan Document.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person) approved by Agent; *provided, however*, that notwithstanding the foregoing, "**Eligible Assignee**" shall not include any Borrower or any of a Borrower's Affiliates.

"**Replacement Lender**" has the meaning set forth in Section 11.17(c).

"**Settlement Service**" has the meaning set forth in Section 11.17(a)(v).

16815951v.8

SIGNATURES AND ACKNOWLEDGEMENTS ON
FOLLOWING PAGES

16815951v.8

IN WITNESS WHEREOF, the Borrower, Agent and Lenders have caused this Agreement to be properly executed, by their respective duly authorized representatives, as of the date first above written.

**BORROWER:**

22 MAPLE STREET, LLC, a Delaware limited liability company

By:

Name: Avi "Zisha" Lipschutz

Title: Manager

25 ORIOL DRIVE, LLC, a Delaware limited liability company

By:

Name: Avi "Zisha" Lipschutz

Title: Manager

59 COOLIDGE ROAD, LLC, a Delaware limited liability company

By:

Name: Avi "Zisha" Lipschutz

Title: Manager

20 KINMONTH ROAD, LLC, a Delaware limited liability company

By:

Name: Avi "Zisha" Lipschutz

Title: Manager

## ACKNOWLEDGMENTS

STATE OF ___NY_____ )
COUNTY OF _Rockland_ ) ss

On _Feb. 26th___, 2014, before me the undersigned notary public in and for said state, personally appeared _Avi "Zisha" Lipschutz_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(is), and that by his signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted executed the instrument.

_____
Notary Public

AVRAHAM V OBERMEISTER
NOTARY PUBLIC-STATE OF NEW YORK
No. 01OB6146516
Qualified in Rockland County
My Commission Expires May 22, 2014

STATE OF _____ )
COUNTY OF _____ ) ss

On _____, 2014, before me the undersigned notary public in and for said state, personally appeared Avi "Zisha" Lipschutz ___, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(is), and that by his signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted executed the instrument.

_____
Notary Public

STATE OF MARYLAND )
COUNTY OF _____ ) ss

On _____, 2014, before me the undersigned notary public in and for said state, personally appeared Timothy Sanders, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(is), and that by his signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted executed the instrument.

_____
Notary Public

SIGNATURE PAGE TO LOAN AGREEMENT

**AGENT:**

CAPITAL FUNDING, LLC, a Maryland
limited liability company

By:
Name: Craig Casagrande
Title: Director

STATE OF MARYLAND   )
COUNTY OF *Baltimore* ) ss

On *March 1*, 2014, before me the undersigned notary public in and for said state, personally appeared *Craig Casagrande*, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(is), and that by his signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted executed the instrument.

Notary Public

SIGNATURE PAGE TO LOAN AGREEMENT

**LENDER:**

CAPITAL FUNDING, LLC, a Maryland
limited liability company

By: _____

Name: **Craig Casagrande**

Title: **Director**

STATE OF MARYLAND    )
COUNTY OF *Baltimore*  ) ss

On *MARCH 1*, 2014, before me the undersigned notary public in and for said
state, personally appeared *Craig Casagrande*, personally known to me or
proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are)
subscribed to the within instrument and acknowledged to me that he executed the same in his
capacity(is), and that by his signature(s) on the instrument the individual(s) or the person upon
behalf of which the individual(s) acted executed the instrument.

_____
Notary Public

**LENDER:**

AP MA FUNDING LLC,
a Delaware limited liability company

By:

Name:    John Gray

Title:    Managing Director

STATE OF Maryland )

COUNTY OF Montgomery ) ss

On Feb 28 _____, 2014, before me the undersigned notary public in and for said state, personally appeared _John Gray_ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(is), and that by his signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted executed the instrument.

Notary Public

CAROL D. BAKER
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
MY COMMISSION EXPIRES SEPTEMBER 25, 2017

LENDER:

MVB BANK, INC.
a West Virginia banking corporation

By: _Donald T Robinson_
Name: Donald T. Robinson
Title: President

STATE OF WV )
COUNTY OF _Monongalia_ ) ss

On _March 3_ , 2014, before me the undersigned notary public in and for said state, personally appeared _____ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(is), and that by his signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted executed the instrument.

_Kendra Graber_
Notary Public

NOTARY PUBLIC OFFICIAL SEAL
KENDRA GRABER
State of West Virginia
My Comm. Expires Jan 3, 2022
Two Waterfront Place Ste 1201 Morgantown WV 26501

**LENDER:**

CONGRESSIONAL BANK,
a Maryland chartered bank

By: _____
Name:        Sam Crow
Title:         Chief Credit Officer


STATE OF Maryland )
COUNTY OF Montgomery ) ss

On _February 28_____, 2014, before me the undersigned notary public in and for said state, personally appeared _Sam Crow_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(is), and that by his signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted executed the instrument.


_____
Notary Public

# EXHIBIT A

## LEGAL DESCRIPTION

<u>Exhibit A-1 - Amesbury Property Legal Description</u>

The land with the buildings thereon situated in Amesbury, Essex County, Massachusetts, bounded and described as follows:

SOUTHWESTERLY by land now or formerly of Cammett 461.5 feet;

NORTHWESTERLY by land now or formerly of Cammett heirs, 334.16 feet;

NORTHEASTERLY by land now or formerly of Elkins, of Ellis, or Steere and others on several courses, 50 rods;

SOUTHEASTERLY by land now or formerly of Davis and by Maple Street measuring respectively 161 feet and 40.25 feet;

SOUTHWESTERLY by land now or formerly of Davis, 45 feet;

SOUTHERLY by land now or formerly of Davis on three courses measuring respectively 32.25 feet, 46.33 feet and 32.67 feet; and

SOUTHEASTERLY by land now or formerly of Davis, 95.5 feet.

Being all of said measurements, more or less.

Being Lots 1, 2, 3 and 4 as shown on Plan of Land in Amesbury, recorded with The Essex South District Registry of Deeds in Plan Book 6, Plan 4.

Also the land in said Amesbury. being a triangular piece, situated on the northeasterly side of Maple Street, bounded and described as follows:

Beginning at a point on said Maple Street at land formerly of Comley; thence running

SOUTHEASTERLY by said Maple Street, 80 feet to a bound at land of Davis; thence running

NORTHERLY by said land of Davis to a bound at land formerly of Comley; thence running

SOUTHWESTERLY by land formerly of Comley, 20 feet to Maple Street and the point of beginning.

<u>Exhibit A-2 - Autumn Property Legal Description</u>

Two parcels of land with the buildings thereon, located on Oriol Drive in Worcester, Worcester County, Massachusetts, bounded and described as follows:

**(Unregistered) Parcel 1**: Beginning at a point in the easterly line of Oriol Drive as shown on a plan hereinafter referred to, said point being S. 33° 00' 00" E., 375 feet, more or less, from the southerly line of Lincoln Street; thence

N. 57° 00' 00" E.        by other land of Louis F. Oriol and Daisy M. Oriol, 202.41 feet to a point; thence

N. 21° 31' 55" W.        by land now or formerly of said Oriol, 20.41 feet to a point; thence

N. 79° 56' 10" E.        by land now or formerly of June L. White, 304.06 feet to a point; thence

S. 10° 03' 50" E.        by land now or formerly of said Oriol, 276.67 feet to a point; thence

S. 57° 00' 00" W.        by land now or formerly of said Oriol, 222.80 feet to a point; thence

N. 41° 24' 40" W.        by the northeasterly side of Parcel 2 as hereinafter described, 352.61 feet to a point; Thence

S. 53° 24' 00" W.        by the northwesterly side of Parcel 2 as hereinafter described, 104.50 feet to the easterly side of said Oriol Drive; thence

N. 33° 00' 00" W.        by the easterly side of said Oriol Drive, 11.04 feet to the point of beginning.

Containing 102,151 square feet of land, more or less.

**(Registered) Parcel 2**: Beginning at a point in the easterly line of Oriol Drive as shown on a plan hereinafter referred to, said point being S. 33° 00' 00" E., 386.04 feet, more or less, from the southerly line of Lincoln Street; thence

N. 53° 24' 00" E.        by Parcel 1 as hereinabove described, 104.5 feet to a point; thence

S. 41° 24' 40" E.        by Parcel I as hereinabove described, 352.61 feet to a point; thence

S. 57° 00' 00" W.        by land now or formerly of said Oriol, 35.84 feet to a point; thence

S. 8° 47' 44" W.        by land now or formerly of said Oriol, 85 feet to a point; thence

By a curve to the right, the radius of which is 190 feet by land now or formerly of said Oriol and by the easterly side of said proposed street, 159.85 feet to a point; thence

N. 33° 00' 00" W.      by the easterly side of said Oriol Drive, 263.96 feet to the point of beginning.

Containing 40,080 square feet of land, more or less.

Being Lot 33 on Plan 15937U filed with the Land Court on Certificate No. 7220.

Parcel 1 and Parcel 2 combined contain 3.45 acres of land as such are shown on a Plan of Land entitled "Liberty Bell Heights" owned by Louis F. Oriol and Daisy M. Oriol, prepared by Robinson & Fox, Inc., dated August, 1967, recorded with said Deeds, Plan Book 317, Plan 69.

Being the same premises conveyed to J. Dennis Morgan, Trustee of Autumn Realty Trust by Deed dated December 24, 2002 and recorded with the Worcester District Registry of Deeds in Book 28614, Page 79 and registered as Document No. 79354 on Certificate No. 14834.

<u>Exhibit A-3 - Emerson Village Property Legal Description</u>

The land with the buildings thereon situated in Watertown, Middlesex County, Massachusetts, being lots marked "A" and "B" on a "Plan of Land in Watertown, MA." Made by William T. Pierce, Engineer, dated April 23, 1889, duly recorded with the Middlesex South District Deeds in Book of Plans 61, as Plan 49, said lots "A" and "B" being together bounded and described as follows:

Beginning at a stone bound as shown on said Plan, twenty (20) feet southerly from a point in the centre line of Coolidge Hill Road, said point being about six hundred thirty eight and 50/100 feet (638.50) distant from the easterly line of Arlington Street; thence running

SOUTHEASTERLY along said Coolidge Hill Road, one hundred and ninety seven and 37/100 (197.37) feet to another stone bound shown on said Plan; thence turning and running;

SOUTHWESTERLY one hundred and eighty (180) feet to another stone bound as shown on said Plan; thence turning and running;

NORTHWESTERLY bounded southerly by land now or formerly of Martha J. Coolidge, one hundred eighty two and 14/100 (182.14) feet to another stone bound in easterly line of a proposed street, as shown on said Plan; thence turning and running

NORTHEASTERLY along said proposed street, two hundred thirty and 77/100 (230.77) feet to the point of beginning.

Containing 41,112 square feet of land more or less. Be any or all of said measurements and contents, more or less, or however otherwise said premise may be bounded, measured or described.

Exhibit A-4 - Waban Health Center Property Legal Description

A certain parcel of land situated on Kinmonth Road in Newton, Middlesex County, Massachusetts shown on a plan entitled "Plan of Land at West Corner of Beacon Street, Windsor Road & Kinmonth Road, Waban – Mass. "dated June 29, 1959, by Wm. E. Leonard – C.E., recorded with Middlesex South District Registry of Deeds, Book 9433, Page 472, bounded and described as follows:

| | |
|---|---|
| NORTHEASTERLY | by Kinmonth Road as shown on said plan by two lines measuring one hundred forty-three and 82/100 (143.82) feet and eighteen and 15/100 (18.15) feet, respectively; |
| SOUTHEASTERLY | by Lot A-1 as shown on said plan two hundred thirty-two and 42/100 (232.42) feet; |
| SOUTHWESTERLY | by land now or formerly of Metropolitan Transit Authority as shown on said plan sixty-nine and 4/100 (69.04) feet; |
| WESTERLY | by land now or formerly of Brae Burn County Club as shown on said plan two hundred thirty-two and 77/100 (232.77) feet. |

Being that portion of Lot A as shown on the aforesaid plan located, northwesterly, of a dashed line constituting the northwesterly boundary of the area designated "Area A-1" on said plan.

Together with the right to use Kinmonth Road for all purposes for which streets and ways are commonly used in the City of Newton, in common with others.

**EXHIBIT B**

**COMPLIANCE CERTIFICATE**

Re:    Loan Agreement dated [_____], 2014 (together with amendments, if any, the "<u>Loan Agreement</u>") by and among _____, as Borrower, Capital Funding, LLC, as Agent and Capital Lending and Mortgage Group, LLC, as Lender (capitalized terms used but not defined herein have the meaning ascribed to them in the Loan Agreement)

The undersigned officer of the above named Borrower does hereby certify that for the financial period ending [[_____:

1.    No Default or Event of Default has occurred or exists except [[_____.

2.    The Debt Service Coverage for the Borrower for the preceding [[\_\_\_\_month(s) (or such lesser period as shown have elapsed following the closing of the Loan) through the end of such period was:

          Required:   _____
          Actual:     _____

**The manner of calculation is attached.**

3.    The EDITDAR for the Facility for the [month] [annual] period is:

          Required:   $_____
          Actual:     $_____

**The manner of Calculation is attached**

4.    All representations and warranties contained in the Loan Agreement and other Loan Documents are true and correct in all material respects as though given on the date hereof, except [_____].

5.    All information provided herein is true and correct.

6.    Capitalized terms not defined herein shall have the meanings given to such terms in the Loan Agreement.

Dated _____.

        By: _____

        Name: _____

        Title: _____

## EXHIBIT C

## LOAN COMMITMENT

| Lender | Loan Commitment Amount | Loan Commitment Percentage |
|---|---|---|
| Capital Funding, LLC | $6,856,627 | 18.6% |
| Congressional Bank | $4,000,000 | 10.9% |
| MVB Bank, Inc. | $4,000,000 | 10.9% |
| AP MA Funding LLC | $22,000,000 | 59.7% |
| TOTAL | $36,856,627 | 100% |

**EXHIBIT D**

**[Intentionally Deleted]**

## EXHIBIT E

## POST CLOSING REPAIRS AND REPLACEMENTS

See attached.

16815951v.8

## Amesbury Village

## Total Repair Cost

**Total Critical Repair Costs:**                          $18,630.00
**Total Non-Critical Repair Costs:**                     $65,530.00

**Total Critical and Non-Critical Repair Costs:**        $84,160.00

(**Note:** All repair costs include applicable State and local taxes. Davis Bacon wage rates are *not* appliable.)

## Critical Repairs

| | | |
|---|---|---|
| Property Name: | Amesbury Village | |
| Location: | Amesbury, Massachusetts | |
| Date of Site Visit: | 2/6/2013 | |
| EMG Project Number: | 108813.14R-004.041 | |

| | | |
|---|---|---|
| Number of Beds: | 102 | |
| Number Buildings: | 1 | |
| Reserve Term /Years: | 15 | years |
| Building Age /Years: | 39 | years |

| Sec | Component or System | Type | Comments | Quantity | Unit | Unit Cost | Critical Repairs Total $ |
|---|---|---|---|---|---|---|---|
| II. E.6.d | Common area plaster wall, acoustical ceiling tiles and associated finishes | Specific | There are isolated water damaged ceiling tiles in basement rooms requiring routine replacement. Please refer to Section 15 Supplemental Comments & Recommendations for additional recommendations. The stairwell walls have evidence of past and current water damage. Areas of the past water damage have been repaired, but not painted with additional areas exhibiting peeling paint and plaster damage. The damaged finishes require repair and replacement to prevent mold growth. Please refer to Section II.D.1 for the associated cost to repair the cause of the water intrusion. | 6 | EA | $0.00 | $0 |
| II. G.1 | Accessibility Parking | Specific | The existing parking accessible parking stalls do not have compliant striping or signage. There are only two of the three required stalls at the building. Restripe and install with compliant signage the two existing parking stalls and add one for 'van' accessibility and post compliant signage indicating a 'van' accessible stall | 3 | EA | $200.00 | $600 |
| II. G.1 | Accessibility - Accessible Route | Specific | The stairwell landings are open at the basement level which is an accessible path to the ground floor amenities and the exterior smoking tent. Install cane detection at the base of the stairwell. | 3 | EA | $150.00 | $450 |
| II. G.1 | Accessibility - Accessible Route | Specific | The exterior ramp from the parking stalls to the building entrance is not fitted with handrails on both sides of the ramp. Install complaint railings on both sides of the ramp | 24 | LF | $150.00 | $3,600 |
| II. G.1 | Accessibility Common Area Restroom | Specific | There is no common area restroom adjacent to the administrative office which is accessible. Install signage indicating accessible restroom is located within the ground floor shower room. The shower room restroom requires lever handle hardware at entry, a grab bar and relocation of the accessories to achieve full compliance | 1 | LS | $500.00 | $500 |
| II. G.1 | Accessibility Resident Room | General | Lever action hardware is not provided at all accessible locations of the resident rooms. | 110 | EA | $50.00 | $5,500 |
| II. G.1 | Accessibility Resident Room | General | Provide proper mounted horizontal grab bars on two sides. | 28 | EA | $250.00 | $7,000 |
| II. G.1 | Accessibility Resident Room | General | Wrap drain pipes below lavatory with insulation; protect against contact with hot, sharp or abrasive surfaces. | 28 | EA | $35.00 | $980 |

| | |
|---|---|
| Total Critical Repairs Cost | $18,630 |
| Cost per Bed | $183 |

*Critical Repairs*

## Non-Critical Repairs

| Property Name: | Amesbury Village | Number of Beds: | 102 |
|---|---|---|---|
| Location: | Amesbury, Massachusetts | Number Buildings: | 1 |
| Date of Site Visit: | 2/6/2013 | Reserve Term /Years: | 15 years |
| EMG Project Number: | 108813.14R-004.041 | Building Age /Years: | 39 years |

| Sec | Component or System | Type | Comments | Quantity | Unit | Unit Cost | Non-Critical Total $ |
|---|---|---|---|---|---|---|---|
| II. C.3 | Asphalt pavement, repair cut & patch, full-depth | Specific | The pavement was covered with approximately six inches of snow on the day of the site reconnaissance. There are isolated areas of significant failure occurring within the top section of the exit drive lane and entrance drive lane, the majority of the northeast parking area and sections of the south side parking area. The north side parking area had too much snow cover to allow for review. | 4,000 | SF | $2.50 | $10,000 |
| II. C.3 | Asphalt pavement, mill, stabilize and overlay with new pavement | Specific | The pavement in the northeast parking area requires full removal, stabilization, and the remaining failed sections require cut and patch repairs | 13,000 | SF | $2.00 | $26,000 |
| II. C.3 | Asphalt pavement, seal coat over term | Specific | The seal coating is worn and pavement markings are difficult to identify | 34,000 | SF | $0.15 | $5,100 |
| II. C.5 | Retaining wall, concrete | Specific | There are isolated hairline lineal cracks forming in the wall. The cracks require proper repair to prevent further deterioration of the wall and to maintain integrity | 50 | LF | $15.00 | $750 |
| II. C.5 | Site stair, concrete | Specific | One of the steps approximately three up from the base has begun to spall due to extreme weather conditions. The damaged step requires reconstruction. The associated costs are to be combined with the concrete retaining wall repair and exit landing repair. | 1 | EA | $250.00 | $250 |
| II. C.5 | Retaining walls, loose and natural stone | Specific | At the time of the site reconnaissance, the retraining wall was covered with approximately one foot of snow. There are portions of the wall is out of plumb due to its condition and overgrowth of vegetation. The retaining wall requires removal and reconstruction. The work should be performed by a licensed contractor under the direction of a Professional Engineer | 180 | | $30.00 | $5,400 |
| II. D.1 | Foundation walls, water intrusion | Specific | There is evidence of water intrusion in the stairwells along the north side of the building. The resulting moisture can be attributed to the damaged stair landing adjacent to the stair. Please refer to Section II.D.5 for additional costs and recommendations. The site topography allows for water to dam along the north side of the building. A sump pump was not observed within the basement. Additional water damaged foundation walls were located at isolated areas within the basement storage rooms. It is recommended sump pumps be installed in the basement along the north side of the building and preventative measures within the north side drive lane and sealant integrity at the building base be maintained to prevent additional seepage along the foundation walls | 2 | EA | $1,390.00 | $2,780 |
| II. D.1 | Domestic hot water vault | Specific | The basement domestic hot water room ceiling deck has significant amounts of corrosion. A structural assessment of the area was completed by EMG on February 13, 2014. Repairs are required to the steel structure and decking | 1 | EA | $9,750.00 | $9,750 |

## Non-Critical Repairs

| Property Name: | Amesbury Village | Number of Beds: | 102 |
|---|---|---|---|
| Location: | Amesbury, Massachusetts | Number Buildings: | 1 |
| Date of Site Visit: | 2/6/2013 | Reserve Term /Years: | 15 years |
| EMG Project Number: | 108813.14R-004.041 | Building Age /Years: | 39 years |

| Sec | Component or System | Type | Comments | Quantity | Unit | Unit Cost | Non-Critical Total $ |
|---|---|---|---|---|---|---|---|
| II. D.5 | Exterior concrete stair repair | Specific | The concrete exit landing steps on the north side of the building have separated from the wall and are allowing for water intrusion into the wall cavity causing interior stairwell wall damage.  The staircase requires proper repairs to prevent water intrusion and further interior deterioration and suspect mold growth | 1 | LS | $500.00 | $500 |
| II. F.4. | NFPA-13 Compliance | Specific | The building is not fully compliant with NFPA-13.  The elevator room within the basement does not have sprinkler coverage inside.  Currently there is only a chemical fire extinguisher.  A licensed contractor under the direction of an engineering professional must be retained to analyze the existing condition, provide recommendations and estimate the scope and cost of any required repairs.  A budgetary cost to extend the sprinkler lines into the elevator room and provide a certificate of compliance for the completed work | 1 | EA | $5,000.00 | $5,000 |

| Total Non-Critical Repair Cost | $65,530 |
|---|---|
| Cost per Bed | $642 |

## Autumn Village

## Total Repair Cost

**Total Critical Repair Costs:**                    $25,620.00
**Total Non-Critical Repair Costs:**                $15,517.00

**Total Critical and Non-Critical Repair Costs:**   $41,137.00

(**Note:** All repair costs include applicable State and local taxes. Davis Bacon wage rates are *not* appliable.)

# Critical Repairs

| Property Name: | Autumn Village | | Number of Beds: | 160 |
|---|---|---|---|---|
| Location: | Worcester, Massachusetts | | Number Buildings: | 1 |
| Date of Site Visit: | 2/10/2014 | | Reserve Term /Years: | 15 years |
| EMG Project Number: | 108813.14R-001.041 | | Building Age /Years: | 45 years |

| Sec | Component or System | Type | Comments | Quantity | Unit | Unit Cost | Critical Repairs Total $ |
|---|---|---|---|---|---|---|---|
| II. G.1 | Accessibility - Parking | General | The existing parking accessible parking stalls do not have compliant striping or signage. Restripe and install with compliant signage and add one for 'van' accessibility and post compliant signage indicating a 'van' accessible stall | 2 | EA | $200.00 | $400 |
| II. G.1 | Accessibility - Common Area Restroom | General | Add Compliant Signage at Common Area Restroom | 2 | EA | $50.00 | $100 |
| II. G.1 | Accessibility- Common Area Restroom | General | Wrap Sink Drain Pipes at Common Area Restroom | 2 | EA | $35.00 | $70 |
| II. G.1 | Accessibility - Elevator | General | Add Compliant Brail Markings at Elevator | 1 | EA | $350.00 | $350 |
| II. G.1 | Accessibility - Common Area Restroom | General | Widen doors at Common Area Restroom | 2 | EA | $1,000.00 | $2,000 |
| | Accessibility - Resident Room Restroom | General | Add Compliant Grab Bars on 2 sides at Resident Rooms | 70 | EA | $250.00 | $17,500 |
| | Accessibility - Resident Room Restroom | General | Wrap Sink Drain Pipes at Resident Rooms | 70 | EA | $35.00 | $2,450 |
| II. G.1 | Accessibility - Resident Room | General | Add Lever action hardware at Resident Rooms | 55 | EA | $50.00 | $2,750 |

| Total Critical Repairs Cost | $25,620 |
|---|---|
| Cost per Bed | $160 |

# Non-Critical Repairs

| Property Name: | Autumn Village | | Number of Beds: | 160 |
|---|---|---|---|---|
| Location: | Worcester, Massachusetts | | Number Buildings: | 1 |
| Date of Site Visit: | 2/10/2014 | | Reserve Term /Years: | 15 years |
| EMG Project Number: | 108813.14R-001.041 | | Building Age /Years: | 45 years |

| Sec | Component or System | Type | Comments | Quantity | Unit | Unit Cost | Non-Critical Total $ |
|---|---|---|---|---|---|---|---|
| II. C.3 | Asphalt pavement, repair cut & patch, full-depth | General | There is an isolated area of significant failure occurring along the northern portion of the parking lot near the generator and transformer area. According to the POC, storm water ponds in the area of a storm water drain and the pavement surrounding the area has deteriorated and partially sunk. The pavement requires full removal, stabilization and inspection of the drain area by a qualified contractor under the supervision of a Professional Engineer | 1 | LS | $10,000.00 | $10,000 |
| II. C.3 | Asphalt pavement, seal coat over term | General | Isolated areas of map cracks and alligator cracks occur throughout the pavement parking stall areas and the seal coating is worn and pavement markings are difficult to identify | 36,780 | SF | $0.15 | $5,517 |
| II. G.15 | Mold/Moisture | Specific | Moisture damaged was observed in the Maintenance room, lowest level. The source of the moisture was reportedly a bathroom on the floor above. The plumbing was repaired. The affected area is approximately 10 square feet. The ceiling tiles need to be replaced as part of routine maintenance | 1 | LS | $0.00 | $0 |

| Total Non-Critical Repair Cost | $15,517 |
|---|---|
| Cost per Bed | $97 |

**Emerson Village**

## Total Repair Cost

| | |
|---|---|
| **Total Critical Repair Costs:** | $28,990.00 |
| **Total Non-Critical Repair Costs:** | $21,560.00 |
| **Total Critical and Non-Critical Repair Costs:** | $50,550.00 |

(**Note:** All repair costs include applicable State and local taxes. Davis Bacon wage rates are *not* appliable.)

## Critical Repairs

| Property Name: | Emerson Village | | Number of Beds: | 158 |
|---|---|---|---|---|
| Location: | Watertown, Massachusetts | | Number Buildings: | 1 |
| Date of Site Visit: | 2/7/2014 | | Reserve Term /Years: | 15 years |
| EMG Project Number: | 108813.14R-003.041 | | Building Age /Years: | 47 years |

| Sec | Component or System | Type | Comments | Quantity | Unit | Unit Cost | Critical Repairs Total $ |
|---|---|---|---|---|---|---|---|
| II. C.3 | Concrete sectional replacement | General | The pavement along Coolidge Hill Road was covered with approximately six inches of snow on the day of the site reconnaissance. There are isolated cracked concrete pavers at the two driveway entrances. The cast concrete requires sectional replacement to maintain integrity and to eliminate tripping hazards | 175 | SF | $6.00 | $1,050 |
| II. G.1 | Accessibility Parking | Specific | The two existing parking accessible parking stalls do not have compliant striping or signage. There are only two of the three required stalls at the building. Restripe and install with compliant signage the two existing parking stalls and add one for 'van' accessibility and post compliant signage indicating a 'van' accessible stall | 3 | EA | $200.00 | $600 |
| II. G.1 | Accessibility - Accessible Route | Specific | The stairwell landings are open at the basement level which is an accessible path to the basement beauty salon and other amenities. Install cane detection at the base of the stairwell. | 2 | EA | $150.00 | $300 |
| II. G.1 | Accessibility Common Area Restroom | Specific | There is no common area restroom adjacent to the administrative office which is accessible. Install signage indicating accessible restroom is located within the ground floor dining room. The men and women dining room restrooms require installation of compliant grab bars, accessories and pipe wrap at the wall hung sing to achieve full compliance | 2 | EA | $1,170.00 | $2,340 |
| II. G.1 | Accessibility - Resident Rooms | General | Lever action hardware is not provided at all accessible locations of the resident rooms. | 152 | EA | $50.00 | $7,600 |
| II. G.1 | Accessibility - Resident Rooms | General | Provide proper mounted horizontal grab bars on two sides at the resident rooms. | 60 | EA | $250.00 | $15,000 |
| II. G.1 | Accessibility - Resident Rooms | General | Wrap drain pipes below lavatory with insulation; protect against contact with hot, sharp or abrasive surfaces at the resident rooms. | 60 | EA | $35.00 | $2,100 |

| | |
|---|---|
| Total Critical Repairs Cost | $28,990 |
| Cost per Bed | $183 |

**Non-Critical Repairs**

| Property Name: | Emerson Village | | Number of Beds: | 158 |
|---|---|---|---|---|
| Location: | Watertown, Massachusetts | | Number Buildings: | 1 |
| Date of Site Visit: | 2/7/2014 | | Reserve Term /Years: | 15 years |
| EMG Project Number: | 108813.14R-003.041 | | Building Age /Years: | 47 years |

| Sec | Component or System | Type | Comments | Quantity | Unit | Unit Cost | Non-Critical Total $ |
|---|---|---|---|---|---|---|---|
| II. C.3 | Asphalt pavement, repair cut & patch, full-depth | General | The pavement was covered with approximately six inches of snow on the day of the site reconnaissance.  There are isolated areas of significant failure occurring within the entrance drive lane and within the west side service drive lane.  Additional areas of map cracks and alligator cracks occur throughout the pavement parking stall areas.   The pavement requires sectional replacement to maintain its integrity via cut and patch repair. | 4,000 | SF | $2.50 | $10,000 |
| II. C.3 | Asphalt pavement, seal coat over term | General | The remainder of the pavement is in good to fair condition, however, the seal coating is worn and pavement markings are difficult to identify | 20,000 | SF | $0.15 | $3,000 |
| II. C.5 | Fence replacement, metal chain link | General | The EMG Property Condition Report dated October 23, 2013 indicated the fencing had several areas with bent poles do to tree growth and impact damage.  This condition was partial observed and the impact damage was resulting from snow removal and dumping in the adjacent parking area.  The remainder of the fencing has exceeded its useful life.  Replacement of the fencing is recommended to maintain perimeter security | 130 | LF | $12.00 | $1,560 |
| II. C.5 | Retaining walls, unit masonry / concrete | General | The supporting retaining wall has evidence of moisture damage resulting from water entering through the crack deck of the loading dock.  The wall surfaces are cracked with efflorescent staining.  The damaged concrete and asphalt surfaces require repairs to prevent further deterioration | 100 | SF | $15.00 | $1,500 |
| II. F.4. | NFPA-13 | General | The elevator room within the basement does not have sprinkler coverage inside.  Currently there is only a chemical fire extinguisher.  The entrance canopy and interior entrance vestibule are not fitted with sprinkler heads.  The construction drawings were not provided to determine the composition of the canopy and vestibule framing.  A licensed contractor under the direction of an engineering professional must be retained to analyze the existing condition, provide recommendations and estimate the scope and cost of any required repairs.  A budgetary cost to extend the sprinkler lines into the elevator room and provide a certificate of compliance for the completed work and the remainder of the building | 1 | EA | $5,000.00 | $5,000 |
| II. G.15 | Mold/Moisture | Specific | Moisture damage was observed in the ceilings throughout the fifth floor.  Specifically, within Room 519 and within the hallways.  The areas effected by the moisture were approximately two square feet in size or less and are a result of previous roof leaks.  Approximately 10 locations throughout the fifth floor were observed.  The damaged ceiling areas will need to be repaired and painted. | 1 | LS | $500.00 | $500 |

| | |
|---|---|
| Total Non-Critical Repair Cost | $21,560 |
| Cost per Bed | $136 |

## Waban Health and Rehabilitation Center

## Total Repair Cost

| | |
|---|---|
| **Total Critical Repair Costs:** | $9,900.00 |
| **Total Non-Critical Repair Costs:** | $32,700.00 |
| **Total Critical and Non-Critical Repair Costs:** | $42,600.00 |

(**Note:** All repair costs include applicable State and local taxes. Davis Bacon wage rates are *not* appliable.)

## Critical Repairs

| Property Name: | Waban Health and Rehabilitation Center | Number of Beds: | 88 |
|---|---|---|---|
| Location: | Newton, Massachusetts | Number Buildings: | 1 |
| Date of Site Visit: | 2/6/2014 | Reserve Term /Years: | 15 years |
| EMG Project Number: | 108813.14R-002.041 | Building Age /Years: | 52 years |

| Sec | Component or System | Type | Comments | Quantity | Unit | Unit Cost | Critical Repairs Total $ |
|---|---|---|---|---|---|---|---|
| II. E.6.c | Common area ceilings, acoustical tile | Specific | There are isolated water damaged ceiling tiles in basement rooms requiring routine replacement. Please refer to Section 15 Supplemental Comments & Recommendations for additional recommendations | 20 | SF | $0.00 | $0 |
| II. G.1 | Accessibility Parking | Specific | The existing parking accessible parking stall does not have compliant striping or signage. There is only one of two required stalls at the building. Restripe the existing parking stall for 'van' accessibility and post compliant signage indicating a 'van' accessible stall. Install a second standard accessible parking stall adjacent to the 'van' accessible stall. | 2 | EA | $200.00 | $400 |
| II. G.1 | Accessibility - Accessible Route | Specific | The stairwell landings are open at the basement level which is an accessible path to the exterior garden and picnic patio. Install cane detection at the base of the stairwell | 1 | EA | $150.00 | $150 |
| II. G.1 | Accessibility Common Area Restroom | Specific | There is no common area restroom adjacent to the administrative office which is accessible. Install signage indicating accessible restroom is located within the physical therapy office | 3 | EA | $50.00 | $150 |
| II. G.1 | Accessibility - Resident Rooms | General | Lever action hardware is not provided at all accessible locations of the resident rooms. | 70 | EA | $50.00 | $3,500 |
| II. G.1 | Accessibility - Resident Rooms | General | Provide proper mounted horizontal grab bars on two sides of the resident rooms. | 20 | EA | $250.00 | $5,000 |
| II. G.1 | Accessibility - Resident Rooms | General | Wrap drain pipes below lavatory with insulation; protect against contact with hot, sharp or abrasive surfaces at the resident rooms. | 20 | EA | $35.00 | $700 |

| | |
|---|---|
| Total Critical Repairs Cost | $9,900 |
| Cost per Bed | $113 |

## Non-Critical Repairs

| Property Name: | Waban Health and Rehabilitation Center | Number of Beds: | 88 |
|---|---|---|---|
| Location: | Newton, Massachusetts | Number Buildings: | 1 |
| Date of Site Visit: | 2/6/2014 | Reserve Term /Years: | 15 years |
| EMG Project Number: | 108813.14R-002.041 | Building Age /Years: | 52 years |

| Sec | Component or System | Type | Comments | Quantity | Unit | Unit Cost | Non-Critical Total $ |
|---|---|---|---|---|---|---|---|
| II. C.3 | Asphalt pavement, removal, stabilize, grade and overlay | Specific | The pavement was covered with approximately six inches of snow on the day of the site reconnaissance. There are significant areas of failure and deterioration, which include sink holes, alligator cracking and localized depressions. In addition, the pavement settling has caused ponding conditions in the west side entrance drive. The pavement requires full removal, stabilization, and contouring to allow for proper site drainage to the local catch basins | 13,000 | SF | $2.00 | $26,000 |
| II. C.5 | Retaining walls, unit masonry / concrete | Specific | There are isolated areas of cracked parging and damaged stone occurring at the front north building entrance landing. In addition, there are areas of the loose stone retaining wall requiring minor repairs and the CMU retaining wall has several lineal cracks | 400 | SF | $8.00 | $3,200 |
| II. F.4. | Fire suppression system | General | The building is not fully compliant with NFPA-13. The elevator room within the basement does not have sprinkler coverage inside. Currently there is only a chemical fire extinguisher. A licensed contractor under the direction of an engineering professional must be retained to analyze the existing condition, provide recommendations and estimate the scope and cost of any required repairs. A budgetary cost to extend the sprinkler lines into the elevator room and provide a certificate of compliance for the completed work | 1 | LS | $3,500.00 | $3,500 |

| Total Non-Critical Repair Cost | $32,700 |
|---|---|
| Cost per Bed | $372 |

# EXHIBIT F

## PERMITTED ENCUMBRANCES

Amesbury Property Exceptions

1. Real estate taxes and municipal charges which constitute liens but which are not yet due and payable. NOTE: Taxes are paid through March 31, 2014.

2. Easement to Amesbury Electric Light Company dated December 7, 1950 and recorded with said Deeds in Book 3800, Page 254.

3. Rights of Ethel C. Davis, her heirs and assigns, to pass and repass with vehicles and/or others over a certain triangular parcel of real estate to and from Maple Street to remaining land of Davis as reserved in a deed from Ethel C. Davis to Winthrop M. Conley dated December 6, 1950, recorded with said Deeds in Book 3791, Page 281.

Autumn Property Exceptions

1. Real estate taxes and municipal charges which constitute liens but which are not yet due and payable. NOTE: Taxes are paid through ___ (to be completed upon receipt of a current MLC).

2. Subject to the rights recited in Deed dated November 2, 1953 and recorded in Book 3546, Page 60.

3. Easement for water, sanitary and surface sewer as described in deed to City of Worcester dated May 10, 1968 and recorded in Book 4853, Page 343.

4. Sewer Easement as shown on Plan Book 332, Page 12.

5. Restrictions in Quitclaim Deed from Salisbury Nursing and Rehabilitation Center, Inc. to J. Dennis Morgan, Trustee of the Autumn Realty Trust dated December 24, 2002 and recorded in Book 28614, Page 79 and filed as Document No. 79354.

6. The following matters shown on ALTA/ACSM Land Title Survey "25 Oriol Drive, City of Worcester, County of Worcester, Commonwealth of Massachusetts, dated _____, 2014, Project No. 30474:

   a) 19.7' Encroachment of Wood Fence onto Northerly adjoiners property, as shown on Survey.

Emerson Village Property Exceptions

1. Real estate taxes and municipal charges which constitute liens but which are not yet due and payable. NOTE: Taxes are paid through March 31, 2014.

2. The following matters shown on a survey entitled ALTA/ACSM Land Title Survey "59 Coolidge Hill Road, City of Watertown, County of Middlesex, State of Massachusetts", dated _____, 2014, Project No. 30284, as shown on Survey.

   a) Concrete and fence extended beyond the property line by a maximum distance of 20 feet
   b) Air conditioning unit and concrete pad extend beyond the property line by a maximum distance of 6.5 feet
   c) Retaining wall extends beyond the property line by a maximum distance of 14.2 feet
   d) Fence extends beyond the property line by a maximum distance of 14 feet
   e) Asphalt pavement extends beyond the property line by a maximum distance of 7.5 feet
   f) Guardrail extends beyond the property line by a maximum distance of 7.9 feet

Waban Health Center Property Exceptions

1. Real estate taxes and municipal charges which constitute liens but which are not yet due and payable. NOTE: Taxes are paid through _____ (to be completed upon receipt of current MLC)

2. The following matters shown on a survey entitled ALTA/ACSM Land Title Survey "20 Kinmonth Road, City of Newton, County of Middlesex, State of Massachusetts", dated _____, 2014, Project No. 30285, as shown on Survey.

   a) Fence, guardrail and asphalt pavement extended beyond property 47.6 feet (per survey)
   b) Concrete extends beyond the property line 33.7 feet (per survey)
   c) Stone wall extends beyond the property 29.8 feet (per survey)
   d) Frame shed extends beyond the property 23.1 feet (per survey)
   e) Wood fence extends beyond the property by 7 feet (per survey)

16815951v.8

## EXHIBIT G

## PAYMENT RESERVES

| RE Taxes (Monthly Deposit) | Property Insurance (Monthly Deposit | Realty and Equipment (Monthly Deposit) | Cash Collateral Reserve | HUD Financing Cost Reserve | HUD Fee Reserve |
|---|---|---|---|---|---|
| $27,958.96 | $3,442.50 | $300/bed/year | $786,275.00 | $946,128.00 | $113,535.00 |

# EXHIBIT H

## EXIT FEE

$771,200

## EXHIBIT I

## POST-CLOSING OBLIGATIONS

|  | Description of Item | Timing (# days following Closing or as otherwise indicated) |
|---|---|---|
| 1. | Deliver a copy of the approved Medicare and Medicaid Agreements evidencing participation in the Medicare and Medicaid programs by each Operator. | 90 days |
| 2. | Deliver a copy of each final approved Facility License. | 90 days |
| 3. | Guarantors deliver signed personal detailed financial statements in the form previously requested | 10 days |
| 4. | Borrowers shall file a financing statement reflecting the Operators' security interest grant to Borrower under the Lease, and Borrower shall assign such financing statement to Agent as Collateral. | 10 days |
| 5. | Borrowers shall deliver fully executed Deposit Account Control Agreements in favor of Agent with respect to each Deposit Account. | 10 days |
| 6. | Deliver a signed pledge agreement from Synergy Health Centers, LLC on Agent's form pledge for each Borrower | 10 days |

**SCHEDULE 3.21**

**ORGANIZATIONAL CHARTS OF BORROWER**

# Pre-Transfer MA Facilities Real Estate



Larry Lipschutz — 24%
Dov Newmark — 25%
Zisha Lipschutz — 26%
8 Individuals*, with 2.5% each — 20.01%
MA Center, LLC — 4.99%

Synergy Health Centers, LLC

100% — 20 Kinmonth Road, LLC — Waban, MA
100% — 22 Maple Street, LLC — Amesbury, MA
100% — 25 Oriol Drive, LLC — Worcester, MA
100% — 59 Coolidge Road, LLC — Watertown, MA

*Zigmond Brach, Jeremiah Brach, Abigail Weiss, Pearl Friedman, Rachel Wiesner (holds an extra .01%), Joel Brach, Abraham Brach, Jennie Brach

# MA Facilities Operations



# Post-Transfer MA Facilities Real Estate



*Zigmond Brach, Jeremiah Brach, Abigail Weiss, Pearl Friedman, Rachel Wiesner (holds an extra .01%), Joel Brach, Abraham Brach, Jennie Brach

# MA Facilities Operations



Larry Lipschutz — 24%
Dov Newmark — 25%
Zisha Lipschutz — 26%
8 Individuals*, with 2.5% each — 20.01%
MA Center, LLC — 4.99%

Synergy Health Centers, LLC

100% — Waban Health Center, LLC — Waban, MA
100% — Merrimack Valley Health Center, LLC — Amesbury, MA
100% — Worcester Health Center, LLC — Worcester, MA
100% — Watertown Health Center, LLC — Watertown, MA

*Zigmond Brach, Jeremiah Brach, Abigail Weiss, Pearl Friedman, Rachel Wiesner (holds an extra .01%), Joel Brach, Abraham Brach, Jennie Brach